Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL[1]

| EL PUEBLO DE PUERTO RICO<br><br>Apelada<br><br>v.<br><br>KEISHLA PÉREZ BIGIO<br><br>Apelante | KLAN202400232 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Bayamón<br><br>Caso Núm.<br>D VI2020G0003<br>D LA2020G0057<br><br><br>Sobre:<br>CP INFR. ART. 93 (A) 1ER GRADO<br>LEY 404 INFR. ART. 5.15 (A) (1) |
|---|---|---|
| EL PUEBLO DE PUERTO RICO<br><br>Apelada<br><br>v.<br><br>WILLIAM ALEXIS AVILÉS<br><br>Apelante | KLAN202400351 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Bayamón<br><br>Caso Núm.<br>D VI2020G0006<br>D LA2020G0063-0064<br>D LA2020G0067<br><br>Sobre:<br>INFR. ART. 93 (A) CP<br>ARTS. 5.04 (2 cargos), y 5.15<br>LEY 404 |

Panel integrado por su presidenta, la Jueza Cintrón Cintrón, el Juez Pagán Ocasio y la Juez Barresi Ramos.

Pagán Ocasio, juez ponente

## SENTENCIA

En San Juan, Puerto Rico, a 27 de junio de 2025.

## I.

El 8 de marzo de 2024, la señora Keishla Pérez Bigio (señora Pérez Bigio), quien se encuentra privada de su libertad, presentó una *Apelación criminal* en la que nos solicitó que revoquemos dos (2) sentencias de culpabilidad dictadas en su contra por el Tribunal de

---

[1] Véase Orden Administrativa OATA-2021-086 del 4 de noviembre de 2021.

Primera Instancia, Sala Superior de Bayamón (TPI o foro primario) el 9 de febrero de 2024, notificadas y archivadas en autos el 22 de febrero de 2024.[2] Conforme a estas, después de celebrado un juicio por tribunal de derecho, en el cual también fue juzgado el señor William Alexis Avilés González (señor Avilés González), el TPI encontró a la señora Pérez Bigio culpable por:

1) asesinato en primer grado, en violación del Artículo 93(a) del Código Penal de Puerto Rico de 2012 (Código Penal), Ley Núm. 146 de 2012, según enmendada, 33 LPRA sec. 5142.
2) disparar o apuntar armas, en violación del Artículo 5.15(A)(1) de la Ley de Armas de Puerto Rico de 2000 (Ley de Armas de 2000), Ley Núm. 404 de 2000, según enmendada, 25 LPRA ant. sec. 458n.

Por la comisión de esos delitos, le impuso las siguientes dos (2) penas a cumplirse de forma consecutiva entre sí y con cualquier otra:

1) noventa y nueve (99) años de cárcel, por concepto del asesinato en primer grado.
2) diez (10) años de cárcel, equivalentes a la pena de cinco (5) años fijada por disparar o apuntar armas, duplicada en virtud del Artículo 7.03 de la Ley de Armas de 2000, *supra* ant. sec. 460b.

Para un total de ciento nueve (109) años de cárcel.

Producto del mismo juicio, el foro primario también halló al señor Avilés González culpable por:

1) asesinato en primer grado, en violación del Artículo 93(a) del Código Penal, *supra.*
2) portación y uso de armas de fuego sin licencia, en violación del Artículo 5.04 de la Ley de Armas de 2000, *supra* ant. sec. 458c.
3) un segundo cargo de portación y uso de armas de fuego sin licencia, en violación del Artículo 5.04 de la Ley de Armas de 2000, *supra.*
4) disparar o apuntar armas, en violación del Artículo 5.15(A)(1) de la Ley de Armas de 2000, *supra.*

En virtud de ello, le impuso, el 12 de marzo de 2024, las siguientes cuatro (4) penas a cumplirse de forma consecutiva entre sí y con cualquier otra:

1) noventa y nueve (99) años por el asesinato en primer grado;
2) veinte (20) años de cárcel por la portación y uso de armas de fuego sin licencia, equivalentes a la pena de (10) años

---

[2] El recurso recibió el identificador alfanumérico KLAN202400232. La *Sentencia* se incluyó como anejo al recurso de *Apelación.*

fijada ante la infracción de ese delito, duplicada en virtud del Artículo 7.03 de la Ley de Armas de 2000, *supra.*

3) veinte (20) años de cárcel por el otro cargo de portación y uso de armas de fuego sin licencia, que equivalen a la pena de (10) años fijada ante la infracción de ese delito, duplicada en virtud del Artículo 7.03 de la Ley de Armas de 2000, *supra.*

4) diez (10) años de cárcel por disparar o apuntar armas, los cuales responden a la pena de cinco (5) años que apareja la infracción de ese delito, duplicada en virtud del Artículo 7.03 de la Ley de Armas de 2000, *supra.*

El 12 de marzo de 2024, emitimos una *Resolución* en la que le ordenamos a la Secretaría del TPI remitir los autos originales de los casos DVI2020G0003 y DLA2020G0057. Además, le concedimos a la señora Pérez Bigio hasta el 21 de marzo de 2024 para acreditar el método que utilizaría para reproducir la prueba oral.

El 15 de marzo de 2024, la señora Pérez Bigio radicó una *Moción en cumplimiento de orden de 12 de marzo de 2024* en la que informó que utilizaría la Transcripción de la Prueba Oral (TPO) como método de reproducción de la prueba oral y solicitó un término extendido para presentarla.

El 19 de marzo de 2024, emitimos una *Resolución* en la que le impartimos a la señora Pérez Bigio una serie de directrices para perfeccionar el caso mediante la presentación de la TPO.

Paralelamente, el 10 de abril de 2024, el señor Avilés González, quien también se encuentra privado de su libertad, presentó un *Recurso [de] apelación criminal* en el que solicitó la revocación de las cuatro (4) sentencias de culpabilidad dictadas en su contra por el TPI el 12 de marzo de 2024 en los casos DVI2020G0006, DLA2020G0063-0064 y DLA2020G0067.[3]

El 12 de abril de 2024, dicho panel emitió una *Resolución* en la que le impartió varias órdenes al señor Avilés González para el perfeccionamiento del recurso.

---

[3] El recurso recibió el identificador alfanumérico KLAN202400351 y fue asignado al Panel III de este Tribunal.

El 18 de abril de 2024, el Pueblo de Puerto Rico (Pueblo de Puerto Rico, Ministerio Público o parte apelada) radicó una *Moción de consolidación* en la que solicitó la consolidación del caso KLAN202400232, presentado por la señora Pérez Bigio, y del caso KLAN202400351, promovido por el señor Avilés González.

El 22 de abril de 2024, emitimos una *Resolución* en la que, por versar sobre las mismas controversias, ordenamos la consolidación de los casos KLAN202400232 y KLAN202400351 en el caso de más antigüedad. Al mismo tiempo, le ordenamos a las partes dar estricto cumplimiento a nuestra *Resolución* del 19 de marzo de 2024, dictada originalmente en el caso KLAN202400232.

El 30 de abril de 2024, emitimos una *Resolución* en la que le concedimos a la señora Pérez Bigio y al señor Avilés González (en conjunto, apelantes) un término breve para informar el estado de la TPO.

El 2 de mayo de 2024, la señora Pérez Bigio presentó una *Moción informativa sobre regrabación de los procedimientos* en la que solicitó una extensión del término para remitir al Pueblo de Puerto Rico el borrador de la TPO a la otra parte, toda vez que las grabaciones del juicio duraban sesenta y ocho (68) horas.

El 6 de mayo de 2024, emitimos una *Resolución* en la que les concedimos a los apelantes hasta el 10 de junio de 2024 para someter el borrador de la TPO, conforme fue ordenado en nuestra *Resolución* del 19 de marzo de 2024. A la vez, les concedimos a las partes hasta el 12 de junio de 2024 para presentar la moción conjunta exigida en aquella ocasión.

El 7 de mayo de 2024, la Coordinadora Alterna de Grabación del TPI compareció ante nos mediante una *Moción informando honorarios y materiales* en la que informó la duración de la regrabación, así como los honorarios a cobrar por su entrega.

El 17 de mayo de 2024, la Coordinadora Alterna de Grabación del TPI compareció nuevamente mediante una *Moción de comparecencia especial en cumplimiento de orden* en la que notificó que las regrabaciones de las vistas de juicio en su fondo estaban listas.

Ese mismo día, emitimos una *Resolución* en la que les ordenamos a las partes cumplir estrictamente las directrices impartidas en nuestra *Resolución* del 6 de mayo de 2024.

El 7 de junio de 2024, la señora Pérez Bigio radicó una *Moción informativa sobre regrabación de los procedimientos y en solicitud de término adicional* en la que informó que remitió a las demás partes las transcripciones de las vistas celebradas el 20 de enero de 2022, 2 de febrero de 2022, 7 de marzo de 2022, 25 de octubre de 2022, 26 de octubre de 2022, 27 de octubre de 2022, 15 de mayo de 2023, 16 de mayo de 2023, 17 de mayo de 2023, 4 de julio de 2023, 5 de julio de 2023, 6 de julio de 2023 y 7 de julio de 2023. Además, puntualizó que la compañía contratada para realizar las transcripciones había expresado que las regrabaciones tenían algunos problemas de ruido e interferencia y, por ello, había pedido más tiempo para finalizar la TPO. Por esa razón, nos solicitó que le concediéramos un término adicional para entregar el resto de las transcripciones.

El 10 de junio de 2024, emitimos una *Resolución* en la que les concedimos a los apelantes hasta el 1 de julio de 2024 para entregar las transcripciones que faltaban. Igualmente, les concedimos hasta el 2 de agosto de 2024 para presentar la moción conjunta sobre la TPO ordenada en nuestra *Resolución* del 19 de marzo de 2024.

En esa misma fecha, el Pueblo de Puerto Rico presentó una *Moción sobre transcripción de la prueba oral* en la que solicitó un término adicional de treinta (30) días para examinar el borrador de la TPO, remitido por los apelantes. Al respecto, planteó que había

comenzado el proceso de revisión del borrador, pero que, por su extensión, requeriría de un término de treinta (30) días para evaluarlo y notificar su postura. Además, informó que el 27 y 28 de mayo de 2024, había recibido el borrador de las transcripciones de los días de juicio, según detalló la señora Pérez Bigio en su comparecencia del 7 de junio de 2024. Ahora bien, precisó que faltaban los borradores de las transcripciones de, al menos, trece (13) días de juicio, a saber: 3, 10, 11, 12 y 13 de julio de 2023, 30 de agosto de 2023 y 10, 11, 13, 17, 19, 23 y 26 de octubre de 2023. Por ello, solicitó que le ordenáramos a los apelantes remitir el borrador de las transcripciones restantes.

El 12 de junio de 2024, emitimos una *Resolución* en la que referimos al Pueblo de Puerto Rico a nuestra *Resolución* del 10 de junio de 2024 sobre la TPO.

El 1 de julio de 2024, la señora Pérez Bigio radicó una *Moción* en la que solicitó un término adicional para entregar el resto de las transcripciones.

El 3 de julio de 2024, emitimos una *Resolución* en la que le concedimos a la señora Pérez Bigio un término final hasta el 8 de julio de 2024 para someter las transcripciones restantes.

El 1 de agosto de 2024, las partes presentaron una *Moción conjunta en cumplimiento de orden y presentando transcripción de prueba oral estipulada* en la que sometieron la totalidad de la TPO estipulada.

El 12 de agosto de 2024, emitimos una *Resolución* en la que acogimos la TPO estipulada por las partes y les concedimos a los apelantes un término de treinta (30) días para presentar sus respectivos alegatos.

El 12 de septiembre de 2024, la señora Pérez Bigio y el señor Avilés González presentaron sendas mociones solicitando término adicional en las que, en consideración de la cantidad de errores

señalados, la discusión y la voluminosa TPO, solicitaron un término adicional final para presentar sus alegatos.

El 16 de septiembre de 2024, emitimos una *Resolución* en la que le concedimos a la señora Pérez Bigio un término final hasta el 20 de septiembre de 2024 para presentar su alegato. También, concedimos el mismo término al señor Avilés González.

El 19 de septiembre de 2024, la señora Pérez Bigio radicó un *Alegato de la apelante* en el que nos solicitó que revoquemos las sentencias apeladas. En su escrito, resumió los testimonios desfilados en el juicio y argumentó, en esencia, que no se probó su culpabilidad más allá de duda razonable, que se admitió erróneamente el testimonio del señor González Martínez vertido en Vista Preliminar y que las penas le fueron impuestas en contravención de la ley.

Junto al alegato, presentó una *Moción solicitando autorización para presentar alegato en exceso de páginas al amparo de la Regla 70(D)* en la que solicitó que autorizáramos la presentación del escrito en exceso del límite de páginas establecido en la Regla 28(D) del Reglamento del Tribunal de Apelaciones, 4 LPRA Ap. XXII-B, R. 28(D).

Al mismo tiempo, radicó una *Moción presentando transcripción adicional* en la que sometió las transcripciones correspondientes a una vista del juicio en su fondo celebrada el 17 de abril de 2023 y al testimonio de Vista Preliminar del señor Luis Enrique González Martínez (señor González Martínez), vertido el 9 y 10 de marzo de 2020. Según explicó, ambas vistas no fueron transcritas por la compañía contratada para ello y, por esa razón, no fueron presentadas junto a la TPO. A su vez, informó que todas las partes estipularon los borradores de ambas transcripciones.

El 20 de septiembre de 2024, emitimos una *Resolución* en la que le concedimos al Pueblo de Puerto Rico dos (2) términos: uno

hasta el 19 de octubre de 2024 para presentar su alegato en oposición y otro, breve, para exponer su posición sobre las transcripciones adicionales sometidas. Al igual, autorizamos la presentación en exceso de páginas del alegato de la señora Pérez Bigio.

El 24 de septiembre de 2024, el señor Avilés González presentó una *Moción urgente solicitando reconsideración término final* en la que solicitó que le extendiéramos hasta el 4 de octubre de 2024 el término provisto para presentar su alegato.

El 26 de septiembre de 2024, el Pueblo de Puerto Rico radicó una *Solicitud de reconsideración de término para presentar alegato en oposición* en la que solicitó que reconsideráramos nuestra *Resolución* del 20 de septiembre de 2024.

El 27 de septiembre de 2024, emitimos una *Resolución* en la que le concedimos al señor Avilés González hasta el 4 de octubre de 2024 para presentar su alegato.

El 30 de septiembre de 2024, el señor Avilés González presentó un *Alegato de la parte apelante* en el que solicitó que revoquemos las convicciones dictadas en su contra por el TPI. A esos efectos, propuso que ordenemos un nuevo juicio o absolvamos al señor Avilés González. En contra de las sentencias, planteó que el foro primario incidió en nueve (9) errores.

Junto al alegato, radicó una *Moción solicitando autorización [para] presentar alegato en exceso páginas reglamentarias* en la que solicitó que autorizáramos la presentación del escrito en exceso del límite reglamentario de páginas.

Ese mismo día, el Pueblo de Puerto Rico presentó una *Moción en cumplimiento de resolución* en la que informó que estipuló las transcripciones adicionales.

El 3 de octubre de 2024, emitimos una *Resolución* en la que autorizamos la presentación en exceso de páginas del alegato del

señor Avilés González y le concedimos al Pueblo de Puerto Rico un término de treinta (30) días para presentar su alegato en oposición respecto a los casos consolidados de epígrafe.

El 28 de octubre de 2024, el Pueblo de Puerto Rico radicó una *Solicitud de extensión de término para presentar alegato en oposición* en la que solicitó que le extendiéramos el término concedido para someter su alegato en oposición.

El 31 de octubre de 2024, emitimos una *Resolución* en la que le concedimos al Pueblo de Puerto Rico hasta el 16 de diciembre de 2024 para presentar su alegato.

El 16 de diciembre de 2024, el Pueblo de Puerto Rico presentó una *Solicitud de término final* en la que solicitó un breve término adicional para presentar su alegato en oposición.

El 18 de diciembre de 2024, emitimos una *Resolución* en la que le concedimos al Pueblo de Puerto Rico un término final hasta el 19 de diciembre de 2024 para presentar su alegato.

El 19 de diciembre de 2024, el Pueblo de Puerto Rico radicó un *Alegato de El Pueblo de Puerto Rico* en el que solicitó que confirmemos las sentencias apeladas.

Junto a su alegato en oposición, también sometió una *Solicitud para que se acepte [el] alegato de El Pueblo de Puerto Rico en exceso de páginas reglamentarias* en la que solicitó que autorizáramos la presentación del escrito en exceso del límite reglamentario de páginas.

El 20 de diciembre de 2024, emitimos una *Resolución* en la que autorizamos la presentación del alegato del Pueblo de Puerto Rico en exceso de páginas.

El 30 de abril de 2025, emitimos una *Resolución* en la que le ordenamos a la Secretaría del TPI remitir, en calidad de préstamo, la prueba documental sometida durante el juicio en los casos consolidados de epígrafe. Le concedimos un término de diez (10)

días, contados a partir de la notificación de dicha *Resolución,* para cumplir dicha orden.

Recibida la prueba documental según ordenado y contando con la comparecencia de todas las partes, damos por perfeccionadas las apelaciones criminales de epígrafe. En adelante, pormenorizamos los hechos procesales esenciales para la atención de ambos recursos.

**II.**

El caso de marras tiene su génesis en hechos ocurridos el 30 de septiembre de 2019 cuando la señora Hilda María Padilla Romero (señora Padilla Romero) fue asesinada. Por esos hechos, el Ministerio Público radicó seis denuncias contra los apelantes por los delitos de asesinato en primer grado, tentativa de asesinato y tres cargos por apuntar y disparar un arma de fuego. En esencia, a la señora Pérez Bigio y al señor Avilés González se les imputó que en concierto y común acuerdo entre ellos y con el señor González Martínez, dieron muerte a propósito, con conocimiento y voluntariamente a la señora Padilla Romero. Según la teoría del Ministerio Público, la señora Pérez Bigio contactó y pagó al señor González Martínez para que, siendo guiado por el señor Avilés González, acechara, apuntara, disparara y asesinara a la señora Padilla Romero, quien transitaba en su vehículo, junto a sus dos (2) hijas, menores de edad.

Llegando ambos casos de forma consolidada, el 7, 21 y 28 de febrero de 2020 y el 9 y 10 de marzo de 2020 se celebró la Vista Preliminar. En ella, declararon: (1) la menor Yaireishka Morales Padilla (joven Morales Padilla) – hija de la señora Padilla Romero – quien presenció parte de los hechos; (2) el Agente Roynashmil Rodríguez Martínez (Agte. Rodríguez Martínez), agente encargado del caso; y (3) el señor González Martínez, quien presuntamente disparó

y dio muerte a la señora Padilla Romero. Este último declaró a lo largo de los días 9 y 10 de marzo de 2020.

Por su pertinencia al presente caso, destacamos que el señor González Martínez declaró frente a la señora Pérez Bigio y el señor Avilés González y estuvo sujeto al <u>oportuno y extenso contrainterrogatorio</u> de los representantes legales de estos.

En apretada síntesis, a preguntas del Ministerio Público, el señor González Martínez testificó que:

1) En ese momento, tenía veintitrés (23) años.[4] Residía en la cárcel.[5] Pero, antes de eso, vivía en el Sector Los Martínez en Caimito Alto, San Juan, con su mamá y dos (2) tíos.[6]
2) Antes de ser ingresado a la cárcel, se dedicaba a vender sustancias controladas en un punto de drogas en el Sector Los Martínez en Caimito Alto.[7]
3) Estudió hasta el décimo grado, y sabía leer y escribir.[8]
4) No padecía de alguna condición mental o física que le impidiera declarar ni estaba bajo los efectos de alguna sustancia controlada.[9]
5) Previo a ser arrestado, había utilizado sustancias controladas por dos (2) años, las cuales consistían en *Percocet, Tramadol* y *Xanax*.[10] Utilizaba las sustancias tres veces a la semana.[11]
6) Uno o dos meses antes del 30 de septiembre de 2019, la señora Pérez Bigio, a quien se refirió como Kei, empezó a decirle que había una persona que le estaba haciendo la vida imposible a ella y a sus hijos y le pidió que hiciera una "vuelta".[12]
7) Una "vuelta" significaba matar a la persona.[13]
8) Previo al 30 de septiembre de 2019, había conocido a la señora Pérez Bigio por un año o dos y sabía que esta vivía en el sector Los Bigio de Caimito, a cinco minutos de él.[14]
9) La señora Pérez Bigio era blanca, de pelo largo, bajita.[15]
10) La señora Pérez Bigio se encontraba en sala y la identificó.[16]
11) La señora Pérez Bigio residía con su madre y sus dos (2) hijos, de aproximadamente cuatro (4) y un (1) años, en una casa de altos y bajos, con rejas blancas al frente y que conducía una Ford 150 blanca de dos (2) puertas.[17]
12) Se comunicaba con la señora Pérez Bigio por teléfono y en persona en su casa.[18]

---

[4] TPO de Vista Preliminar (VP), 9 de marzo de 2020, pág. 512, líneas 17-18.
[5] Íd., líneas 21-22.
[6] Íd., pág. 512, líneas 23-24, pág. 513, líneas 1-2 y 14-15.
[7] Íd., pág. 513, líneas 3-4, 9 y 12.
[8] Íd., líneas 19-22.
[9] Id., línea 23 y pág. 514, líneas 1-8.
[10] Íd., pág. 514, líneas 10-18.
[11] Íd., líneas 20-21, pág. 515, líneas 1-4.
[12] Íd., pág. 516, líneas 7, 9, 20-21; pág. 517, líneas 7 y 9-10; pág. 518, líneas 19-23.
[13] Íd., pág. 517, líneas 12-14.
[14] Íd., pág. 519, líneas 4-19.
[15] Íd., líneas 21-23.
[16] Íd., pág. 520, líneas 2-4 y líneas 8-10.
[17] Íd., pág. 520, líneas 11-17; pág. 521, líneas 1-5.
[18] Íd., pág. 521, líneas 7-11.

13) Los números de teléfono de la señora Pérez Bigio eran largos, de afuera.[19]

14) La señora Pérez Bigio le manifestó que la persona a la que se dirigiría la "vuelta" no le dejaba trabajar con su papá.[20]

15) La señora Pérez Bigio le preguntó cuánto le cobraría por ese trabajo, él le respondió: "$2,000" y ella le indicó que estaba bien.[21]

16) Cerca de dos (2) semanas después, la señora Pérez Bigio lo llamó diciéndole que usó $500 y él respondió que estaba bien, que le pagara cuando pudiera.[22]

17) La señora Pérez Bigio le expresó que la mujer que quería que asesinara trabajaba en el negocio de su padre en Bayamón y conducía una Honda Pilot negra de cuatro (4) puertas.[23]

18) La señora Pérez Bigio le explicó que la mujer llegaba a la oficina aproximadamente a las 5:30 y 6:00 p.m.[24]

19) La señora Pérez Bigio le envió por mensaje de texto una foto de la cara de la mujer a su número de teléfono 787-902-4397.[25]

20) La mujer en la foto era rubia, blanca y gordita.[26]

21) Al recibir la foto, la guardó en su teléfono para saber quién era la señora y la miró en varias ocasiones.[27]

22) Llegó al negocio en el que trabajaba la señora Padilla Romero porque la señora Pérez Bigio lo dirigía por teléfono.[28]

23) Allí, vio el negocio del padre de la señora Pérez Bigio, el cual era crema, tenía un *rolling door*, una puerta pequeña a la izquierda y se encontraba cerca de una tienda de artículos escolares.[29]

24) Llegó al negocio en un Hyundai Elantra, color *charcoal grey*, cuatro (4) puertas, con tablilla 252 y los cristales con tintes completos.[30] Al momento de los hechos, había tenido el vehículo por tres meses luego de comprarlo por $500 en el punto de drogas en el que trabajaba en el Sector Los Martínez en Caimito Alto a unos muchachos que fueron allí a ofrecerlo.[31]

25) Cuando llegó a bordo del Hyundai Elantra, el vehículo era conducido por el señor Avilés González y el señor González Martínez se encontraba en el asiento del pasajero.[32]

26) El señor Avilés González era blanco, de pelo negro y bajo.[33]

27) Conocía al señor Avilés González hacían siete (7) años, desde la escuela intermedia Inés María Mendoza y fuera de la escuela.[34]

28) El señor Avilés González era mecánico de aviación, trabajaba en Aguadilla y tenía un Nissan Sentra azul con tintes.[35]

---

[19] Íd., líneas 13-15.

[20] Íd., pág. 523, línea 1-2 y 5.

[21] Íd., líneas 13-14, 22-23; pág. 524, líneas 2, 4-6.

[22] Íd., líneas 9-14.

[23] Íd., pág. 524, líneas 21-23; pág. 525, líneas 5-23; pág. 526, línea 1.

[24] Íd., pág. 526, líneas 8-16.

[25] Íd., líneas 18-21; pág. 527, líneas 2-15 y 21-22; pág. 528, línea 1.

[26] Íd., pág. 528, líneas 3-4.

[27] Íd., líneas 13-21.

[28] Íd., pág. 529, líneas 11-17; pág. 530, líneas 19-22.

[29] Íd., pág. 530, líneas 1-13.

[30] Íd., pág. 531, líneas 1-9.

[31] Íd., líneas 10-23; pág. 532, líneas 1-10.

[32] Íd., pág. 532, líneas 12-16.

[33] Íd., líneas 18-19.

[34] Íd., líneas 20-23; pág. 533, líneas 2-6.

[35] Íd., pág. 533, líneas 11-18.

29) El señor Avilés González se encontraba en sala y lo identificó.[36]

30) El 30 de septiembre de 2019, a eso de las 3:00 p.m., estaba en su casa en Caimito Alto, esperando al señor Avilés González para realizar la "vuelta" encargada por la señora Pérez Bigio.[37]

31) A eso del mediodía, le había dicho al señor Avilés González que tenía una "vuelta" que hacer y este le respondió "lo que quisiera".[38]

32) Una vez el señor Avilés González llegó a su casa en Caimito Alto, este se montó en el Hyundai Elantra como conductor, mientras que el señor González Martínez ocupó la silla del pasajero.[39]

33) El señor Avilés González estaba vestido con un *jacket* negro y un pantalón largo azul.[40] El señor González Martínez estaba vestido completamente de negro.[41]

34) Acto seguido, salieron en dirección a Bayamón por la carretera PR-177 hasta el Costco de Bayamón.[42]

35) Luego, llegaron hasta el área del negocio donde trabajaba la mujer que iban a asesinar, cerca de una tienda de artículos escolares en una calle de cuatro (4) carriles, dos (2) para cada dirección.[43]

36) Al llegar, entre 4:30 y 5:00 p.m., se estacionaron en reversa frente a un negocio abandonado ubicado frente al lugar de trabajo de la señora Padilla Romero.[44]

37) Iban a cometer el asesinato con una pistola que él tenía.[45] Él llevaba un arma Glock 27, calibre .40, de color negra, que contaba con diecisiete municiones.[46]

38) El señor Avilés González llevaba una Smith & Wesson, calibre .45, color gris.[47]

39) Estando estacionado frente al negocio, vio a la mujer rubia de la foto llegar en una Honda Pilot negra, vestida con un mahón azul largo y una camisa oscura.[48] La mujer era la misma de la foto.[49]

40) La mujer entró al negocio por una puerta pequeña y salió rápido con una jaula que puso en la parte de atrás al asiento del pasajero de la Honda Pilot negra.[50]

41) La señora dio reversa hacia la carretera PR-177 en la que había tráfico y el señor Avilés González comenzó a seguirla y a tocar bocina para pasar.[51]

42) El señor Avilés González y el señor González Martínez iban por el carril izquierdo y la mujer iba por el derecho.[52]

43) Siguieron hacia la carretera PR-177 en dirección a un semáforo en el que se encontraba un Costco y tanto la Honda Pilot como ellos viraron a la izquierda.[53] Esa carretera tenía (3) tres carriles en dirección a San Juan, ellos se ubicaron en el carril del medio y la Honda Pilot en el de la derecha.[54]

---

[36] Íd., pág. 534, líneas 1-7.
[37] Íd., líneas 11-23.
[38] Íd., pág. 535, líneas 13-16; pág. 536, líneas 1-6.
[39] Íd., pág. 536, líneas 8-9 y 13-14.
[40] Íd., líneas 17-22.
[41] Íd., pág. 537, líneas 1-2.
[42] Íd., líneas 5-16.
[43] Íd., pág. 538, líneas 1-23; pág. 539, línea 1.
[44] Íd., pág. 539, líneas 3-22.
[45] Íd., pág. 540, líneas 1-3.
[46] Íd., líneas 4-9.
[47] Íd., líneas 11-12.
[48] Íd., líneas 14-21; pág. 541, líneas 1-7.
[49] Íd., líneas 11-17.
[50] Íd., líneas 19-22; pág. 542, líneas 2-14.
[51] Íd., pág. 543, líneas 13-21; pág. 544, líneas 5-7.
[52] Íd., pág. 544, líneas 8-9.
[53] Íd., líneas 10-20, pág. 545, líneas 2-3.
[54] Íd., líneas 5-10.

44) Pasaron una gasolinera Shell a mano derecha y se toparon con un semáforo.[55] Al cambiar el semáforo a verde, el señor González Martínez le dijo al señor Avilés González que bajara la velocidad para que la mujer pasara y él la pudiese verla bien.[56]

45) Tan pronto la Honda Pilot les pasó, decidieron hacer la "vuelta" después de un semáforo intermitente que quedaba más adelante.[57]

46) Cuando cambió la luz, el señor González Martínez y el señor Avilés González ya llevaban puestas unas máscaras para cubrir sus rostros.[58] La de él era negra completa y la del señor Avilés González era negra a mitad.[59]

47) A la izquierda del semáforo intermitente en el que harían la "vuelta" quedaba un Hogar Crea.[60]

48) Debido al semáforo intermitente, el tráfico estaba lento.[61]

49) Antes de llegar al semáforo intermitente, le dijo al señor Avilés González que se pegara a la Honda Pilot para él bajar el cristal, sacar el brazo y disparar.[62]

50) El señor Avilés González pegó el vehículo a unos tres (3) o cuatro (4) pies y él sacó la mano por la ventana derecha del pasajero y disparó unas catorce (14) veces hacia el cristal del conductor de la Honda Pilot, a la cabeza de la señora de la foto.[63]

51) Acto seguido, el señor Avilés González y el señor González Martínez se fueron por la Avenida Martínez Nadal en dirección a Caimito.[64]

52) Una vez en la Avenida, rápido llamó a la señora Pérez Bigio, a un número que comenzaba con 256, para informarle que la "vuelta" que le mandó a hacer ya estaba hecha.[65] Ella le contestó y él le informó que habían hecho la vuelta.[66]

53) Al llegar al sector Los Martínez en Caimito Alto, el señor Avilés González se fue en su vehículo y el señor González Martínez se quedó en su casa.[67]

54) El 30 de septiembre de 2019, utilizó cuatro (4) *Percocet* y cuatro (4) *Tramadol*.[68]

55) El 1 de octubre de 2019, el señor González Martínez fue a buscar el dinero que la señora Pérez Bigio le debía en la casa de esta en el sector Los Bigio de Caimito.[69] Allí, la señora Pérez Bigio le entregó $1,500 en billetes de $20.[70]

56) En la tarde, en su casa en Caimito, el señor González Martínez le entregó al señor Avilés González $750, la parte que le tocaba.[71] Le dio esa cantidad al señor Avilés González porque "él andaba conmigo en esa vuelta".[72]

57) El señor González Martínez usó el dinero en ropa, en un celular y en su vicio de drogas.[73]

---

[55] Íd., líneas 17-19; pág. 546, línea 1.
[56] Íd., pág. 546, líneas 2-5.
[57] Íd., líneas 10-11.
[58] Íd., pág. 547, líneas 22-23; pág. 548, líneas 1-17.
[59] Íd., pág. 548, líneas 1-6.
[60] Íd., pág. 549, líneas 3-5.
[61] Íd., líneas 7-13.
[62] Íd., líneas 15-20.
[63] Íd., pág. 550, líneas 1-20; pág. 551, líneas 1-9.
[64] Íd., pág. 551, líneas 12-14.
[65] Íd., líneas 12-21; pág. 552, líneas 9-11.
[66] Íd., pág. 552, líneas 17-20.
[67] Íd., pág. 553, líneas 12-16.
[68] Íd., líneas 18-23.
[69] Íd., pág. 554, líneas 4-10.
[70] Íd., líneas 13-21.
[71] Íd., pág. 555, líneas 5-11.
[72] Íd., pág. 559, líneas 11-12.
[73] Íd., pág. 555, líneas 13-14.

58) La Policía ocupó la pistola Glock utilizada en el asesinato en el punto de drogas del Sector Los Martínez y el Hyundai Elantra, pero no recordaba cuándo.[74]

59) Una foto que se le enseñó mostraba la carretera PR-177 y se podía observar el Hyundai Elantra en el que andaban el señor González Martínez y el señor Avilés González, situado al lado del negocio de la mujer que iban a asesinar, el cual no se veía en la imagen.[75]

60) No asesinaron a la señora Padilla Romero frente a ese negocio porque la señora Pérez Bigio le había dicho al señor González Martínez que no lo hiciera porque era el negocio de su padre.[76]

61) Se comunicaba con el señor Avilés González, a quien conocía como Wabi, por teléfono a un número que comenzaba con 635 o en persona.[77]

62) Al día del juicio, no conocía el nombre de la mujer a la que asesinó.[78]

63) En el Exhibit 6-1 del Ministerio Público se podía ver el Hyundai Elantra que utilizó el día de los hechos.[79]

64) En el Exhibit 4 del Ministerio Público se podía apreciar la Honda Pilot de la mujer de la foto que envió la señora Pérez Bigio.[80]

65) No sabría decir cuánto tiempo de cárcel cumpliría por declarar en la Vista Preliminar.[81]

66) El Exhibit 16-1 del Ministerio Público se trataba del convenio suscrito por él con el Ministerio Público.[82] Ese documento decía que cumpliría treinta y siete (37) años de cárcel.[83]

Luego del interrogatorio directo llevado a cabo por el Ministerio Público, a preguntas de la representación legal de la señora Pérez Bigio declaró lo siguiente:

1) En sus estudios cursó tanto en la corriente regular como en la de educación especial.[84] Para ser de la corriente de educación especial, le diagnosticaron un grado de atraso.[85] Ingresó a educación especial en elemental.[86]

2) En el 2016, sufrió un accidente que le causó daño cerebral, manifestado en convulsiones.[87]

3) Para el 30 de septiembre de 2019 trabajaba en un punto de drogas vendiendo todo tipo de drogas.[88] Sin embargo, en su declaración jurada expresó que se dedicaba a "chivear" y no incluyó que se dedicara al tráfico de sustancias controladas.[89]

---

[74] Íd., líneas 16-18 y 22-23; pág. 556, líneas 1-10.

[75] Íd., pág. 557, líneas 1-23; pág. 558, líneas 1-5, 10-11.

[76] Íd., pág. 558, líneas 17-23; pág. 559, línea 1.

[77] Íd., pág. 559, líneas 21-23; pág. 560, líneas 1-7, 9-15.

[78] Íd., pág. 560, líneas 21-23.

[79] Íd., pág. 561, líneas 8-11. Identificamos el Exhibit por su número equivalente a nivel del juicio.

[80] Íd., líneas 12-17. Identificamos el Exhibit por su número equivalente a nivel del juicio.

[81] Íd., pág. 562, líneas 1-9.

[82] Íd., pág. 563, líneas 9-23; pág. 564, líneas 1-12; pág. 565, líneas 12-23; pág. 566, línea 1. Identificamos el Exhibit por su número equivalente a nivel del juicio.

[83] Íd., pág. 567, líneas 6-7.

[84] Íd., pág. 568, líneas 21-24, pág. 569, línea 1.

[85] Íd., pág. 569, líneas 7-11.

[86] Íd., pág. 20-23.

[87] Íd., pág. 570, líneas 18-23; pág. 571, líneas 2-6.

[88] Íd., pág. 571, líneas 14-20.

[89] Íd., pág. 572, líneas 1-7.

4) Era usuario diario de *Percocet* por cerca de uno o dos años antes del 30 de septiembre de 2019, ingiriendo cuatro (4) pastillas, cuya cantidad de miligramos desconocía.[90]

5) Era usuario de *Tramadol* y utilizaba cuatro (4) pastillas de dos (2) miligramos.[91]

6) Era usuario de *Xanax,* ingería una pastilla para dormir y no la utilizaba todos los días.[92]

7) Era usuario de heroína inhalada, utilizaba "una nada más" a la semana o dos (2) semanas y se le olvidó decirlo cuando el Ministerio Público le preguntó sobre su uso de sustancias controladas en el directo.[93]

8) No consumía alcohol, cocaína, *crack* ni marihuana.[94]

9) Su uso de *Tramadol, Xanax* y *Percocet* era diario.[95]

10) El 30 de septiembre de 2019, usó *Percocet, Tramadol* y *Xanax,* pero no heroína inhalada.[96]

11) No vio cuando la Policía ocupó el Hyundai Elantra, se enteró a través de sus compañeros del Sector Los Martínez.[97]

12) Para el 30 de septiembre de 2019, había tenido el Hyundai Elantra por aproximadamente dos (2) meses, luego de adquirirlo de una persona en el punto de drogas en el Sector Los Martínez y buscarlo en Bayamón por el área de la Joyería Santa Juanita.[98] No recordaba a quién le pagó $500 por el vehículo.[99]

13) No sabía si el Hyundai Elantra fue obtenido mediante *carjacking* y no fue él quien lo robó mediante *carjacking.*[100]

14) Usaba el Hyundai Elantra para "estar por ahí" y no lo usó para cometer otros delitos.[101]

15) Para el 30 de septiembre de 2019, había tenido la pistola Glock utilizada en el asesinato por cerca de tres meses tras adquirirla en el punto de drogas del Sector Los Martínez.[102] No recordaba a quién le compró el arma.[103]

16) No utilizó la pistola Glock para cometer ningún otro delito.[104]

17) Ante una pregunta sobre si utilizó el Hyundai Elantra para cometer otros delitos, <u>levantó su derecho a no contestar la pregunta</u>.[105]

18) No utilizó el vehículo el 3 de septiembre de 2019 para asesinar al señor Rafael Díaz Bonet.[106] Luego, levantó su derecho a no contestar si utilizó la pistola Glock para asesinar a dicha persona.[107]

19) Decidió continuar declarando ante la línea de preguntas sobre sus pasados crímenes <u>luego de ser asistido por su propio representante legal</u>, el licenciado Alex Ramos.[108] Levantó su derecho a no contestar preguntas sobre si utilizó el Hyundai Elantra el 1 de octubre de 2019 para

---

[90] Íd., líneas 21-23; pág. 573, líneas 1-8, 13-15, 19-23; pág. 574, líneas 1-3.
[91] Íd., pág. 574, líneas 4-13.
[92] Íd., líneas 12-19; pág. 575, líneas 3-4.
[93] Íd., pág. 575, líneas 7-23; pág. 576, líneas 1-6.
[94] Íd., pág. 576, líneas 8-15.
[95] Íd., 16-18.
[96] Íd., líneas 19-23; pág. 577, líneas 1-3.
[97] Íd., pág. 577, líneas 8-17.
[98] Íd., líneas 20-23; pág. 578, líneas 1-11.
[99] Íd., pág. 579, líneas 15-17.
[100] Íd., pág. 578, líneas 12-15.
[101] Íd., líneas 17-23; pág. 579, línea 1.
[102] Íd., pág. 579, líneas 18-23; pág. 580, líneas 2-5.
[103] TPO de VP, 10 de marzo de 2020, pág. 610, líneas 1-15.
[104] TPO de VP, 9 de marzo de 2020, pág. 580, líneas 9-17.
[105] TPO de VP, 10 de marzo de 2020, pág. 589, líneas 7-16.
[106] Íd., líneas 17-23.
[107] Íd., pág. 593, líneas 4-8.
[108] Íd., pág. 590, líneas 5-23; pág. 591, líneas 1-2.

asesinar al señor Jabdiel Muñoz Villegas.[109] También levantó el derecho a no contestar una pregunta sobre si utilizó la pistola Glock para asesinar a dicha persona.[110]

20) El Hyundai Elantra fue ocupado en el viraje de su casa en el Sector Los Martínez en Caimito, el cual describió.[111]

21) Fue arrestado el 7 de octubre de 2019 y ocuparon la pistola Glock en el monte, luego fue llevado a *detox* y allí le suministraron unas pastillas blancas, cuya identidad desconocía.[112] No recordaba qué medicamento le suministraban para el 11 de octubre de 2019, ni con precisión cuánto tiempo llevaba en *detox*.[113]

22) El 11 de octubre de 2019 fue excarcelado del Centro Médico Correccional por el Agte. Rodríguez Martínez y no le habían dado de alta.[114]

23) No recordaba si el Agte. Rodríguez Martínez había solicitado una orden de alta para entrevistarlo o sacarlo de *detox*.[115]

24) En *detox*, no le estaban dando *Metadona* ni *suboxone*, únicamente unas pastillas blancas, cuya identidad desconocía.[116]

25) El 11 de octubre de 2019 le leyeron unas advertencias legales al ser excarcelado.[117] No recordó de qué derechos se trataba, ni de qué habló en esa mañana.[118]

26) Le leyeron y explicaron las advertencias de ley y lo llevaron a un cuarto de la comandancia de Bayamón a las 11:30 a.m. y marcó en la hoja de advertencias que no quería declarar, que iba a permanecer callado.[119] Mostrándosele el documento, lo reconoció.[120]

27) El Agte. Rodríguez Martínez no le dijo que era sospechoso de la muerte de la señora Padilla Romero.[121]

28) Luego de marcar que no declararía, dijo que se sentía mal porque tenía dolor de estómago por el vicio que estaba rompiendo.[122] Además de las pastillas blancas, también le suministraron un suero, pero desconocía qué tenía.[123]

29) En esa ocasión, no le comunicó al Agte. Rodríguez Martínez que había sido representado por una licenciada de apellido Sánchez de la Sociedad para Asistencia Legal.[124]

30) Luego de indicar que no declararía, lo dejaron en el mismo cuarto de la Comandancia de Bayamón, pero desconocía cuánto tiempo.[125]

31) No recordaba qué agentes estaban presentes, más allá del Agte. Rodríguez Martínez.[126]

32) No recordaba de qué habló con el Agte. Rodríguez Martínez, además del tema de su dolor de estómago.[127]

---

[109] Íd., pág. 591, líneas 4-23, pág. 592, línea 5.
[110] Íd., pág. 593, líneas 12-21.
[111] Íd., pág. 595, líneas 13-23; pág. 596, líneas 1-3.
[112] Íd., pág. 596, líneas 8-15; pág. 597, líneas 11-23; pág. 598, líneas 1-3.
[113] Íd., pág. 599, líneas 8-20.
[114] Íd., pág. 598, líneas 5-15.
[115] Íd., pág. 599, líneas 1-6.
[116] Íd., pág. 600, líneas 1-14.
[117] Íd., líneas 17-22.
[118] Íd., pág. 602, líneas 6-12.
[119] Íd., líneas 10-23; pág. 603, líneas 1-16.
[120] Íd., pág. 604, líneas 1-17.
[121] Íd., pág. 603, líneas 17-19.
[122] Íd., pág. 605, líneas 3-14.
[123] Íd., líneas 15-19.
[124] Íd., pág. 606, líneas 4-7.
[125] Íd., líneas 20-22; pág. 607, líneas 1-7 y 22-23; pág. 608, línea 2.
[126] Íd., pág. 608, línea 4-6.
[127] Íd., líneas 4-11.

33) A las 2:00 p.m. firmó unas nuevas advertencias legales y ahí si decidió declarar porque se sentía mejor.[128]

34) El 11 de octubre de 2019 conocía el nombre y los dos apellidos de la señora Pérez Bigio, a quien le decía "Kei".[129]

35) El 14 de octubre de 2019 prestó una declaración jurada, la cual reconoció, en la que se refirió a la señora Pérez Bigio como "Kei" y expresó que ese día se enteró del nombre de la persona a la que se refiere como "Kei".[130] Aun así, reiteró que sabía el nombre de la señora Pérez Bigio desde antes.[131]

36) El 11 de octubre de 2019, sabía que era sospechoso, no le ofrecieron inmunidad, ni ayudarlo, ni él pidió un beneficio.[132]

37) A las 7:05 p.m. le hicieron y le explicaron unas terceras advertencias legales, las cuales entendió y firmó.[133] No recordaba quienes estaban presentes en ese momento.[134]

38) Antes de firmar las terceras advertencias legales, permaneció en el mismo cuarto de la Comandancia de Bayamón y el Agte. Rodríguez Martínez no le enseñó una foto de la señora Pérez Bigio.[135]

39) Durante el Contrainterrogatorio, se le presentaron las advertencias legales que le fueron leídas bajo custodia, ubicadas en los Exhibits, 15-1, 15-2, 15-3, 15-4, 15-5, 15-6 y 16-2 del Ministerio Público.[136]

40) En su declaración jurada no mencionó su número de teléfono, ni el número que comenzaba con 256 que relacionó a la señora Pérez Bigio.[137] Tampoco incluyó que, además de que le dijeron que la Honda Pilot era negra, también le precisaron si tenía cuatro (4) o dos (2) puertas o la tablilla.[138] Tampoco mencionó el nombre de la señora Padilla Romero, lo cual también estipuló posteriormente el Ministerio Público.[139]

41) No le entregó a la Policía la foto de la mujer a ser asesinada que la señora Pérez Bigio le envió.[140] Tampoco le entregó a la Policía los mensajes de texto mediante los que se comunicaba con la señora Pérez Bigio.[141]

42) El 30 de septiembre de 2019 realizó unos catorce disparos, pero no los contó.[142] No fue el Agte. Rodríguez Martínez quien le dijo que ocuparon catorce casquillos en la escena.[143]

43) No vio unas niñas en la Honda Pilot a la que disparó, ni apuntó hacia ellas.[144]

44) Recordó que, bajo custodia, identificó a la señora Pérez Bigio en un cartón de fotos como el número dos.[145]

45) El 14 de octubre de 2019, le hicieron unas cuartas advertencias.[146] Ese día, prestó la referida declaración

---

[128] Íd., líneas 13-17.

[129] Íd., pág. 611, líneas 20-23; pág. 612, líneas 2-6; pág. 613, líneas 4-5.

[130] Íd., pág. 613, líneas 8-21; pág. 615, líneas 4-7; pág. 616, líneas 4-19.

[131] Íd., pág. 617, líneas 5-7.

[132] Íd., línea 23; pág. 618, líneas 1-22

[133] Íd., pág. 620, líneas 17-23; pág. 621, líneas 1-11.

[134] Íd., pág. 621, líneas 17-19.

[135] Íd., pág. 620, líneas 1-10.

[136] Identificamos el Exhibit por su número equivalente a nivel del juicio.

[137] TPO de VP, 10 de marzo de 2020, pág. 623, líneas 10-22; pág. 624, líneas 6-12.

[138] Íd., pág. 629, líneas 4-7 y 9-10.

[139] Íd., pág. 690, líneas 13-14.

[140] Íd., pág. 626, líneas 11-15.

[141] Íd., líneas 16-20.

[142] Íd., pág. 629, líneas 14-20.

[143] Íd., líneas 21-23.

[144] Íd., pág. 630, líneas 11-14.

[145] Íd., pág. 635, líneas 13-18.

[146] Íd., pág. 636, líneas 12-14.

jurada y le hicieron unas quintas advertencias legales.[147] Asimismo, le hicieron unas sextas advertencias legales.[148]

46) El 7 de noviembre de 2019, obtuvo un No Causa en el caso de armas que tenía en San Juan.[149] Al ser excarcelado, el Agte. Rodríguez Martínez lo buscó en Ponce, pero no recordó que le dijera que estaba libre, ni que le mostrara una orden de arresto.[150] Tampoco le comentó que podía ser acusado de asesinato en primer grado por la muerte de la señora Padilla Romero.[151] Esa noche permaneció detenido, no le dijeron que iría preso o que si cooperaba lo colocarían en el albergue de testigos, ni recordaba tales detalles.[152]

47) Lo llevaron al albergue de testigos y él se fue voluntariamente de allí.[153] No había llegado a acuerdo alguno con el Ministerio Público.[154]

48) El 26 de noviembre de 2019, firmó el acuerdo de cooperación con el Ministerio Público, pero él no pidió algo a cambio por declarar, no salió del Ministerio Público ofrecer el acuerdo, ni del Agte. Rodríguez Martínez, ni recordaba los detalles sobre su origen.[155]

49) Ese día le hicieron unas séptimas advertencias legales, las que se podían apreciar en el Exhibit 17-2 del Ministerio Público.[156] En esa ocasión, no estaba representado por abogado, no pidió asesorarse con un abogado y entendió el acuerdo.[157]

50) No recordaba cuántas veces vio el video del negocio que le mostró el Ministerio Público, ni cuántas veces lo excarcelaron para entrevistarlo, ni cuándo fue la última vez que habló con el Agte. Rodríguez Martínez.[158]

Concluido el contrainterrogatorio de la defensa de la señora Pérez Bigio, a preguntas de la representación legal del señor Avilés González, el señor González Martínez testificó lo siguiente:

1) Antes de firmar el convenio, nunca le habían hablado para cooperar.[159] No recordaba si los fiscales asignados habían hablado del tema con él o si le habían explicado que tenía un caso de asesinato, otro de armas y otros de tentativa, y las penas a las que se exponía.[160]

2) Los días que estuvo fuera de prisión tras su arresto no continuó operando el punto de drogas, ni utilizó drogas nuevamente.[161]

3) Era conveniente para él la condena por treinta y siete (37) años que le ofrecieron en el convenio comparado con los "doscientos (200) años" que podía enfrentar.[162]

4) Fue él quien disparó catorce (14) veces contra la señora Padilla Romero con un arma que él había obtenido y

---

[147] Íd., pág. 638, líneas 1-18.
[148] Íd., líneas 21-23.
[149] Íd., pág. 639, líneas 8-15.
[150] Íd., líneas 17-23; pág. 640, línea 1.
[151] Íd., línea 8-10.
[152] Íd., pág. 641, líneas 1-22.
[153] Íd., pág. 642, líneas 5-13.
[154] Íd., líneas 14-20.
[155] Íd., pág. 645, líneas 17-23; pág. 646, líneas 1-4; pág. 647, líneas 8-13.
[156] Íd., pág. 646, líneas 10-18. Se identifica el Exhibit por su número equivalente a nivel del juicio.
[157] Íd., pág. 647, líneas 1-7.
[158] Íd., pág. 657, líneas 16-23; pág. 658, líneas 2-9.
[159] Íd., pág. 659, líneas 4-11.
[160] Íd., líneas 13-23; pág. 660, líneas 1-20.
[161] Íd., pág. 662, líneas 1-3 y 5-16.
[162] Íd., pág. 663, líneas 6-13.

utilizaba para protegerse en el punto de drogas que operaba.[163]

5) Cuando fue arrestado, sabía que la Policía había ocupado el Hyundai Elantra, pero que no estaban por allí: el señor Avilés González, el Nissan Sentra del que era dueño, la señora Pérez Bigio y la Ford 150 de la que esta era dueña.[164]

6) Cuando el Agte. Rodríguez Martínez le expresó que era sospechoso del asesinato de la señora Padilla Romero, el señor González Martínez sabía que "estaba frito" y que su única salida era cooperar con la Policía.[165]

7) En el video que le mostraron del Hyundai Elantra no se veía al señor Avilés González conduciendo.[166] El Hyundai Elantra tenía tintes en todas las ventanas, no se podía ver hacia adentro.[167]

8) La Honda Pilot negra tenía tintes en los cristales posteriores del vehículo y los de al frente estaban menos oscuros.[168]

9) Le disparó a la Honda Pilot negra por el lado izquierdo únicamente.[169] No sabía quién disparo por el lado derecho de ese vehículo en el que aparecía un orificio en una de las ventanas laterales.[170]

10) Las conversaciones que tuvo con la señora Pérez Bigio antes del 30 de septiembre de 2019, relacionadas a la "vuelta", no tenían nada que ver con el señor Avilés González.[171]

11) En la declaración jurada no especificó que la señora Pérez Bigio le manifestara el nombre de la persona que asesinaría.[172] La única información que se incluyó sobre la mujer fue que era rubia.[173]

12) En la declaración jurada no expresó que el señor Avilés González viviera en Caimito[174], ni que este guiara un Nissan Sentra[175].

13) Al llegar a Caimito, el señor Avilés González no le dijo que hicieran la "vuelta" en el Nissan Sentra, el que dijo que hicieran la "vuelta" y que la hicieran en el Hyundai Elantra fue el señor González Martínez.[176]

14) En la declaración jurada describió al señor Avilés González como "bajito".[177] En el documento no proveyó detalles sobre su peso, forma del rostro, tipo de pelo, en qué brazos tenía un tatuaje, ni qué tatuaje tenía.[178]

15) Fue él quien dirigió todo, estuvo pendiente a identificar a la persona y ordenó al señor Avilés González a que moviera el vehículo.[179] Mientras disparaba, en ningún momento el señor Avilés González le dijo que siguiera disparando.[180]

16) Él realizó los catorce (14) disparos.[181]

---

[163] Íd., pág. 666, líneas 1-8 y 19-23; pág. 667, líneas 1-7.
[164] Íd., pág. 669, líneas 4-23.
[165] Íd., pág. 670, líneas 10-17.
[166] Íd., pág. 675, líneas 1-23.
[167] Íd., pág. 676, líneas 2-15.
[168] Íd., líneas 16-22; pág. 677, líneas 1-10; pág. 678, líneas 1-23.
[169] Íd., pág. 680, líneas 22-23; pág. 681, líneas 1-23; pág. 682, línea 1.
[170] Íd., pág. 684, líneas 13-14.
[171] Íd., pág. 689, líneas 1-4.
[172] Íd., pág. 690, líneas 18-22; pág. 691, líneas 1-3.
[173] Íd., pág. 691, líneas 5-9.
[174] Íd., pág. 695, líneas 3-6.
[175] Íd., pág. 697, líneas 19-22.
[176] Íd., líneas 4-16.
[177] Íd., pág. 699, líneas 10-12.
[178] Íd., líneas 18-23; pág. 700, líneas 1-20.
[179] Íd., pág. 701, líneas 1-16.
[180] Íd., pág. 706, líneas 1-4.
[181] Íd., líneas 7-9.

17) En la declaración jurada no expresó que el señor Avilés González tuviese una máscara.[182]

18) No vio las dos menores que había en el interior de la Honda Pilot.[183] La "vuelta" no incluía a dos menores de edad.[184] En ningún momento observó a dos menores salir de la Honda Pilot.[185]

19) No disparó a ninguna de las menores para matarlas.[186]

20) Mientras hacían la "vuelta", el señor Avilés González poseía una pistola, pero no la disparó, ni la apuntó.[187] Tampoco había expresado de dónde salió esa otra pistola, ni dónde el señor Avilés González la tenía.[188]

21) Nunca le mostraron una foto del señor Avilés González para identificarlo.[189] Tampoco participó en una rueda de confrontación.[190]

Culminada la ronda de contrainterrogatorios, a preguntas del Ministerio Público en el redirecto, el señor González Martínez declaró que asesinó a la señora Padilla Romero porque la señora Pérez Bigio se lo pidió[191] y que, mientras disparaba, el señor Avilés González iba guiando[192].

Cabe puntualizar que, al menos, el 10 de marzo de 2020, el señor González Martínez declaró acompañado de su abogado, quien intervino en el procedimiento para aconsejarlo, tal y como se desprende del recuento procesal pormenorizado precedentemente.

Luego de la argumentación de las partes y tras evaluar la prueba presentada, el TPI determinó causa probable para acusar a los peticionarios por los delitos imputados.[193]

Tras múltiples trámites procesales, el TPI comenzó el juicio en su fondo el 25 de octubre de 2022, según se desprende de una *Minuta*, transcrita el 2 de noviembre de 2022. Las referidas incidencias procesales incluyeron lo siguiente:

1) El rechazo por el TPI de sendas mociones de desestimación radicadas por los apelantes al amparo de

---

[182] Íd., pág. 703, líneas 15-23.
[183] Íd., pág. 704, líneas 18-20; pág. 705, líneas 8-14 y 19-21.
[184] Íd., pág. 705, líneas 1-3.
[185] Íd., líneas 4-11.
[186] Íd., líneas 16-18.
[187] Íd., pág. 708, líneas 5-17.
[188] Íd., líneas 18-23.
[189] Íd., pág. 709, líneas 4-7 y 12-17.
[190] Íd., líneas 18-22.
[191] Íd., pág. 711, líneas 15-16.
[192] Íd., líneas 18-21.
[193] El planteamiento de los apelantes respecto a la procedencia de la declaración de causa probable para juicio a la que llegó el TPI en la Vista Preliminar fue levantado en el caso KLCE202100185, consolidado con el caso KLCE202100309. En esa ocasión, un panel hermano denegó la expedición del auto de *certiorari*.

la Regla 64(p) de Procedimiento Criminal, 34 LPRA Ap. II, R. 64(p), y la subsiguiente denegatoria por este Tribunal de la expedición de *Certiorari* para revisar dichas determinaciones en el caso KLCE202100185 consolidado con el caso KLCE202100309, emitida en una *Resolución* del 25 de junio de 2021 por un panel hermano.

2) La renuncia por la señora Pérez Bigio de su derecho a juicio por jurado el 11 de julio de 2022 durante la celebración de una vista de desinsaculación del jurado, tal y como surge de una *Minuta* transcrita el 12 de julio de 2022.

3) La desestimación por falta de jurisdicción por este Tribunal de un recurso de *Certiorari Criminal* en el que la señora Pérez Bigio solicitó la revocación de una *Minuta Resolución* notificada por el TPI el 6 de abril de 2022 en la que el foro primario estableció los requisitos que debía cumplir una declaración jurada, utilizada por el Ministerio Público para lograr la admisión de ciertos récords electrónicos de una compañía de telefonía. Ese caso recibió el alfanumérico KLCE202200488 y fue desestimado por falta de jurisdicción el 27 de mayo de 2022 por este mismo panel.

Se celebró el juicio en su fondo en las fechas de: 25, 26, 27 y 28 de octubre de 2022; 17 de abril de 2023; 15, 16 y 17 de mayo de 2023; 3, 4, 5, 6, 7, 10, 11, 12 y 13 de julio de 2023; 30 de agosto de 2023; 10, 11, 13, 17, 19, 23 y 26 de octubre de 2023; y 21 de noviembre de 2023. La prueba testifical consistió en los testimonios de las siguientes personas:

1) Agente José A. Flores González (Agte. Flores González)
2) Agente Carlos Pagán Rosado (Agte. Pagán Rosado)
3) Señor Delvin Rodríguez Torres (señor Rodríguez Torres)
4) Señor Alex Cintrón Castellanos (señor Cintrón Castellanos)
5) Agente Juan L. Ortiz Guzmán (Agte. Ortiz Guzmán)
6) Agente Leslie Rosado Maysonet (Agte. Rosado Maysonet)
7) Señor González Martínez
8) Agente Ricardo Martínez Natal (Agte. Martínez Natal)
9) Agente Rubén Lamberty Aldea (Agte. Lamberty Aldea)
10) Teniente Varwin Alvarado Reyes (Tnte. Alvarado Reyes)
11) Señora Cristina M. Pumarejo Collazo (señora Pumarejo Collazo)
12) Agente Vivian Acevedo Jiménez (Agte. Acevedo Jiménez)
13) Agente Maribel Cortés De Jesús (Agte. Cortés De Jesús)
14) Señor Héctor González Acevedo (señor González Acevedo)
15) Agente Julio E. Guerrero Santiago (Agte. Guerrero Santiago)
16) Agte. Rodríguez Martínez
17) Señora Jacqueline Berríos Rivera (examinadora Berríos Rivera)
18) Agente Igneris Negrón Rivera (Agte. Negrón Rivera)
19) Dr. Francisco Dávila Toro (Dr. Dávila Toro)
20) Joven Morales Padilla

Entretanto, la prueba documental consistió en setenta y cinco (75) Exhibits presentados por el Ministerio Público, resumidos en la siguiente tabla:

| EXHIBIT NÚM. | DESCRIPCIÓN |
|---|---|
| 1 | Copia de la *Hoja de Identificación Cadáver* de la señora Padilla Romero, División de Patología Forenses del Instituto de Ciencias Forenses (ICF). |
| 2-1 | Copia de una *Certificación de Información* negativa de licencia de arma con respecto al señor González Martínez. |
| 2-2 | Fotocopia de una *Certificación de Información* negativa de Licencia de arma del señor Avilés González. |
| 3-1 al 3-32 | Treinta y dos (32) fotografías tomadas al Hyundai Elantra el 4 de octubre de 2019. |
| 4-1 al 4-42 | Cuarenta y dos (42) fotografías a color de la escena y cuerpo de la occisa. |
| 5-1 al 5-5 | Cinco (5) fotografías a color de la Honda Pilot. |
| 6-1 | CD con fotografías del Hyundai Elantra tomadas el 8 de octubre de 2019. |
| 6-2 al 6-7 | Fotocopia a color de seis (6) fotografías ampliadas tomadas al Hyundai Elantra. |
| 7 | CD que contiene un video de la escena del delito. |
| 8-1 | CD con grabación de llamada realizada al Sistema 9-1-1. |
| 8-2 | Fotocopia de un *Subpoena* dirigido al Sistema 9-1-1 del 7 de octubre de 2019. |
| 8-3 | Fotocopia *Información de Incidente* con registro de llamadas del 9-1-1. |
| 9-1 al 9-41 | Cuarenta y un (41) fotos de la carretera PR-174 capturadas el 10 de diciembre de 2019. |
| 10-1 | Fotocopia del *Formulario de consentimiento a un registro* firmado por el señor Juan Pérez Colón (señor Pérez Colón) 3 de octubre de 2019. |
| 10-2 | CD que contiene un video captado por cámaras de seguridad de JAPC Construction (JAPC). |
| 10-3 | CD que contiene un video captado por cámaras de seguridad de JAPC |
| 10-4 | CD que contiene un video captado por cámaras de seguridad de JAPC |
| 11-1 | *Pendrive* color negro y plata que contiene un video captado por cámaras de seguridad de GM Auto Parts, |
| 11-2 | CD que contiene un video captado por cámaras de seguridad de El Centro de Crucero. |
| 11-3 | CD que contiene un video captado por cámaras de seguridad Condominio The Falls. |
| 12-1 | Copia de una *Solicitud de Servicio Forense* relacionada al *Recibo de Control y Cadena de Custodia* (AF-19-1194), redactada por el ICF acerca de la señora Padilla Romero. |
| 12-2 | Copia de una *Solicitud de Servicio Forense* sobre el *Recibo de Control y Custodia* (AF-19-1179), del ICF a nombre del señor González Martínez. |
| 12-3 | Copia de una *Solicitud de Servicio Forense* del *Recibo de Control y Custodia* (AF-19-1222), del ICF relacionado a la señora Padilla Romero. |
| 12-4 | Copia de *Solicitud de Servicio Forense* del *Recibo de Control y Custodia* (P-19-0401) con respecto a la señora Padilla Romero. |
| 13-1 | *Curriculum Vitae* de la examinadora Berríos Rivera. |
| 13-2 | Copia del *Certificado de Examen* (AF-19-1179) del ICF relacionado con el señor González Martínez del 20 de noviembre de 2019. |
| 13-3 | Copia del *Certificado de Examen* (AF-19-1194), (AF-19-1222) y (P- 19-0401) redactado por el ICF en relación con la señora Padilla Romero fechado el 20 de noviembre de 2019. |
| 14-1 | *Curriculum Vitae* del Dr. Dávila Toro. |
| 14-2 | *Certificación de Muerte* (PAT-3843-19) expedida el 21 de octubre de 2019. |

| | |
|---|---|
| 14-3 | Copia de *Informe Médico - Forense* (PAT-3843-19) de la señora Padilla Romero. |
| 14-4 | Copia de *Certificado* de *Análisis Toxicológico* (PAT-3843-19) realizado a la señora Padilla Romero. |
| 14-5 | CD con Fotos de la señora Padilla Romero en Patología Forense capturadas por el Dr. Dávila Toro (PAT-3843-19). |
| 15-1 | Copia de *Advertencias miranda para persona sospechosa en custodia* firmada por el señor González Martínez, fechada el 11 de octubre de 2019 a las 11:20 a.m. |
| 15-2 | Copia de *Advertencias miranda para persona sospechosa en custodia* firmada por el señor González Martínez, fechada el 11 de octubre de 2019 a las 2:00 p.m. |
| 15-3 | Copia de *Advertencias miranda para persona sospechosa en custodia* firmada por el señor González Martínez, fechada el 11 de octubre de 2019 a las 7:05 pm. |
| 15-4 | Copia de *Formulario de Advertencias para personas sospechosas en custodia* firmada por el señor González Martínez, fechada el 14 de octubre de 2019 a las 9:55 a.m. |
| 15-5 | *Declaración de Derecho Advertencias que deberá hacerle a un sospechoso o acusado* firmada por el señor González Martínez, fechada el 14 de octubre de 2019 a las 10:30 am. |
| 15-6 | Copia de *Advertencias miranda para persona sospechosa en custodia* firmada por el señor González Martínez, fechada el 7 de octubre de 2019 a las 9:00 p.m. |
| 16-1 | *Acuerdo de cooperación con el Gobierno de Puerto Rico y convenio de alegación pre acordada de culpabilidad bajo la Regla 72 (D) de Procedimiento Criminal* del 26 de noviembre de 2019, firmado por el señor González Martínez. |
| 16-2 | *Declaración de derecho advertencias que deberá hacerle a un sospechoso o acusado* firmado por el señor González Martínez, fechada el 26 de noviembre de 2019. |
| 17-1 | Copia de *Advertencias Miranda para persona sospechosa en custodia* firmada por el señor Avilés González, fechada el 21 de octubre de 2019 a las 11:16 a.m. |
| 17-2 | Copia de *Advertencias Miranda para persona sospechosa en custodia* firmada por el señor Avilés González, fechada el 26 de noviembre de 2019 a las 5:30 p.m. |
| 17-3 | Copia de *Advertencias Miranda para persona sospechosa en custodia* firmada por el señor Avilés González, fechada el 27 de noviembre de 2019 a las 9:10 a.m. |
| 18-1 | *Curriculum Vitae* del señor Cintrón Castellanos. |
| 18-2 | Copia *Informe de Solicitud de Análisis* relacionado al proyectil disparado (SAR 19-0295). |
| 18-3 | CD que contiene fotografías de la Honda Pilot (SAR-19-0295). |
| 19 | Copia del *Curriculum Vitae* de la Agte. Negrón Rivera. |
| 20 | *Inventario de vehículo* de la Honda Pilot, fechado el 30 de septiembre de 2019 a las 6:00 p.m. |
| 21 | Copia del *Informe de hallazgos de escena* del ICF. |
| 22-1 al 22-11 | Copia de once (11) fotos a color de la escena y de la señora Padilla Romero. |
| 23 | Cuatro (4) proyectiles y catorce (14) casquillos de bala. |
| 24 | Dos (2) proyectiles relativos al informe AF-19-1222, tiene dos (2) pequeños sobres color manila. |
| 25-1 al 25-21 | Veintiún (21) fotos del sector Camino Los Martínez II en Caimito. |

| | | |
|---|---|---|
| | 26-1 al 26-12 | Doce (12) fotos del Camino Los Bigio en Caimito. |
| | 27-1 al 27-8 | Ocho (8) fotos de las pertenencias encontradas dentro de la Honda Pilot. |
| | 28-1 | *Certification of Pursuant to rules 803 (6) and 902 (11) of the Federal Rules of Evidence and 28 USC sec. 1746* emitida por SPRINT. |
| | 28-2 | CD que contiene un documento titulado *Hash List.* |
| | 28-3 | Registro de llamadas del *Hash List* certificado por SPRINT. |
| | 28-4 | Escritura de *Acta de protocolización de certificación otorgada fuera de Puerto Rico* con relación a la certificación emitida por SPRINT. |
| | 29-1 | CD que contiene el registro de llamadas remitido por la compañía telefónica AT&T en atención a una *Orden de registro y allanamiento.* |
| | 29-2 | CD que contiene el registro de llamadas emitido por AT&T y los reportes en relación con la contestación de la *Orden de registro y allanamiento* en nombre de AT&T. |
| | 29-3 | *Acta de Protocolización de Certificación otorgado fuera de Puerto Rico* autorizada por AT&T. |
| | 30-1 | Certificación de CLARO. |
| | 30-2 | *Declaración Jurada* autorizada por la señora Linette Guzmán Vázquez y la *Declaración Jurada* autorizada por el señor William Rivera Rivera (señor Rivera Rivera) en representación de CLARO. |
| | 30-3 | Certificación del registro de llamadas de CLARO enviada por el señor Rivera Rivera con fecha del 21 de octubre de 2019. |
| | 31-1 | *Apostille* firmada por la señora Marilú Santiago Díaz en capacidad de Directora de la Oficina Ceremonial y Protocolo del Departamento de Estado con fecha del 31 de agosto de 2022. |
| | 31-2 | Correo electrónico con *Registro de llamadas telefónicas* en respuesta a la *Orden de registro y allanamiento.* |
| | 32-A | CD-R que contiene la regrabación de la Vista Preliminar celebrada los días 9 y 10 de marzo de 2020. |
| | 32-B | Documento titulado *Recibo de Regrabación* en el que indica las fechas de la celebración de la Vista Preliminar. |
| | 33 | *Inventario de propiedad ocupada* del 7 de octubre de 2019. |
| | 34 | Foto a color de la propiedad ocupada por el Agte. Martínez Natal. |
| | 35 | Pistola Glock, color negro, modelo 27, calibre 0.40. |
| | 60 | Llave inteligente del vehículo de motor marca Hyundai Elantra. |
| | 51 | *Inventario de Propiedad Ocupada* fechado el 8 de octubre de 2019. |
| | 36 | Cartera de Hombre color negra y marrón marca Nike. |
| | 37 | Baqueta Color negra, marca Houston. |
| | 38 | *Advertencias Miranda para persona sospechosa en custodia* firmadas por el señor González Martínez, fechadas el 7 de octubre de 2019 a las 5:50 p.m. |
| | 39 | *Cadena de custodia* relacionado a un teléfono celular y beeper de llave inteligente del Hyundai Elantra. |
| | 71 | Teléfono celular marca LG, color gris con *cover* negro |
| | 44-1 al 44-40 | Cuarenta y un (41) fotografías. |
| | 40 | *Formulario de Consentimiento a un Registro* firmado por la señora Lucrecia Martínez Trinidad con fecha del 7 de octubre de 2019 a las 9:00 a.m. |
| | 41 | *Formulario de Consentimiento a un Registro* firmado por el señor González Martínez con fecha del 7 de octubre de 2019 a las 9:00 p.m. |
| | | |

| | |
|---|---|
| 42 | *Inventario de Propiedad Ocupada* del 7 de octubre de 2019. |
| 43 | Documento de *Entrega parte de la propiedad*. |
| 72-1 al 72-4 | Galaxy Modelo GTN71000, blanco, con pantalla rota, que no encendía, con los últimos cuatro números de IMEI 1589, admitido como el Exhibit el 72-1; LG modelo G5, el único con SIM Card, el cual tenía los últimos cuatro números de IMEI 4144 y era emitida por Claro, los últimos cuatro números IMEI del equipo eran 4356, admitido como el Exhibit el 72-2; LG, negro, con pantalla rota, lápiz Stylus y que no tenía disponible el número de IMEI a simple vista, admitido como el Exhibit 72-3; Vortex, modelo 8, negro, con pantalla rota, sin SIM Card, cuyos últimos cuatro números de IMEI eran 1589, admitido como el Exhibit 72-4. |
| 45 | Sobre amarillo preparado por el Tnte. Alvarado Reyes. |
| 46 | Copia de una página del *Libro de Anotaciones* del Cuarto de Evidencia del CIC de Bayamón del 8 de octubre de 2019. |
| 47 | Documento titulado *Inventario de propiedad ocupada* relacionado al señor González Martínez. |
| 48 | Copia Certificada del registro de asistencia del señor Avilés González emitida por Lufthansa Technik de PR con fecha del 14 de enero de 2022. |
| 49 | *Advertencias Miranda para Persona Sospechosa en Custodia*, firmada por el señor González Martínez, con fecha del 8 de octubre de 2019 a las 12:15 p.m., objetado la señora Pérez Bigio. |
| 50-1 | *Formulario de Consentimiento a un Registro* de un teléfono celular LG negro con pantalla estillada, fechado el 8 de octubre de 2019 a las 4:30 p.m. |
| 50-2 | *Formulario de Consentimiento a un Registro* de un teléfono celular Vortex negro con pantalla rota, fechado el 8 de octubre de 2019 a las 4:30 p.m. |
| 50-3 | *Formulario de Consentimiento a un Registro* de un teléfono celular Samsung Galaxy JF negro con pantalla rota, con fecha del 8 de octubre de 2019 a las 4:30 p.m. |
| 50-4 | *Formulario de Consentimiento a un Registro* de un teléfono celular Samsung blanco con pantalla totalmente rota, no tiene batería y tapa, con fecha del 8 de octubre de 2019 a las 4:30 p.m. |
| 50-5 | *Formulario de Consentimiento a un Registro* de un teléfono celular LG gris, con fecha del 8 de octubre de 2019 a las 4:30 p.m. |
| 52 | *Formulario de Solicitud Examen Digital* del Departamento de Justicia. |
| 73 | *Evidencia Electrónica Recibida* del Departamento de Justicia, entregada por el Agte. Negrón y recibida por la Agte. Acevedo Jiménez, con fecha del 17 de octubre de 2019 |
| 59 | Documento titulado *Evidencia Electrónica Recibida* del Departamento de Justicia con fecha del 14 de octubre de 2019. |
| 53 | Documento titulado *Inventario de propiedad ocupada* del 17 de octubre de 2019. |
| 56 | Citación del señor Avilés González (PPR-615.2) con fecha de 16 de octubre de 2019 a las 2:15 p.m. |
| 55-1 al 55-9 | Fotocopia de nueve (9) fotografías en blanco y negro. |
| 54 | Memorando acerca de la Citación del señor William Alexis Avilés González (Q. 2019-7-132-7544) del 22 de octubre de 2019. |
| 57 | *Recibo de entrega de evidencia* con fecha del 15 de octubre de 2019. |
| 58 | DVD+R con video de la gasolinera Shell en Torrimar. |
| 61 | *Muestrario de Confrontación Fotográfica*. |

| 62 | *Acta sobre confrontación fotográfica* (PPR-640-2). |
|---|---|
| 63 | Fotografía impresa en blanco y negro de un hombre. |
| 64 | Notas del Agte. Rodríguez Martínez del 21 de octubre de 2019. |
| 65 | Dos (2) proyectiles. |
| 66 | Tres (3) proyectiles disparados de prueba por el ICF. |
| 67-1 al 67-59 | Certificaciones académicas de la Agte. Negrón Rivera. |
| 68 | *Informe Triangulación de Evidencia* redactado por la Agte. Negrón Rivera, 16 de junio de 2020. |
| 69 | Tabla de llamadas telefónicas. |
| 70-1 al 70-5 | Cinco (5) recibos de los teléfonos celulares investigados por la Unidad Investigativa de Crímenes Cibernéticos (UICC). |
| 74-1 | *Evidencia Electrónica Recibida* en el que la UICC confirma que recibió el 20 de noviembre de 2019 un teléfono celular, LG Stylus negro. |
| 74-2 | *Evidencia Electrónica Recibida* en el que la UICC confirma que recibió el 20 de noviembre de 2019 un teléfono celular, Samsung J7. |
| 75 | Pendrive en el que contiene tres (3) audios. |

Por su parte, la defensa presentó tres (3) Exhibits: un *Resumen de llamada por número de control 54447-T*, admitido como el Exhibit 1 de la defensa; otro *Resumen de llamada por número de control 54450-T*, admitido como Exhibit 2 de la defensa; y un *Certificado de análisis forense DNA* preparado por el Negociado de Ciencias Forenses de Puerto Rico, admitido como Exhibit 3 de la defensa.

A continuación, pormenorizamos las porciones de la TPO atinentes a los errores señalados por los apelantes en los recursos consolidados de epígrafe.

**Testimonio del Agte. Flores González**

El Agte. Flores González, quien expresó que se desempeñaba como agente de la Policía desde el 1999, llegando a estar destacado en el Precinto 132 de Guaynabo y Preventiva de Zona del área de Guaynabo[194], declaró que:

1) El 30 de septiembre de 2019, se encontraba patrullando el área de Guaynabo tras tomar servicio al mediodía cuando, a eso de las 6:00 p.m., llegó una querella de detonaciones en la intersección de la carretera PR-177 con la carretera PR-833 en el área de Los Filtros, Guaynabo.[195]

---

[194] TPO, 25 de octubre de 2022, pág. 58, líneas 20-25; pág. 59, líneas 1-15.
[195] TPO, 25 de octubre de 2022, pág. 61, línea 10-25; pág. 62, líneas 1-3.

2) Tras recibir la información, se dirigió hacia la escena, la cual estaba localizada cerca de la salida hacia la Avenida Martínez Nadal en dirección de Bayamón a San Juan.[196]

3) Al llegar a la escena, observó que estaban subiendo a una mujer con la cabeza vendada a una ambulancia, a quien describió como de tez blanca y "un poco llenita".[197]

4) En el carril extremo derecho, vio una Honda Pilot negra con múltiples impactos de bala en la puerta del conductor y un impacto en el lado derecho del pasajero.[198]

5) También observó que en el carril extremo derecho se encontraban muchos casquillos dispersos.[199]

6) Junto a policías municipales, quienes redirigieron el tránsito de la zona, acordonó el área para preservar la escena.[200]

7) Realizó gestiones con el Instituto de Ciencias Forenses (ICF), el Cuerpo de Investigaciones Criminales (CIC) y el Ministerio Público.[201] Del CIC llegó a la escena el Agte. Pagán Rosado; del ICF llegaron tres (3) personas, una a cargo de fotografía, otra de video y otra de realizar el croquis; y del Ministerio Público llegó la fiscal Jessika Correa González (fiscal Correa González).[202]

8) El esposo de la víctima, de nombre Juan, llegó a la escena y le dijo que ella se llamaba Hilda Padilla y que las menores tenían diecisiete (17) y ocho (8) años.[203]

9) Los agentes municipales en la escena le dijeron que las menores habían sido transportadas al Centro Médico.[204]

10) Mientras preservaba la escena, observó cómo el personal del ICF marcaba los casquillos en la carretera, medía la escena, y tomaba fotografías y videos.[205]

11) A eso de las 7:30 p.m., le informaron que la persona herida de bala había fallecido en Centro Médico.[206]

12) El retén en turno le informó que una fémina se había comunicado al sistema 9-1-1 y había expresado que observó a dos (2) personas encapuchadas, a bordo de un Hyundai Elantra o un Hyundai Accent gris, disparar a quien conducía la Honda Pilot.[207]

13) El personal del ICF recopiló evidencia de la escena y examinó y selló la Honda Pilot y luego la Policía la removió en una grúa.[208]

14) Los tintes de la Honda Pilot eran más claros en las ventanas de al frente que la de atrás.[209]

**Testimonio del Agte. Pagán Rosado**

Por su parte, el Agte. Pagán Rosado, quien aseveró que, para ese entonces, había laborado para la Policía por veintidós (22) años

---

[196] Íd., pág. 62, líneas 4-25; pág. 63, líneas 1-4 y 8-14.

[197] Íd., pág. 63, líneas 15-25; pág. 64, líneas 1-6.

[198] Íd., pág. 64, líneas 12-25, pág. 65, líneas 1-8.

[199] Íd., pág. 65, línea 9-15.

[200] Íd., líneas 16-25; pág. 66, líneas 1-5.

[201] Íd., pág. 66, líneas 6-14.

[202] Íd., líneas 15-25; pág. 67, líneas 1-6.

[203] Íd., pág. 68, líneas 21-25; pág. 69, 1-13.

[204] Íd., pág. 71, líneas 21-23.

[205] Íd., pág. 74, líneas 8-22.

[206] Íd., pág. 75, líneas 6-24.

[207] Íd., pág. 79, líneas 14-24; pág. 87, líneas 2-8.

[208] Íd., pág. 88, líneas 7-25; pág. 89, líneas 1-9.

[209] Íd., pág. 95, líneas 7-20.

y estaba destacado en la División de Homicidios de Bayamón desde el 2011[210], testificó que:

1) El 30 de septiembre de 2019, llegó a la escena ubicada en la carretera PR-177, la cual constaba de tres (3) carriles en cada dirección.[211]
2) El área de la escena estaba acordonada.[212] Allí, observó que, en el carril derecho de la carretera en dirección a San Juan, estaba detenida una Honda Pilot negra con varios impactos de bala en el lado del conductor y vio que en el carril central había varios casquillos.[213]
3) Habló con el Agte. Flores González, quien le informó que los hechos ocurrieron a las 6:00 p.m., que hirieron a la señora Padilla Romero, quien andaba con dos (2) menores de diecisiete (17) y ocho (8) años que no fueron heridas y que las tres (3) involucradas fueron trasladadas a Centro Médico.[214]
4) Los casquillos estaban en el carril central, justamente al lado izquierdo de la Honda Pilot y eran calibre .40.[215]
5) Él se encontraba al lado del personal del ICF mientras ellos trabajaban la escena.[216]
6) El más cerca de los casquillos estaba a más o menos diez (10) pies de la Honda Pilot, mientras que el más lejano estaba más o menos a cuarenta (40) pies de distancia del vehículo.[217]
7) En su informe sobre inventario de la Honda Pilot, admitido como el Exhibit 20 del Ministerio Público, identificó los impactos de bala que tenía el vehículo en su lado izquierdo, pero omitió los del lado derecho.[218]

**Testimonio del señor Rodríguez Torres**

El señor Rodríguez Torres, quien adujo que desde el 2004 había laborado para el ICF como investigador forense[219], declaró que:

1) El 30 de septiembre de 2019, llegó a la escena a eso de las 8:10 p.m. y encontró el área acordonada y alumbrada con focos provistos por el Municipio de Guaynabo.[220]
2) Allí, se encargó de ser el investigador primario del ICF, lo cual implicaba redactar el informe de escena y confeccionar el croquis.[221]
3) Marcó como piezas de evidencia lo siguiente: trece (13) casquillos calibre .40 con números 1 al 13;[222] un proyectil ubicado al lado de la Honda Pilot con el

---

[210] TPO, 26 de octubre de 2022, pág. 15, líneas 7-21.
[211] Íd., pág. 18, líneas 18-25; pág. 19, líneas 1-25.
[212] Íd., pág. 20, líneas 1-4.
[213] Íd., líneas 5-21; pág. 21, líneas 1-13.
[214] Íd., pág. 22, líneas 9-21.
[215] Íd., pág. 27, líneas 11-21.
[216] Íd., pág. 28, líneas 1-12.
[217] Íd., pág. 52, líneas 1-11.
[218] Íd., pág. 69, líneas 8-25; pág. 70, líneas 1-8.
[219] Íd., pág. 106, líneas 21-25; pág. 107, líneas 1-8.
[220] Íd., pág. 111, líneas 19-25; pág. 112, líneas 1-22.
[221] Íd., pág. 113, líneas 13-22.
[222] Íd., pág. 120, líneas 7-25; pág. 121, líneas 1-3.

número 14;[223] la Honda Pilot con el número 15;[224] y otro casquillo calibre .40, encontrado después de levantar las piezas, con el número 16[225].

4) La Honda Pilot tenía la mayoría de las perforaciones en la puerta del conductor, tanto en el área del cristal como en la carrocería, había una perforación en el cristal de la puerta delantera derecha del pasajero y otra en el cristal de la parte posterior del lado derecho.[226] Esa información la hizo constar en el *Informe de hallazgos de escena*, admitido como el Exhibit 21 del Ministerio Público.[227]

5) Encontró sangre en el asiento del conductor y tres (3) proyectiles, uno en el piso del conductor, otro en la consola y uno en el suelo del pasajero.[228] Observó un celular, carteras, muchas pertenencias.[229]

6) Abrió el baúl, observó tanto bultos como muchas pertenencias de lo cual se tomaron fotos y videos.[230] Además de mochilas escolares, había carteras.[231]

7) Luego de ocupar los proyectiles en el interior de la Honda Pilot, selló el vehículo y lo entregó a la Policía.[232]

8) Una vez culminó sus trabajos en la escena a eso de las 11:10 p.m., se trasladó a Centro Médico.[233] Allí, tomó fotos y videos del cuerpo de la occisa, quien según describió tenía una altura de 5 pies con 6 pulgadas, pesaba unas 200 libras aproximadamente, tenía tez blanca, ojos marrones y pelo rubio largo lacio.[234]

9) Tenía varias heridas: detrás de la oreja izquierda, en el pómulo derecho, en el área de la cabeza, en la frente y dos (2) en el brazo izquierdo.[235]

10) No se podía identificar cuántas armas expulsaron los casquillos encontrados en la escena.[236]

11) No levantó muestras de sangre de la escena, ni trabajó la gorra con cabello humano que se encontró allí.[237]

**Testimonio del señor Cintrón Castellanos**

El señor Cintrón Castellanos, quien contó que desde el 2004 había laborado en el ICF como investigador forense[238], testificó lo siguiente:

1) Como investigador forense del ICF, en el 2019, analizó dos (2) vehículos relacionados a este caso: un Hyundai Elantra gris del 2017 que ostentaba la tablilla IWE-252, trasladado mediante grúa hasta el ICF y una Honda Pilot, negra del 2017 que tenía la tablilla IYY-

---

[223] Íd., pág. 121, líneas 5-6.
[224] Íd., líneas 6-7.
[225] Íd., pág. 122, líneas 6-9.
[226] Íd., pág. 125, líneas 18-25; pág. 126, líneas 7-25; pág. 127, líneas 1-11.
[227] Íd., pág. 127, líneas 12-15.
[228] Íd., líneas 21-25; pág. 128, líneas 1-6; pág. 131, líneas 10-14.
[229] Íd., líneas 6-9.
[230] Íd., líneas 9-13 y 24-25; pág. 129, líneas 1-7.
[231] Íd., pág. 131, líneas 2-4.
[232] Íd., pág. 132, líneas 3-25; pág. 133, líneas 1-2.
[233] Íd., pág. 133, líneas 3-15.
[234] Íd., pág. 165, líneas 3-5 y 15-23.
[235] Íd., pág. 166, líneas 12-19 y 25; pág. 167, líneas 1-8.
[236] TPO, 27 de octubre de 2022, pág. 63, líneas 14-17.
[237] Íd., pág. 69, líneas 12-25; pág. 70, líneas 1-9.
[238] Íd., pág. 93, líneas 3-11.

703, analizada en la Comandancia de la Policía de Puerto Rico en Bayamón.[239]

2) Utilizando el Exhibit 18-2 del Ministerio Público detalló las once perforaciones ubicadas en la Honda Pilot, descritas como sigue:

(1) Marco de la puerta trasera del lado izquierdo (detrás del chofer), con trayectoria de izquierda a derecha, de frente hacia atrás y de abajo hacia arriba.

(2) Puerta del chofer, con trayectoria de izquierda a derecha, de atrás hacia el frente y de abajo hacia arriba.

(3) Marco inferior del cristal de la puerta del chofer, con trayectoria de izquierda a derecha y de atrás hacia el frente.

(4) Dos (2) perforaciones en la superficie de metal de la puerta del chofer, con trayectoria de izquierda a derecha y de frente hacia atrás.

(5) Marco inferior del cristal de la puerta del chofer, con trayectoria de izquierda a derecha, de frente a atrás, y de abajo hacia arriba.

(6) Cristal de la puerta del chofer, con trayectoria de izquierda a derecha, de frente hacia atrás, de abajo hacia arriba, traspasando y ocasionando perforaciones 8, 9 y 10.

(7) Seis (6) perforaciones en el cristal de la puerta del chofer, con trayectoria de exterior a interior.

(8) Parte anterior y posterior del cabezal del asiento del conductor.

(9) Parte anterior y posterior del cabezal derecho del asiento posterior.

(10) Cristal del panel trasero del lado derecho.

(11) Cristal de la puerta delantera del lado derecho (cristal del pasajero), de interior a exterior.[240]

3) La perforación en el panel trasero del lado derecho de la Honda Pilot era de salida.[241]

4) La perforación en el cristal de la puerta delantera del lado derecho (cristal del pasajero) fue de adentro hacia afuera.[242]

5) Utilizando la foto 8504 del Exhibit 18-3 del Ministerio Público, mostró el cabello rojizo incrustado en la perforación de la salida del cabezal del asiento del chofer.[243]

6) Sobre la trayectoria de los disparos, explicó que su tendencia de abajo hacia arriba sugería que podían provenir de un vehículo más bajo que la Honda Pilot, una motora o una bicicleta.[244] Así, podría tratarse de un vehículo de cuatro (4) puertas más bajo que la Honda Pilot.[245]

---

[239] Íd., pág. 108, líneas 15-22; pág. 110, líneas 11-22.
[240] Íd., pág. 115, líneas 1-25 a la pág. 119, línea 2; pág. 147, línea 14-25 a la pág. 152, línea 15.
[241] Íd., pág. 131, líneas 3-15.
[242] Íd., pág. 152, líneas 8-15.
[243] Íd., pág. 132, líneas 9-25.
[244] Íd., pág. 139, líneas 1-5.
[245] Íd., pág. 200, líneas 9-13.

7) Recuperó un proyectil del poste central del lado izquierdo de la Honda Pilot y otro de la puerta delantera izquierda.[246]

8) Dentro del vehículo había un sinnúmero de carteras, cuyo origen desconocía y que no se observaban en el Exhibit 4-1.[247] Las carteras carecían de valor científico.[248]

## Testimonio del Agte. Ortiz Guzmán

El Agte. Ortiz Guzmán, quien expresó que estaba adscrito a la División de Servicios Técnicos de Bayamón de la Policía de Puerto Rico en la que había laborado desde el 1992, declaró que:

1) El 12 de diciembre de 2019, el Tnte. Alvarado Reyes solicitó los servicios de la División de Servicios Técnicos para tomar fotos del área de la intersección de la Calle Agustín Stahl con la carretera PR-174.[249] Las fotos fueron admitidas como los Exhibits 9-1 al 9-41 del Ministerio Público.

2) En esa área, retrató un edificio marrón y crema en el que se ubica un negocio de venta de artículos escolares, un negocio llamado Bambú Burger y un estacionamiento.[250] El edificio tenía cámaras de seguridad.[251]

3) En las fotos admitidas como los Exhibits 9-34, 9-35 y 9-36, identificó un negocio de piezas de vehículos con cámaras de seguridad.[252] En el Exhibit 9-4 identificó un negocio "Spa" con cámaras de seguridad y en el Exhibit 9-1 reconoció un edificio denominado Centro del Crucero.[253]

4) Tomó fotos en el Sector Los Martínez en Caimito, admitidas como los Exhibits 25-1 al 25-21 del Ministerio Público.[254]. En el Exhibit 25-16 se podía observar una casa azul al final del camino Los Martínez.[255] En el Exhibit 25-10 se podía ver una casa rosa y un terreno limpio, utilizado para estacionar vehículos.[256] El Exhibit 25-4 recogía el área completa de la cuesta en dirección a la residencia y la casa.[257]

5) Luego llegó al Sector Los Bigio en Caimito para tomar fotos, admitidas como los Exhibits 26-1 al 26-12 del Ministerio Público.[258]

6) En el Exhibit 26-4 se veía el Camino Los Bigio y una casa a mano izquierda con una reja color blanca; el Exhibit 26-9 demostraba la reja, el camino y la casa; en el Exhibit 26-11 se observaba un letrero que decía Sector Los Bigio; y el Exhibit 26-3 mostraba una casa blanca con reja blanca a la derecha del letrero.[259]

---

[246] Íd., pág. 139, líneas 15-23; pág. 140, líneas 5-22; pág. 141, líneas 1-6.
[247] Íd., pág. 168, líneas 5-22; pág. 171, líneas 1-4.
[248] Íd., pág. 196, líneas 9-18.
[249] TPO, 28 de octubre de 2022, pág. 34, líneas 11-25.
[250] Íd., pág. 40, líneas 22-25; pág. 41, líneas 1-22.
[251] Íd., pág. 46, líneas 11-25; pág. 47, línea 1.
[252] Íd., pág. 50, líneas 20-25; pág. 51, líneas 2-13.
[253] Íd., pág. 52, líneas 7-17.
[254] Íd., pág. 53, líneas 1-5.
[255] Íd., pág. 75, líneas 24-25; pág. 76, líneas 1-4.
[256] Íd., pág. 76, líneas 2-25; pág. 77, líneas 1-4.
[257] Íd., pág. 77, líneas 5-7.
[258] Íd., pág. 78, líneas 4-17.
[259] Íd., pág. 82, líneas 13, a la pág. 84, línea 2.

**Testimonio de la Agte. Rosado Maysonet**

Por otra parte, la Agte. Rosado Maysonet testificó que:

1) Había laborado desde hacían doce (12) años en la División de Servicios Técnicos de la Policía en la Comandancia de Bayamón.[260]
2) El 9 de octubre de 2019, el Agte. Rodríguez Martínez se comunicó con ella porque necesitaba sacar unas pertenencias de la Honda Pilot negra.[261]
3) Documentó con fotos el proceso de abrir el baúl del vehículo, así como los bultos de escuela que estaban allí.[262] Las fotos fueron admitidas como los Exhibits 27-1 al 27-8 del Ministerio Público.
4) El Agte. Rodríguez Martínez removió los bultos del vehículo, cerró el baúl y se volvió a sellar.[263]
5) Se rompieron los sellos del baúl de la Honda Pilot, pero el acto no se detalló en un documento, ni se fotografió.[264]

**Testimonio del señor González Martínez**

El señor González Martínez declaró lo siguiente:

1) Tenía veintisiete (27) años y había estudiado hasta décimo grado en la Escuela Inés María Mendoza en San Juan.[265]
2) Estaba detenido en la cárcel de Bayamón, pero desconocía la razón para ello.[266]
3) Luego de que el TPI le explicara que tenía derecho a permanecer callado, a no declarar, a estar asistido por un abogado, que tenía un representante legal asignado y que tenía derecho a no incriminarse a sí mismo, expresó que <u>entendía y que no tenía preguntas al respecto</u>.[267]
4) Se sentía bien y no tenía frío.[268]

A partir de ese punto, el señor González Martínez desplegó una conducta de negación reiterada a contestar las preguntas del Ministerio Público y de la defensa de los apelantes. En específico, sucedió lo siguiente:

1) El Ministerio Público le preguntó si sabía la razón por la que era testigo en este caso y él respondió que no podía contestar.[269] También, le cuestionó por qué no podía contestar la pregunta y él simplemente reiteró que no podía.[270]
2) El Ministerio Público le cuestionó quién era la señora Pérez Bigio y él contestó que no sabía quién era.[271]

---

[260] Íd., pág. 100, líneas 18-25; pág. 101, líneas 1-8.
[261] Íd., pág. 102, líneas 5-13.
[262] Íd., pág. 103, líneas 15-25; pág. 104, líneas 1-3.
[263] Íd., pág. 104, líneas 7-23.
[264] Íd., pág. 110, líneas 6-20; pág. 113, líneas 25; pág. 114, líneas 1-3.
[265] TPO, 17 de abril de 2023, pág. 15, líneas 4-5 y 12-23.
[266] Íd., pág. 16, líneas 7-25.
[267] Íd., pág. 17, línea 13, a la pág. 18, línea 21.
[268] Íd., pág. 20, líneas 11-20.
[269] Íd., pág. 21, línea 12, a la pág. 22, línea 14.
[270] Íd., pág. 22, líneas 15-17.
[271] Íd., líneas 18-25.

3) Se le preguntó quién era el señor Avilés González y respondió que había mirado la Sala, pero no sabía, no lo había visto.[272]

4) Se le cuestionó si conocía a la señora Padilla Romero y él contestó que no podía contestar.[273]

5) Se le preguntó quién asesinó a la señora Padilla Romero y él expresó que no podía contestar esa pregunta.[274]

6) El TPI le explicó al señor González Martínez que podía escoger las razones por las que no podía contestar y, entre ellas, pormenorizó el derecho del testigo a no auto incriminarse o que no pudiera responder porque no recordaba o porque no conocía.[275] Él afirmó entender, mediante dos "okey".[276]

7) El Ministerio Público le preguntó cuál era la razón por la que él indicaba que no podía contestar la pregunta y él manifestó que no recordaba.[277]

8) El Ministerio Público le preguntó quién planificó el asesinato de la señora Padilla Romero, por qué la asesinaron, si conocía al Agte. Rodríguez Martínez y cuántas veces habló con él y el señor González Martínez respondió que no recordaba a cada una de las interrogantes.[278] También enunció que no conocía a la Agte. Acevedo Jiménez.[279]

9) Ante preguntas sobre si conocía a la fiscal Correa González, manifestó que no y que no recordaba.[280] Cuestionado sobre si conocía a la fiscal Lissette Sánchez, al licenciado Alex Ramos y a la licenciada Bárbara Cruz, expresó que no recordaba.[281]

10) El Ministerio Público le interrogó si conocía al licenciado Luis Cintrón y él respondió que sí y que se encontraba en Sala.[282]

11) También, le preguntó si había suscrito un acuerdo de cooperación con el Ministerio Público y él dijo que no recordaba.[283]

12) Mostrándosele el acuerdo de cooperación que suscribió con el Ministerio Público, admitido como el Exhibit 16-1 del Ministerio Público, expresó que <u>no continuaría declarando</u> y que no recordaba.[284]

13) A solicitud del Ministerio Público para que el señor González Martínez fuera declarado testigo hostil, el TPI autorizó las preguntas fueran sugestivas, pero las respuestas en la negativa continuaron de la misma manera.[285]

14) Mostrándosele las advertencias que firmó el mismo día del acuerdo de cooperación, admitidas como el Exhibit 16-2 del Ministerio Público, expresó que no iba a seguir declarando.[286] Cuestionado sobre la razón por la que no seguiría declarando, repitió "[p]orque no voy a seguir declarando.[287]

---

[272] Íd., pág. 23, líneas 5-12.
[273] Íd., líneas 14-18.
[274] Íd., líneas 19-20.
[275] Íd., pág. 25, líneas 1-6.
[276] Íd., líneas 7-12.
[277] Íd., pág. 25, línea 21, a la pág. 26, línea 2.
[278] Íd., pág. 26, líneas 3-19.
[279] Íd., líneas 20-21.
[280] Íd., pág. 26, línea 22, a la pág. 27, línea 1.
[281] Íd., pág. 27, líneas 2-10.
[282] Íd., líneas 11-21.
[283] Íd., líneas 22-25.
[284] Íd., pág. 38, líneas 21-25; pág. 39, líneas 1-24.
[285] Íd., pág. 40, líneas 7-24.
[286] Íd., pág. 41, líneas 3-10.
[287] Íd., pág. 11-12.

15) A preguntas sobre si había visto el documento antes o si reconocía la firma que había en él, el señor González Martínez reiteró que no recordaba y que no iba a seguir declarando.[288]

16) Luego de que el señor González Martínez expresara que no contestaría ni seguiría declarando a preguntas sobre su propio nombre, el Ministerio Público solicitó al TPI que le instruyera y obligara a contestar.[289] Ante ello, el TPI resolvió que no emitiría tal orden de responder porque el señor González Martínez se podría auto incriminar mediante su propio testimonio, afectándole en el caso en el que era acusado por los mismos hechos.[290]

17) Reiterada la negación del señor González Martínez a continuar declarando, el TPI le preguntó <u>directamente</u> si no iba a declarar porque quería preservar su derecho a no incriminarse a sí mismo y si entendía cuál era el derecho y <u>él contesto que sí, entendía</u>.[291] Esos hechos quedaron recogidos en la TPO como sigue:

[…]
HON. JUEZA MARIELA MIRANDA RECIO:
Mire, don Luis, don Luis, don Luis, ¿usted no va a declarar?

TESTIGO:
No.

HON. JUEZA MARIELA MIRANDA RECIO:
¿Pero usted no va a declarar porque usted quiere preservar su, su derecho a no auto incriminarse? ¿Me entiende cuál es el derecho a no auto incriminarse?

TESTIGO:
Sí.

HON. JUEZA MARIELA MIRANDA RECIO:
Que todo lo que usted diga lo pueden usar contra usted. Ese es su derecho, a permanecer callado ante eso. ¿Usted no va a declarar por eso?

TESTIGO:
No voy a declarar, sí.

HON. JUEZA MARIELA MIRANDA RECIO:
¿Pero no va a declarar por ese motivo, porque no quiere auto incriminarse?

TESTIGO:
No, porque no voy a seguir declarando es-

HON. JUEZA MARIELA MIRANDA RECIO:
¿Perdón?

TESTIGO:
No voy a seguir declarando.

---

[288] Íd., líneas 15-25
[289] Íd., pág. 43, líneas 7-24.
[290] Íd., pág. 45, líneas 13-22.
[291] Íd., pág. 47, líneas 19-25, a la pág. 49, línea 3.

HON. JUEZA MARIELA MIRANDA RECIO:

Okey. ¿Pero no va a seguir declarando por ese motivo, porque no quiere auto incriminarse o porque no le da la gana?

TESTIGO:

No, porque no, no voy a seguir declarando más ná'.[292]

18) El TPI le preguntó si temía por su vida o la de sus familiares, él respondió que no.[293]

19) A preguntas del TPI sobre condiciones médicas que pudiera padecer, el señor González Martínez expresó que había sufrido una fractura craneal por un accidente de motora antes de ser ingresado a la cárcel y que, a veces, se le olvidaban las cosas.[294]

20) Más adelante, el TPI se dirigió nuevamente al testigo sobre sus derechos. De la TPO estipulada, surge lo siguiente:

HON. JUEZA MARIELA MIRANDA RECIO:

Si usted me lo dice, yo lo voy a proteger hasta el último... hasta las últimas consecuencias, pero me lo tiene que decir: "Mire, yo no me quiero... yo no quiero hablar porque no me quiero auto incriminar".

Usted me lo dice y yo, gustosamente, lo complazco como siempre lo he complacido y usted se levanta y se va para su celda.

¿Cuál es el motivo por el cual usted no quiere declarar, don Luis?

TESTIGO:

Por eso. Porque ya no, ya no estoy motiva'o en declarar. No quiero seguir declarando. No por seguridad ni ná, pero no quiero seguir más ná declarando.[295]

21) Al resto de las preguntas por el Ministerio Público y la defensa de los apelantes, el señor González Martínez respondió "no voy a declarar".[296]

Por todo ello, el 20 y 21 de abril de 2023, el TPI emitió una *Resolución* en el caso de la señora Pérez Bigio y otra en el caso del señor Avilés González, respectivamente, en las que determinó que el señor González Martínez era un testigo no disponible según la Regla 806 de Evidencia, 32 LPRA Ap. VI, R. 806, y, por consiguiente, resolvió admitir el testimonio brindado por él en la Vista Preliminar.

En su dictamen, razonó que el testimonio ofrecido por el señor González Martínez era admisible bajo la Regla 806(b)(1) de Evidencia, *supra*, R. 806(b)(1), toda vez que fue vertido bajo

---

[292] Íd.
[293] Íd., pág. 61, líneas 7-14.
[294] Íd., líneas 15-24; pág. 62, líneas 1-4.
[295] (Subrayado nuestro). Íd., pág. 66, líneas 17-25, a la pág. 67, líneas 1-7.
[296] Véase Íd., págs. 69-120.

juramento y fue ampliamente contrainterrogado por los abogados de los apelantes. A ello, añadió que el señor González Martínez conocía y entendía sus derechos y estaba al tanto del acuerdo de cooperación que suscribió con el Ministerio Público. Por eso, estimó que, al no cumplir su parte del acuerdo, el señor González Martínez tenía claro que todo lo que declarara le incriminaría y le manifestó al foro primario que lo entendía y que no declararía más.

Esas determinaciones fueron impugnadas en sendos recursos de *certiorari* promovidos ante esta Curia por cada uno de los apelantes. Al recurso presentado por la señora Pérez Bigio se le asignó el identificador alfanumérico KLCE202300455, mientras que la petición radicada por el señor Avilés González recibió el KLCE202300456.

El 26 de abril de 2023, este mismo panel emitió una *Resolución* en la que denegó la expedición del auto de *certiorari* solicitado en el caso KLCE202300455. El 28 de abril de 2023, emitimos otra *Resolución* en la que también se denegó la expedición del auto en el caso KLCE202300456.

**Testimonio del Agte. Martínez Natal**

Luego, el Agte. Martínez Natal testificó lo siguiente:

1) Al momento de declarar, había laborado en la Policía por trece (13) años y estaba destacado en la Unidad Motorizada de San Juan.[297]
2) El 4 de octubre de 2019, tenía asignada una ronda preventiva en el área de Caimito.[298] Durante esta, cursaron por radio la tablilla de un vehículo.[299]
3) El vehículo estaba estacionado en una de las calles sin salida del Sector Los Martínez en Caimito y, allí, pudo observar que era un Hyundai, color gris y tenía cuatro (4) puertas.[300]
4) Hizo gestiones con una grúa de la Policía para ocupar el vehículo y mientras esperaba por esta, llegaron agentes del CIC de Bayamón para hacerse cargo del vehículo.[301] Respecto al vehículo, no realizó más gestiones.[302]

---

[297] TPO, 16 de mayo de 2023, pág. 8, líneas 23-25; pág. 9, líneas 1-2 y 14-17.
[298] Íd., pág. 11, líneas 20-25; pág. 12, líneas 1-2.
[299] Íd., pág. 15, líneas 9-14
[300] Íd., pág. 16, líneas 8-22.
[301] Íd., líneas 23-25; pág. 17, líneas 1-3.
[302] Íd., pág. 17, líneas 4-6.

5) El 7 de octubre de 2019, recibió instrucciones de impactar el área de Caimito, en específico el Sector Los Martínez, junto a miembros de la División de Inteligencia.[303]

6) Al llegar, estacionó su motora a la izquierda por un pastizal bastante alto, cerca de un vehículo confidencial de la Policía, y vio, a 10 o 15 pies de distancia, vio a un individuo salir del lado izquierdo de una casa abandonada con una cartera Nike negra y marrón guindándole del pecho y su mano derecha metida dentro de esta.[304] El individuo tenía la vista puesta en el vehículo confidencial que tenía de frente, sacó de la cartera un arma de fuego color negra con un abastecedor bastante grande y con una vaqueta que se utiliza para mantenerla dentro del pantalón.[305] Acto seguido, el individuo se volteó a su mano derecha y apuntó al Agte. Martínez Natal con el arma de fuego.[306]

7) El individuo salió corriendo hacia el lado derecho de la residencia, el Agte. Martínez Natal se identificó como Policía, comenzó a perseguirlo hasta que el individuo se cayó y pudo arrestarlo.[307]

8) En ese momento, le leyó las advertencias Miranda, le preguntó al individuo si tenía licencia de armas a lo que este respondió que no, y lo registró por razones de seguridad.[308]

9) Producto del registro, ocupó la cartera Nike color negra y marrón, así como tres (3) cargadores adicionales que estaban dentro de la cartera.[309]

10) Además, en el mismo lugar, ocupó el arma de fuego, la cual estaba cargada, y un abastecedor de veintidós (22) municiones.[310]

11) La propiedad de la que salió el individuo estaba abandonada, llena de pintura y madera, y a su alrededor había pasto de más de seis (6) pies de altura.[311]

12) Preparó un *Inventario de la propiedad ocupada*, formulario PPR, y le tomó foto a la propiedad ocupada.[312]

13) En el inventario se detalló la ocupación de un arma Glock negra, modelo 27, calibre .40,[313] una llave inteligente marca Hyundai y un celular marca LG.

14) El joven arrestado era el señor González Martínez, a quien le ocupó la evidencia antes descrita.[314]

15) El arma de fuego que ocupó fue llevada al ICF para que fuera analizada.[315]

**Testimonio del Agte. Lamberty Aldea**

Entretanto, el Agte. Lamberty Aldea, quien manifestó que había laborado en la Policía por trece (13) años y que para el 2019

---

[303] Íd., líneas 14-20; pág. 18, líneas 6-17.
[304] Íd., pág. 20, línea 25; pág. 21, líneas 1-25; pág. 22, líneas 1-4.
[305] Íd., pág. 22, líneas 5-13.
[306] Íd., líneas 14-25.
[307] Íd., pág. 23, líneas 6-25; pág. 24, líneas 1-6.
[308] Íd., pág. 24, líneas 8-16.
[309] Íd., líneas 17-25; pág. 25, líneas 1-2.
[310] Íd., pág. 25, líneas 3-11.
[311] Íd., pág. 32, líneas 3-7.
[312] Íd., pág. 33, líneas 20-25; pág. 34, líneas 1-3.
[313] Íd., pág. 39, líneas 13-25; pág. 40, líneas 10-23.
[314] Íd., pág. 40, líneas 24-25; pág. 41, líneas 1-4.
[315] Íd., pág. 49, líneas 4-9; pág. 51, líneas 3-8.

estaba destacado en la División de Inteligencia[316], declaró lo siguiente:

1) El 7 de octubre de 2019, recibió instrucciones de impactar varios puntos de drogas en el área de San Juan, en específico el del área de Caimito.[317]

2) Ese día, el Agte. Martínez Natal había arrestado al señor González Martínez.[318]

3) Luego del arresto, el señor González Martínez fue llevado por el Agte. Martínez Natal al cuartel de la Unidad Motorizada.[319] Allí, el arrestado fue entrevistado, pero el declarante no participó.[320]

4) En la noche, recibió instrucciones de visitar la residencia del señor González Martínez en Caimito porque se quería hacer un registro consentido de la casa y se trasladó hacía allá.[321]

5) Una vez allí, a donde también trasladaron al señor González Martínez, llamó al Tnte. Alvarado Reyes para notificarle el arresto realizado, toda vez que cerca del lugar del arresto se había ocupado un vehículo relacionado con la muerte de la señora Padilla Romero.[322] El Tnte. Alvarado Reyes le contestó que tenía interés y que llegaría al área en la que se encontraban, lo cual hizo antes de que comenzaran el registro.[323]

6) Esperaron que la madre del señor González Martínez llegara y le explicó a la señora que se trataba de un registro consentido.[324] Ella leyó el consentimiento al registro y lo firmó.[325] El consentimiento al registro de la residencia suscrito por la madre del señor González Martínez, la señora Lucrecia Martínez, fue admitido como el Exhibit 40 del Ministerio Público.

7) A las 9:00 p.m. leyó las advertencias al señor González Martínez antes de entrar a la residencia a registrarla, asimismo le leyó y le explicó el consentimiento al arrestado y este lo firmó.[326] Esas advertencias fueron reconocidas por el testigo y admitidas por el TPI como el Exhibit 15-6 del Ministerio Público.[327] El consentimiento al registro de la residencia suscrito por el señor González Martínez fue reconocido por el testigo y se presentó como el Exhibit 41 del Ministerio Público.

8) En el cuarto del señor González Martínez se ocuparon cuatro (4) hojas de cuadre y cuatro (4) teléfonos, los cuales fueron custodiados por el Agte. Lamberty Aldea.[328]

9) Preparó un Inventario de la propiedad ocupada, el cual reconoció y fue admitido como el Exhibit 42 del Ministerio Público.[329]

10) También, en su presencia, la Unidad de Servicios Técnicos le tomó fotos a la propiedad ocupada, las

---

[316] TPO, 3 de julio de 2023, pág. 6, líneas 11-13; pág. 7, líneas 6-8.

[317] Íd., pág. 8, líneas 10-16; pág. 9, líneas 8-14; pág. 10, líneas 1-7.

[318] Íd., pág. 12, líneas 15-25.

[319] Íd., pág. 17, líneas 4-13.

[320] Íd., pág. 18, líneas 19-25.

[321] Íd., pág. 22, líneas 3-18; pág. 23, líneas 4-10.

[322] Íd., pág. 24, líneas 3-21.

[323] Íd., líneas 22-25; pág. 25, líneas 1-6.

[324] Íd., pág. 25, líneas 7-17; pág. 26, líneas 9-10.

[325] Íd., pág. 32, líneas 8-13.

[326] Íd., pág. 54, líneas 17-23; pág. 55, líneas 16-25.

[327] Íd., pág. 70, líneas 9-25, pág. 71, líneas 1-2.

[328] Íd., pág. 71, líneas 22-25, pág. 72, líneas 1-5.

[329] Íd., pág. 74, líneas 11-19; pág. 76, líneas 1-17.

cuales fueron admitidas como los Exhibits 44-1 a 44-40 del Ministerio Público.[330]

11) Los teléfonos tenían las pantallas rotas y fueron entregados al Tnte. Alvarado Reyes.[331]

12) Cuando se hizo el registro consentido, no le expresó al señor González Martínez, ni a la señora Lucrecia Martínez que eran sospechosos de delito.[332]

13) Al momento en que el señor González Martínez firmó las advertencias y el consentimiento al registro, se le habían soltado las esposas.[333]

14) Encontró los celulares en el cuarto del señor González Martínez, quien le indicó que le pertenecían y que ese cuarto era el suyo.[334]

**Testimonio del Tnte. Alvarado Reyes**

El Tnte. Alvarado Reyes testificó lo siguiente:

1) Había trabajado en la Policía desde 1993 y, al momento de declarar, se desempeñaba como director nocturno del CIC de Bayamón.

2) Para el momento de los hechos, tenía el rango de sargento.[335]

3) El 30 de septiembre de 2019, recibió una llamada del Agte. Pagán Rosado en la que este le informó sobre un incidente de una mujer herida por disparos en la carretera PR-177, jurisdicción de Guaynabo, cerca de un Hogar CREA.[336]

4) Le instruyó al Agte. Pagán Rosado que, como agente preliminar, fuera tomando datos de la escena en lo que llegaba el Agte. Rodríguez Martínez.[337]

5) Cuando llegó a la escena, era de noche, estaba oscuro y se había desviado el tráfico.[338]

6) Pudo observar una Honda Pilot de color negro con impactos de bala en el área del conductor, que estaba detenida en el carril derecho de la carretera en dirección de Bayamón a Guaynabo.[339] También, vio casquillos en el piso desde la intersección hasta donde estaba el referido vehículo.[340]

7) El Agte. Flores González, quien era el custodio de la escena, le dijo que las perjudicadas en la escena habían sido la señora Padilla Romero y dos (2) menores hijas de esta.[341] Este también le informó que las tres (3) habían sido transportadas al Centro Médico, pero que la señora Padilla Romero había fallecido.[342]

8) El Agte. Flores González le informó que habían recibido una querella del sistema 9-1-1 en la que se notificaron unas detonaciones de un vehículo a otro y se describió el otro vehículo involucrado como un Hyundai Elantra o Accent gris oscuro.[343]

---

[330] Íd., líneas 4-9 y 23-25; pág. 75, líneas 1-13.
[331] Íd., pág. 97, línea 7 a la pág. 104, línea 11.
[332] Íd., pág. 119, línea 25; pág. 120, líneas 1-3; pág. 121, líneas 5-8.
[333] Íd., pág. 161, líneas 23-25; pág. 162, líneas 1-5.
[334] Íd., pág. 162, líneas 6-18.
[335] Íd., pág. 167, líneas 10-21.
[336] Íd., pág. 169, línea 8, a la pág. 170, línea 13.
[337] Íd., pág. 171, líneas 4-24.
[338] Íd., pág. 172, línea 24, a la pág. 173, línea 4.
[339] Íd., pág. 173, línea 25, a la pág. 174, línea 14.
[340] Íd., pág. 174, líneas 15-19.
[341] Íd., pág. 174, línea 20, a la pág. 175, línea 5.
[342] Íd., pág. 177, líneas 1-7.
[343] Íd., pág. 182, líneas 3-15; pág. 196, líneas 6-10.

9) En los Exhibits 4-1 y 4-10 del Ministerio Público, se podía identificar la Honda Pilot que conducía la señora Padilla Romero con los impactos en el área del conductor.[344]

10) En el Exhibit 4-11 del Ministerio Público, se apreciaba un proyectil de bala disparado en la puerta del pasajero delantero.[345]

11) En el interior de la Honda, había sangre en el área del conductor y en el cabezal había un impacto de proyectil con cabello largo de mujer incrustado.[346]

12) En el Exhibit 4-37 del Ministerio Público, se podía observar la Honda Pilot negra en la carretera PR-177.[347]

13) Le asignó a la Agte. Acevedo Jiménez ir a Centro Médico a verificar el estado de las menores y confirmar el fallecimiento de la señora Padilla Romero.[348]

14) Se verificaron las cámaras de seguridad del control de acceso de una urbanización, ubicada frente al Hogar Crea, en la que también entrevistaron al guardia de seguridad.[349]

15) El 4 de octubre de 2019, fue notificado de la presencia en el Sector Los Martínez en Caimito de un vehículo Hyundai con las descripciones provistas mediante llamadas al sistema 9-1-1 y que llevaba una tablilla que finalizaba en 252.[350]

16) Acto seguido, fue al lugar a buscar el vehículo, lo encontró, lo registró, lo selló y realizó gestiones para que el ICF lo recibiera, llevado en grúa.[351]

17) El vehículo estaba bien estacionado de frente a la calle a dos (2) casas del final de una calle sin salida, en un área que se utilizaba para virar.[352]

18) El Exhibit 3-22 del Ministerio Público demostraba el Hyundai Elantra color gris oscuro que se ocupó ese día.[353]

19) En el Exhibit 3-19 del Ministerio Público se veía la parte interior del Hyundai Elantra y la ventana del techo, *sunroof*, que estaba abierta.[354]

20) En el Exhibit 3-27 del Ministerio Público se podía ver la tablilla IWE-252 y el final de la calle.[355]

21) En los Exhibit 3-23 y 3-24 del Ministerio Público se podía observar el final de la calle y la casa al lado de la cual estaba estacionado el Hyundai Elantra.[356]

22) El 7 de octubre de 2019 fue informado sobre una intervención de la Unidad Motorizada con un individuo que tenía un arma de fuego y se dirigió al cuartel de dicha unidad.[357]

23) Al llegar al cuartel, el Agte. Lamberty Aldea le informó que estaban próximos a salir hacia la residencia de la persona detenida, el señor González Martínez, y, por ello, se mantuvo al margen de la investigación.[358]

24) El Agte. Lamberty Aldea le dijo que, además del arma, ocuparon unas llaves de un Hyundai, lo que resultaba

---

[344] Íd., pág. 184, línea 24, a la pág. 186, línea 3.
[345] Íd., pág. 186, líneas 4-9.
[346] Íd., pág. 187, líneas 13-25.
[347] Íd., pág. 187, línea 25, a la pág. 188, línea 17.
[348] Íd., pág. 192, línea 6-21.
[349] Íd., pág. 193, líneas 15, a la pág. 194, línea 5.
[350] Íd., pág. 198, líneas 2-12.
[351] Íd., líneas 13-22; pág. 200, líneas 1-3.
[352] Íd., pág. 198, línea 22, a la pág. 199, línea 11.
[353] Íd., pág. 201, líneas 10-17.
[354] Íd., pág. 202, líneas 9-14.
[355] Íd., pág. 203, líneas 6-20.
[356] Íd., pág. 204, líneas 10-14.
[357] Íd., pág. 206, líneas 3-25.
[358] Íd., pág. 208, líneas 6-24.

relevante para él porque el Hyundai Elantra del caso relacionado con los hechos había sido ocupado en la misma área del arresto.[359]

25) Acompañó a los oficiales a la residencia del señor González Martínez en Caimito, una casa verde oscuro, ubicada al final de la calle.[360]

26) Posteriormente, el Agte. Lamberty Aldea le dijo que, aunque en la residencia no encontró armas, ocupó unos celulares, los cuales el testigo recibió y de lo que preparó un recibo.[361]

27) En el cuartel, se presentó al señor González Martínez, pero decidió entrevistarlo luego porque era tarde.[362]

28) Su firma aparecía en el documento de recibo de los cuatro (4) celulares, preparado tras recibirlos del Agte. Lamberty Aldea, admitido como el Exhibit 43 del Ministerio Público.[363] Los celulares fueron descritos en un *Inventario de propiedad ocupada*, admitido como el Exhibit 42 del Ministerio Público.

29) Los Exhibits 72-1 al 72-4 del Ministerio Público eran los cuatro (4) celulares que recibió, cada uno con su pantalla rota.[364]

30) El 8 de octubre de 2019, fue a la Unidad Motorizada de San Juan con la Agte. Acevedo Jiménez para hablar con el señor González Martínez, a quien le tomaron su información personal, le leyeron las advertencias y le explicaron que la entrevista estaba relacionada con el asesinato de la señora Padilla Romero.[365]

31) El señor González Martínez anotó que no declararía.[366]

32) El señor González Martínez lucía tranquilo, estaba contestando las preguntas, estaba cooperador y, luego, lo llevaron a la celda nuevamente.[367]

33) La Agte. Acevedo Jiménez le preguntó al señor González Martínez si estaría dispuesto a consentir el registro de los cuatro (4) celulares que el Agte. Lamberty Aldea había ocupado, admitidos como los Exhibits 72-1 al 72-4 del Ministerio Público, y de otro celular que ocupó el Agte. Martínez Natal, admitido como el Exhibit 71 del Ministerio Público.[368]

34) Le mostraron los consentimientos al señor González Martínez, él los leyó y los firmó, al igual que la Agte. Acevedo Jiménez.[369]

35) Los consentimientos para los registros de los cinco celulares fueron admitidos como los Exhibits 50-1 al 50-5 del Ministerio Público.

36) Los celulares fueron entregados a la Agte. Acevedo Jiménez para que los llevara a la Unidad Investigativa de Crímenes Cibernéticos (UICC) del Departamento de Justicia para que fueran analizados.[370] Preparó un recibo en un Inventario de propiedad ocupada PPR-126, el cual fue admitido como el Exhibit 47 del Ministerio Público.[371]

37) Sobre la recepción de los cuatro (4) celulares por él a manos del Agte. Lamberty Aldea el 7 de octubre de

---

[359] Íd., pág. 210, línea 25, a la pág. 211, línea 21.
[360] Íd., pág. 209, líneas 6-10; pág. 212, líneas 2-6.
[361] Íd., pág. 217, líneas 2-16.
[362] Íd., pág. 218, líneas 4-18.
[363] Íd., pág. 225, línea 14, a la pág. 226, línea 10.
[364] TPO, 4 de julio de 2023, pág. 20, líneas 1-3.
[365] Íd., pág. 23, línea 12, a la pág. 26, línea 25.
[366] Íd., pág. 37, líneas 7-12.
[367] Íd., pág. 37, líneas 13-18; pág. 38, líneas 10-15; pág. 40, líneas 4-22.
[368] Íd., pág. 42, líneas 10-21.
[369] Íd., pág. 53, líneas 22, a la pág. 54, línea 7.
[370] Íd., pág. 90, líneas 16-23.
[371] Íd., pág. 85, línea 14, a la pág. 86, línea 23.

2019, preparó otro *Inventario de propiedad ocupada*, formulario PPR-126, admitido como el Exhibit 43 del Ministerio Público.[372]

38) Los celulares que entregó a la Agte. Acevedo Jiménez eran los mismos que recibió del Agte. Lamberty Aldea.[373]

39) No prestó declaración jurada y no realizó un informe oficial sobre sus acciones relacionadas al caso, así que su testimonio se basó en sus memorias sobre los eventos ocurridos en 2019.[374]

40) Ninguna de las menores de edad resultó herida.[375]

41) El Hyundai Elantra había sido reportado como hurtado y no estaba a nombre del señor González Martínez.[376]

42) Al ocupar el vehículo, observó el Hyundai Elantra desde afuera, no percibió objetos delictivos o celulares en el interior, ni impactos de bala en el exterior.[377]

43) Cuando el señor González Martínez llenó el acápite del formulario para no declarar, no le hicieron más preguntas.[378]

**Testimonio de la señora Pumarejo Collazo**

La señora Pumarejo Collazo declaró que:

1) Desde el 2019 trabajaba para el Departamento de Recursos Humanos de Lufthansa Technik Puerto Rico (Lufthansa) en Aguadilla y, al momento de declarar, fungía como *HR Business Partner*, estaba encargada del monitoreo de los empleados con el código de conducta, requisitos de asistencia y puntualidad y era la persona designada para representar a la compañía en casos de discriminación, demandas o situaciones con algún empleado.[379]

2) El señor Avilés González fue empleado de Lufthansa desde el 2017 hasta el 2019.[380]

3) El Exhibit 48 del Ministerio Público era una carta certificada, emitida por Lufthansa con información sobre la asistencia del señor Avilés González del 1 de septiembre al 15 de octubre de 2019.[381]

4) El horario de trabajo del señor Avilés González era de 7:00 a.m. a 4:00 p.m. de lunes a viernes y se registraba su asistencia mediante un ponche con huella dactilar.[382]

5) Según surgía de la certificación, el 30 de septiembre de 2019, el señor Avilés González ponchó su entrada a las 6:45 a.m. y su último ponche fue a las 11:01 a.m.[383]

6) No surgía del sistema una justificación y, por lo tanto, el horario de 11:00 a.m. a 4:00 p.m. quedó al descubierto.[384]

---

[372] Íd., pág. 89, líneas 12-25.
[373] Íd., pág. 92, líneas 2-5.
[374] Íd., pág. 94, líneas 2-21.
[375] Íd., pág. 102, línea 22, a la pág. 103, línea 5.
[376] Íd., pág. 121, líneas 2-14.
[377] Íd., pág. 121, línea 24, a la pág. 122, línea 13.
[378] Íd., pág. 178, líneas 10-18.
[379] TPO, 5 de julio de 2023, pág. 6, líneas 18-24 y 25; pág. 7, líneas 1-6 y 23-25; pág. 8, líneas 1-6 y 12-16.
[380] Íd., pág. 14, líneas 17-21.
[381] Íd., pág. 16, líneas 11-25; pág. 18, líneas 1-22; pág. 19, líneas 6-25; pág. 20, líneas 1-3.
[382] Íd., pág. 20, líneas 4-24.
[383] Íd., línea 25; pág. 21, líneas 1-5.
[384] Íd., pág. 21, líneas 15-25; pág. 22, líneas 1-6

7) El señor Avilés González se reportó nuevamente a trabajar el 2 de octubre de 2019 a las 8:31 a.m. y no surgía justificación para la ausencia del 1 de octubre de 2019.[385]

8) Para el 30 de septiembre de 2019, no era supervisora del señor Avilés González y no lo conocía.[386]

**Testimonio de la Agte. Acevedo Jiménez**

La Agte. Acevedo Jiménez testificó lo siguiente:

1) Fungía como agente investigadora, adscrita a la División de Homicidios de Bayamón, en la que se había destacado por cerca de dieciocho (18) años.[387]

2) El 30 de septiembre de 2019, después de estar en la escena, se trasladó al Centro Médico, a instrucciones del Tnte. Alvarado Reyes, y allí le informaron que la señora Padilla Romero había fallecido.[388]

3) La menor LPP estaba con su padre, el señor Pérez Colón, y la joven Morales Padilla estaba con su tío.[389] Ambas menores estaban asustadas, pero la joven Morales Padilla también estaba llorosa y roja.[390]

4) Entrevistó a la joven Morales Padilla en presencia de su tío y una trabajadora social.[391] Esta le contó que:

(1) Ese día llamó a su madre a eso de las 3:00 p.m. para que la recogiera en la escuela.

(2) Una vez llegó esperaron unos minutos en lo que la menor LPP compraba unos libros en la feria del colegio.

(3) Ambas menores se fueron con su madre en la Honda Pilot hacia el negocio de su padrastro, el señor Pérez Colón.

(4) Después pasaron por otro negocio del padrastro a llevar un dinero a un empleado, luego compraron comida en el restaurante El Mesón, regresaron a llevarle comida al padrastro y después fueron a Santa Juanita a buscar una correspondencia, pero el correo estaba cerrado.

(5) Regresaron a la oficina para buscar a su perrita, que estaba donde trabajaba su mamá en el negocio de su padrastro.

(6) Su madre se bajó sola a buscar la perrita, ambas menores se mantuvieron en el vehículo, la joven Morales Padilla en el asiento del pasajero delantero y la menor LPP en el lado izquierdo de la parte posterior.

(7) Mientras iban por la carretera PR-177 en dirección a su casa en Montehiedra, tenía el celular en la mano y sintió como unos petardos.

(8) Al mirar hacia la derecha, vio una perforación en el cristal al lado de ella, a su madre sangrando mucho y al vehículo irse poco a poco hacia la derecha por lo que comenzó a gritarle a su madre.

(9) Metió el pie, puso el vehículo en *parking*, se bajó, llamó a su padrastro y bajó del vehículo a la menor LPP.

---

[385] Íd., pág. 24, líneas 3-6; pág. 26, líneas 20-25; pág. 27, línea 1-2.
[386] Íd., pág. 27, líneas 24-25; pág. 28, línea 1; pág. 29, líneas 5-9.
[387] TPO, 6 de julio de 2023, pág. 4, líneas 17-21; pág. 5, línea 21, a la pág. 6, línea 2.
[388] Íd., pág. 9, línea 16, a la pág. 10, línea 14.
[389] Íd., pág. 11, línea 2, a la pág. 12, línea 2.
[390] Íd., pág. 12, líneas 3-10.
[391] Íd., pág. 12, línea 20, a la pág. 13, línea 1.

(10) Después cogió el teléfono de su hermanita y llamó al 9-1-1 y detuvo el tráfico pidiendo ayuda a los que transitaban.

(11) Su mamá estaba botando mucha sangre y no le contestaba.

(12) La relación con su madre era buena, eran amigas. La única situación que había tenido su madre fue con la señora Pérez Bigio, hija del señor Pérez Colón, ya que su madre no quería a esta trabajando en los negocios de él.

(13) Su madre corría todo lo relacionado a las oficinas del señor Pérez Colón, excepto la contabilidad.[392]

5) Las menores estaban en el hospital con el uniforme escolar y la mayor de ellas estaba muy nerviosa y con la presión alta.[393]

6) La joven Morales Padilla le expresó que la señora Padilla Romero y el señor Pérez Colón estaban casados y habían sido pareja por diez (10) u once (11) años.[394]

7) El 8 de octubre de 2019, fue a la Unidad Motorizada de San Juan y entrevistó al señor González Martínez, quien se encontraba allí arrestado por un incidente con un arma de fuego.[395]

8) El señor González Martínez, a quien describió como tranquilo, cooperador y responsivo, le proveyó sus datos personales.[396]

9) Le hizo las advertencias de ley al señor González Martínez, admitidas como el Exhibit 49 del Ministerio Público.[397] Este las leyó y las firmó.[398] En el documento, este marcó que no ejercería su derecho a no declarar.[399]

10) Mostró y explicó al señor González Martínez unos documentos de consentimiento para el registro de los cuatro (4) celulares ocupados en su residencia y aquel que le ocuparon al momento del arresto, los cuales el arrestado firmó, admitidos como los Exhibits 50-1 al 50-5 del Ministerio Público.[400]

11) Después pasó a donde estaba el agente Martínez Natal, quien le entregó el celular LG gris, ocupado cuando se arrestó al señor González Martínez, de lo cual se preparó un Inventario de propiedad ocupada PPR-126, admitido como el Exhibit 51 del Ministerio Público.[401] El celular, admitido como el Exhibit 71, estaba en buenas condiciones y tenía un *cover* negro.[402] La llave inteligente marca Hyundai fue admitida como el Exhibit 60, todos Exhibits del Ministerio Público.[403]

12) Depositó el teléfono y la llave en el cuarto de evidencia de la Comandancia de Bayamón para su custodia y anotó el incidente en el Libro de Anotaciones, admitido como el Exhibit 46 del Ministerio Público.[404]

---

[392] Íd., pág. 13, línea 2, a la pág. 24, línea 15; pág. 24, línea 24, a la pág. 26, línea 9; pág. 28, línea 22, a la pág. 29, línea 5.
[393] Íd., pág. 24, líneas 16-23.
[394] Íd., pág. 31, línea 19, a la pág. 32, línea 5.
[395] Íd., pág. 33, línea 11, a la pág. 36, línea 19.
[396] Íd., pág. 36, línea 20, a la pág. 37, línea 24.
[397] Íd., pág. 38, línea 23, a la pág. 39, línea 15.
[398] Íd., pág. 41, línea 23, a la pág. 42, línea 21.
[399] Íd., pág. 48, líneas 16-22.
[400] Íd., pág. 56, línea 18, a la pág. 57, línea 7.
[401] Íd., pág. 82, línea 1, a la pág. 83, línea 9.
[402] Íd., pág. 97, líneas 1-7.
[403] Íd., pág. 100, línea 16, a la pág. 101, línea 11.
[404] Íd., pág. 103, línea 20, a la pág. 104, línea 16.

13) El 9 de octubre de 2019, le entregó el teléfono y la llave al Agte. Rodríguez Martínez, lo cual documentó en el Exhibit 39 del Ministerio Público.[405]

14) El 14 de octubre de 2019, llevó los cinco (5) celulares, los Exhibits 71 y 72-1 al 72-4 del Ministerio Público, a la UICC para análisis.[406]

15) El 17 de octubre de 2019, recibió el resultado de los análisis, admitido como el Exhibit 73 del Ministerio Público.[407]

16) El documento de las advertencias del 8 de octubre de 2019 no decía que se estuviesen haciendo las advertencias por estar vinculado al asesinato de la señora Padilla Romero.[408]

17) Mientras estuvo detenido, el señor González Martínez estuvo solo, sin compañía de familiares o asistencia legal.[409]

18) En su entrevista a la joven Morales Padilla, esta le contó que luego de escuchar los petardos, vio un vehículo color negro.[410] En cambio, no le indicó que la señora Padilla Romero y el señor Pérez Colón tuviesen problemas.[411]

### Testimonio de la Agte. Cortés De Jesús

Además, la Agte. Cortés De Jesús declaró lo siguiente:

1) Para ese momento, había sido agente de la Policía desde el 2009 y estaba destacada en la División de Homicidios en Bayamón.[412]

2) Al momento de los hechos, estaba adscrita al área de Inteligencia Criminal en Bayamón.[413]

3) El 30 de septiembre de 2019, verificó los locales próximos a la escena del asesinato que tuvieran cámaras de seguridad captando la posible ruta del caso.[414] Esas labores consistieron en preguntar en los locales si las cámaras estaban accesibles, tomar notas y entregarlas al oficial a cargo de la investigación.[415]

4) Diligenció una citación al señor Avilés González en Aguadilla.[416] La citación con fecha del 16 de octubre de 2019 fue admitida como el Exhibit 56 del Ministerio Público.

5) En Aguadilla, le tomó foto al señor Avilés González, a su licencia de conducir, a su Nissan Sentra, a la tablilla y la registración del vehículo.[417]

6) Hizo constar en un informe los datos del señor Avilés González, así como los de su vehículo, su residencia y su número de teléfono.[418] El documento fue admitido como el Exhibit 54 del Ministerio Público, objetado por la defensa del señor Avilés González.

7) El Exhibit 55-1 del Ministerio Público era una foto que tomó del señor Avilés González en el estacionamiento

---

[405] Íd., pág. 104, línea 22, a la pág. 106, línea 14.
[406] Íd., pág. 106, líneas 15-20; pág. 108, líneas 6-17; pág. 109, líneas 25.
[407] Íd., pág. 121, líneas 4-12.
[408] TPO, 7 de julio de 2023, pág. 43, líneas 3-7.
[409] Íd., líneas 12-25.
[410] Íd., pág. 71, líneas 5-19.
[411] Íd., pág. 78, líneas 1-7.
[412] TPO, 7 de julio de 2023, pág. 99, líneas 3-14.
[413] Íd., pág. 100, líneas 19-25.
[414] Íd., pág. 101, líneas 5-19.
[415] Íd., pág. 101, línea 23, a la pág. 102, línea 5.
[416] Íd., pág. 111, línea 9, a la pág. 115, línea 16.
[417] Íd., pág. 121, línea 24, a la pág. 123, línea 20.
[418] Íd., pág. 132, línea 4, a la pág. 135, línea 7.

de Lufthansa Technik, con su camisa de trabajo, tarjeta de identificación y un tatuaje.[419]

8) El Exhibit 55-6 del Ministerio Público era una foto que tomó de la licencia de conducir del señor Avilés González.[420]

9) El Exhibit 55-2 del Ministerio Público era una foto que tomó del Nissan Sentra que conducía el señor Avilés González.[421]

10) El Exhibit 55-4 del Ministerio Público era una foto que tomó del lateral del Nissan Sentra.[422]

11) El Exhibit 55-3 del Ministerio Público era una foto que tomó de la tablilla del Nissan Sentra: IUR-519.[423]

12) El Exhibit 55-5 era una foto que tomó de la registración del vehículo.[424]

13) Los Exhibits 55-7, 55-8 y 55-9 del Ministerio Público eran fotos que tomó del apartamento en el que pernoctaba el señor Avilés González, localizado cerca de la Base Ramey en Aguadilla.[425]

14) Entregó las fotos al Agte. Rodríguez Martínez.[426]

## Testimonio del señor González Acevedo

El señor González Acevedo testificó lo siguiente:

1) Al momento de declarar se desempeñaba como gerente de servicio al cliente de AutoExpreso, pero para 2019 era supervisor del área de multas.[427]

2) En el 2019, estaba encargado del equipo que identificaba las imágenes de las multas del sistema AutoExpreso, estaba familiarizado con los sistemas de la compañía y estaba a cargo de contestar *subpoenas*.[428]

3) En este caso, recibió un *subpoena* referente a las tablillas IUR-519 e IWE-252.[429]

4) A raíz de ello, generó un informe utilizando el Sistema Forte, parte de las herramientas disponibles en AutoExpreso, con la que estaba familiarizado y utilizaba en todo momento.[430] El Informe fue marcado como la Identificación 36, ofrecido como prueba por el Ministerio Público y no admitido por el TPI.[431]

5) El sistema FORTE estaba en buen funcionamiento.[432]

## Testimonio del Agte. Guerrero Santiago

Entretanto, el Agte. Guerrero Santiago declaró lo siguiente:

1) Al momento de declarar, había sido agente de la Policía por cerca de veinticuatro (24) años y se desempeñaba en la División de Extracciones de Video y Grabaciones de Manifestaciones del Centro de

---

[419] Íd., pág. 139, líneas 1-14.
[420] Íd., líneas 15-23.
[421] Íd., pág. 139, línea 24, a la pág. 140, línea 1.
[422] Íd., pág. 140, líneas 2-5.
[423] Íd., líneas 6-10.
[424] Íd., líneas 11-13.
[425] Íd., líneas 14-22.
[426] Íd., pág. 140, línea 23, a la pág. 141, línea 4.
[427] TPO, 7 de julio de 2023, pág. 153, línea 23, a la pág. 154, línea 16.
[428] Íd., pág. 154, línea 19, a la pág. 155, línea 20.
[429] Íd., pág. 172, 8-11.
[430] Íd., pág. 175, línea 15, a la pág. 179, línea 17; pág. 188, líneas 1-18.
[431] Íd., pág. 179, línea 18, a la pág. 187, línea 2; pág. 190, línea 1, a la pág. 203, línea 11. Véase TPO, 10 de julio de 2023, pág. 5, línea 12, a la pág. 73, línea 2.
[432] TPO, 7 de julio de 2023, pág. 188, líneas 19-22.

Recopilación, Análisis y Diseminación de Información Criminal (CRADIC).[433]

2) Se dedicaba a extraer videos, como aquellos captados por cámaras de seguridad, y los grababa en discos DVD-R, los cuales no permiten grabaciones adicionales.[434]

3) El 30 de septiembre de 2019, recibió instrucciones de presentarse a la escena del asesinato para recopilar videos de las cámaras de seguridad del Condominio The Falls.[435]

4) Una vez llegó allí, consiguió la autorización de la persona encargada del sistema de cámaras en una hoja de consentimiento, verificó el sistema, identificó una cámara que captaba parte de la carretera, realizó la extracción, grabó el video en un pendrive, traspasó el video a un disco DVD-R y, durante todo ello, confirmó que todo estuviera fiel y exacto a lo que ilustraba el sistema de cámaras.[436]

5) El 3 de octubre de 2019, visitó varios lugares para obtener material videográfico captado por cámaras de seguridad, tales como el restaurante Bonanza en la carretera PR-174, una gasolinera Shell en Torrimar, un supermercado, un lugar de ventas de pasajes para crucero, llamado El Crucero, y el negocio JAPC Construction (JAPC).[437] Los videos que buscaban en todos los sitios visitados fueron extraídos, excepto en JAPC, pues se decidió esperar.[438]

6) De la gasolinera Shell se extrajeron los videos captados por tres (3) cámaras distintas, cuyo equipo estaba en condiciones buenas de funcionamiento.[439] El disco DVD-R con los videos fue admitido como el Exhibit 58 del Ministerio Público y el recibo del CRADIC como el Exhibit 57 del Ministerio Público.

7) En los videos captados por las cámaras de la gasolinera Shell había un adelanto aproximado de 11 minutos[440] y en los de JAPC de 6 minutos, mientras que en los del negocio El Crucero había cerca de 10 minutos de atraso, lo cual hizo constar en sus notas.[441]

### Testimonio del Agte. Rodríguez Martínez

El Agte. Rodríguez Martínez, encargado de la investigación del asesinato de la señora Padilla Romero, testificó:

1) Se desempeñaba como agente investigador de la Policía, cuerpo al que había pertenecido por trece (13) años.[442]

2) Para el 30 de septiembre de 2019 estaba adscrito a la División de Homicidios de Bayamón.[443]

3) El 30 de septiembre de 2019, llegó a la escena del asesinato alrededor de las 10:00 p.m., la cual encontró acordonada y cercana al semáforo

---

[433] TPO, 10 de julio de 2023, pág. 78, líneas 4-19.
[434] Íd., pág. 82, línea 20, a la pág. 87, línea 5; pág. 88, línea 15, a la pág. 89, línea 11.
[435] Íd., pág. 90, línea 12, a la pág. 93, línea 24.
[436] Íd., pág. 93, línea 25, a la pág. 96, línea 1.
[437] Íd., pág. 96, línea 7, a la pág. 97, línea 14.
[438] Íd., pág. 97, línea 15, a la pág. 99, línea 13.
[439] Íd., pág. 107, línea 8-25.
[440] Íd., pág. 99, línea 21, a la pág. 100, línea 9.
[441] Íd., pág. 129, línea 23, a la pág.130, línea 24.
[442] TPO, 11 de julio de 2023, pág. 4, líneas 3-11.
[443] Íd., pág. 6, líneas 14-16.

intermitente en la intersección de la carretera PR-177 con la carretera PR-833.[444]

4) El incidente ocurrió en los carriles que iban de Bayamón a San Juan, en donde observó una Honda Pilot negra, tinteada, tablilla IYY-703, en el carril de la derecha luego del semáforo con impactos y perforaciones de bala, en su mayoría en la puerta y cristal del chofer, una en el cristal trasero del lado derecho y otra en el cristal derecho del pasajero.[445]

5) El Agte. Pagán Rosado le mencionó que la señora Padilla Romero resultó herida mientras viajaba en la Honda Pilot con sus dos (2) hijas de diecisiete (17) y ocho (8) años, cuyos nombres proveyó.[446]

6) El Agte. Pagan Rosado le dijo que escuchó por radio que, según información recibida a través del Sistema 9-1-1, en el incidente estuvo envuelto un Hyundai Accent o Elantra gris con dos (2) individuos encapuchados.[447]

7) La Honda Pilot tenía perforaciones en las puertas y cristales y que dentro había pertenencias, bultos de escuela, loncheras, libros, una jaula, unas carteras y un teléfono.[448]

8) Dentro de la Honda Pilot había sangre principalmente en el área del chofer y pedazos de cristal.[449]

9) El Exhibit 4-34 del Ministerio Público mostraba la Honda Pilot en el carril de la extrema derecha en dirección a San Juan, cerca de un muro de cemento.[450]

10) El Exhibit 4-35 del Ministerio Público demostraba la salida en la carretera PR-177 hacia la Avenida Martínez Nadal por la carretera PR-20.[451]

11) En el Exhibit 4-36 del Ministerio Público se podía ver la Honda Pilot desde el frente y ubicada luego del semáforo intermitente.[452]

12) En el Exhibit 4-37 del Ministerio Público se ilustraba la Honda Pilot en el carril de la derecha, el semáforo intermitente y las piezas de evidencia marcadas.[453]

13) Los Exhibits 4-38 y 4-40 del Ministerio Público mostraban los carriles de la carretera, el alumbrado del área, la escena acordonada y los vehículos de la Policía.[454]

14) El Exhibit 4-12 del Ministerio Público demostraba los impactos de bala en la Honda Pilot.[455]

15) El Exhibit 4-3 del Ministerio Público ilustraba la Honda Pilot negra y su tablilla.[456]

16) El Exhibit 4-1 del Ministerio Público enseñaba la Honda Pilot con sangre en el asiento del conductor y en el suelo del vehículo.[457]

17) El Exhibit 4-6 del Ministerio Público mostraba el interior de la Honda Pilot, una gorra azul con mechones de cabello color rubio en el área del *dash*.[458]

---

[444] Íd., pág. 11, líneas 18 y 25; pág. 12, líneas 1-25; pág. 13, líneas 1-6.
[445] Íd., pág. 13, líneas 14-25; pág. 14, líneas 1-7.
[446] Íd., pág. 18, líneas 16-25
[447] Íd., pág. 20, líneas 16-25; pág. 21, líneas 1-3.
[448] Íd., pág. 21, líneas 21-24; pág. 22, líneas 1-14.
[449] Íd., pág. 25, líneas 8-13.
[450] Íd., líneas 14-25; pág. 26, líneas 6-14.
[451] Íd., pág. 26, líneas 15-23.
[452] Íd., pág. 27, líneas 15-24.
[453] Íd., pág. 28, líneas 7-13.
[454] Íd., líneas 14-24; pág. 29, líneas 1-17.
[455] Íd., pág. 29, líneas 18-25; pág. 30, líneas 1-13.
[456] Íd., pág. 30, líneas 14-22.
[457] Íd., líneas 23-25; pág. 31, líneas 1-14.
[458] Íd., pág. 31, líneas 15-19.

18) En el Exhibit 4-11 del Ministerio Público se veían los impactos de bala en el cristal y la puerta del chofer de la Honda Pilot.[459]

19) En el Exhibit 4-9 del Ministerio Público se observaba el orificio de bala en el cristal posterior del lado derecho de la Honda Pilot.[460]

20) En el Exhibit 4-12 del Ministerio Público se apreciaba una jaula en el asiento de atrás, directamente detrás del asiento del pasajero.[461]

21) En el Exhibit 4-3 del Ministerio Público divisó las pertenencias de la occisa, entre ellas una licencia y una tarjeta de crédito.[462]

22) En el Exhibit 22-1 del Ministerio Público se documentó la sangre en el área del chofer, en el asiento, en el piso, en el guía y en la cartera que estaba en el medio del vehículo.[463]

23) En el Exhibit 22-2 del Ministerio Público se podía ver sangre en el medio de la Honda Pilot y en el asiento, así como documentos dentro de la cartera, un vaso de comida del restaurante El Mesón, otro vaso del mismo restaurante en la puerta del pasajero y una botella de agua.[464]

24) En el Exhibit 22-4 del Ministerio Público se apreciaban dos (2) bultos y una lonchera en el baúl.[465]

25) El Exhibit 22-7 del Ministerio Público reflejaba las pertenencias que había en la guagua, dos (2) carteras, una llave, unos llaveros y dinero en efectivo.[466]

26) Luego de trabajar la escena, se trasladó a la morgue del Centro Médico y, allí, observó que la señora Padilla Romero era una mujer de tez blanca, gruesa, con pelo teñido de rubio, tenía diversas heridas y vestía una camisa vino con logo del negocio JAPC, mahón y calzado crema.[467]

27) Las heridas se podían identificar en los Exhibits 4-42, 4-41, 22-5, 22-6, 26-9 y 22-1 del Ministerio Público.[468]

28) En la Honda Pilot, estaba conduciendo la señora Padilla Romero, a quien pertenecía el vehículo, la mayor de las niñas iba en el asiento delantero del pasajero y la pequeña, atrás.[469]

29) En Sala, escuchó las llamadas del 9-1-1 y, en relación con el vehículo Hyundai que se mencionaba, obtuvo la tablilla, que era la IWE-252, y supo que aparecía hurtado ese mismo año en el área de Dorado.[470]

30) Se verificaron cámaras de seguridad: unas del negocio JAPC, el cual pertenecía al compañero de la señora Padilla Romero y donde ella trabajaba; del negocio Centro del Crucero; del negocio GM Auto Parts; del negocio Smokey Delights; del restaurante Bonanza; del negocio Cadillac Uniform; del Supermercado Amigo; de una gasolinera Shell en la carretera PR-177; de un Supermercado Pueblo; y del Condominio The Falls.[471]

---

[459] Íd., líneas 20-23.
[460] Íd., líneas 24-25; pág. 32, líneas 1-9.
[461] Íd., pág. 32, líneas 14-22.
[462] Íd., líneas 23-25; pág. 33, líneas 1-5.
[463] Íd., pág. 34, líneas 4-16.
[464] Íd., líneas 17-25; pág. 35, líneas 1-23.
[465] Íd., pág. 35, líneas 24-25; pág. 36, líneas 1-9.
[466] Íd., pág. 36, líneas 24-25; pág. 37, líneas 1-19.
[467] Íd., pág. 37, línea 20 a la pág. 39, línea 25.
[468] Íd., pág. 40, línea 1 a la pág. 42, línea 3.
[469] Íd., pág. 43, líneas 10-19.
[470] Íd., pág. 44, líneas 21-25; pág. 45, líneas 1-19.
[471] Íd., pág. 46, líneas 12-25; pág. 47, líneas 2-11.

31) JAPC era una constructora ubicada en la carretera PR-174 al lado de un negocio de artículos escolares.[472]

32) En el Exhibit 9-23 del Ministerio Público se podía apreciar el negocio de artículos escolares y el negocio JAPC.[473]

33) En el Exhibit 9-27 del Ministerio Público se veía el negocio JAPC con una puerta de metal y un portón de entrada, un establecimiento denominado Adelco, el negocio de artículos escolares y la intersección de la carretera PR-174.[474]

34) En el Exhibit 9-34 del Ministerio Público se podía identificar un negocio denominado GM Auto Parts, de donde se extrajeron videos.[475] En los Exhibits 9-35 y 9-37 del Ministerio Público se podía apreciar una cámara de GM Auto Parts.[476] En el Exhibit 9-39 del Ministerio Público se ubicaba al GM Auto Parts al lado del negocio JAPC y se observaban las cámaras.[477]

35) En el Exhibit 9-41 del Ministerio Público se ilustraba la parte del frente de JAPC y el negocio denominado Centro de Crucero.[478]

36) El 3 de octubre de 2019, verificó las cámaras de JAPC, el cual pertenecía al señor Perez Colón, pareja de la occisa y padre de la menor de ocho (8) años.[479]

37) En los videos observó al Hyundai Elantra dando vueltas en diferentes áreas, a la Honda Pilot llegando a JAPC y al Hyundai Elantra estacionándose al otro extremo de la carretera, frente a JAPC.[480] También, vio cuando la Honda Pilot salió de JAPC y luego el Hyundai Elantra le siguió.[481] Los videos de JAPC fueron extraídos con el consentimiento del señor Pérez Colón.[482]

38) Observó al Hyundai Elantra siguiendo a la Honda Pilot en las cámaras de JAPC, en las del Centro de Cruceros, el GM Auto Parts, la Gasolinera Shell ubicada en la carretera PR-177 y en el Condominio The Falls.[483]

39) El 4 de octubre de 2019, se ocupó el Hyundai Elantra en el Sector Los Martínez en Caimito, el cual reconoció en los Exhibits 3-22, 3-21, 3-16, 3-19 y 3-27 del Ministerio Público.[484] En el Exhibit 3-24 del Ministerio Público, identificó como la residencia del señor González Martínez una casa que se podía observar al final de la calle en la que se ocupó el Hyundai Elantra.[485]

40) El vehículo descrito en la llamada al 9-1-1 sobre los hechos del 30 de septiembre de 2019 era el mismo que el ocupado ese 4 de octubre de 2019 y tenía la misma tablilla.[486]

41) Entrevistó a las menores el 7 de octubre de 2019 y la mayor de estas, la joven Morales Padilla, le expresó, en lo pertinente, que:

---

[472] Íd., pág. 48, líneas 8-13.
[473] Íd., pág. 50, líneas 24-25; pág. 51, líneas 1 y 10-20.
[474] Íd., pág. 51, líneas 21-25; pág. 52, líneas 1-23.
[475] Íd., pág. 52, líneas 24-25; pág. 53, líneas 1-7.
[476] Íd., pág. 53, líneas 8-15.
[477] Íd., líneas 19-25; pág. 54, líneas 1-4.
[478] Íd., pág. 54, líneas 12-19.
[479] Íd., líneas 20-25; pág. 55, líneas 2-11.
[480] Íd., pág. 56, líneas 10-19.
[481] Íd., líneas 20-22.
[482] Íd., pág. 57, línea 15 a la pág. 59, línea 2.
[483] Íd., pág. 63, línea 12 a la pág. 64, línea 23.
[484] Íd., pág. 68, línea 15 a la pág. 70, línea 13.
[485] Íd.
[486] Íd., pág. 73, línea 9 a la 21.

a. Despertó cuando escuchó un ruido como unos petardos y, al mirar, se percató de que había un boquete en el cristal, de que el vehículo continuaba en movimiento y de que su madre estaba herida. Creyó ver una motora y a alguien mirando hacia donde ella y detuvo el vehículo poniendo el freno de emergencia y pisando el freno;

b. Su mamá tuvo discusiones con la señora Pérez Bigio desde que se conocieron y que la última pelea fue por celos;

c. En la primera pelea que tuvieron, la señora Pérez Bigio cortó a la señora Padilla Romero con un objeto. Ambas habían peleado en la casa de la señora Pérez Bigio en el sector Los Bigio en Caimito;

d. La señora Pérez Bigio tenía una F-150 blanca de dos (2) puertas y su número de teléfono era 787-222-6540, pero cambiaba mucho de número;

e. La señora Pérez Bigio era hija del señor Perez Colón; y

f. La señora Pérez Bigio vivía en el Sector Los Bigio en Caimito Alto, en una casa con altos y bajos con su propia madre y sus dos (2) hijos.[487]

42) En los Exhibits 26-2 y 26-3 del Ministerio Público reconoció el camino Los Bigio e identificó la casa de la señora Pérez Bigio que le describió la joven Morales Padilla.[488]

43) El Sector Los Martínez está ubicado bastante cerca del Sector Los Bigio, ambos en Caimito.[489]

44) El 7 de octubre de 2019, fue notificado del arresto del señor González Martínez y la ocupación de una pistola Glock .40, abastecedores, una llave inteligente marca Hyundai y cuatro (4) celulares.[490]

45) El arma fue llevada al ICF con una solicitud de que se comparara con los hallazgos ocupados en la escena del asesinato.[491]

46) Los teléfonos ocupados al señor González Martínez o en su residencia eran LG, Samsung, Vortex, otro Samsung y uno LG color negro, los cuales identificó, admitidos como los Exhibits 71 y 72-1 al 72-4 del Ministerio Público.[492] Solicitó a la Agte. Negrón Rivera que extrajera información relevante a la investigación, tales como llamadas, fotos, audios y mensajes.[493]

47) En el ICF, manipuló la llave inteligente marca Hyundai, admitida como el Exhibit 60 del Ministerio Público y la alarma del Hyundai Elantra sonó porque la llave pertenecía a ese vehículo.[494]

48) El 11 de octubre de 2019, excarceló al señor González Martínez para entrevistarlo luego de que en el Centro Médico Correccional dieran el visto bueno.[495]

49) Llevó al señor González Martínez a la oficina de la División de Homicidios en la Comandancia de Bayamón.[496]

50) Allí, le explicó por qué estaba bajo su custodia y le leyó las advertencias de ley, admitidas como el Exhibit 15-

---

[487] Íd., pág. 75, línea 4 a la pág. 86, línea 16; pág. 96, líneas 5 a la pág. 98, línea 7.

[488] Íd., pág. 99, líneas 5-25; pág. 101, líneas 1-18.

[489] Íd., pág. 116, línea 12-25.

[490] Íd., pág. 117, línea 1 a la pág. 118, línea 1.

[491] Íd., pág. 118, líneas 21-24; pág. 120, líneas 1-6.

[492] Íd., pág. 137, líneas 13-23.

[493] Íd., pág. 143, líneas 7-20.

[494] Íd., pág. 150, líneas 5-25; pág. 153, líneas 2-19.

[495] Íd., pág. 158, línea 25; pág. 159, líneas 1-12.

[496] Íd., pág. 159, líneas 21-25.

1 del Ministerio Público.[497] El señor González Martínez marcó que no declararía.[498]

51) Tras almorzar con el señor González Martínez, a las 2:00 p.m., volvió a hacerle las advertencias, admitidas como el Exhibit 15-2 del Ministerio Público, y este marcó que renunciaba a invocar sus derechos.[499] En ese momento, percibió que el señor González Martínez estaba bien, tranquilo, responsivo y comunicador.[500] Procedió a entrevistarlo y tomó notas de la información que le proveyó, las cuales el señor González Martínez firmó.[501] Las notas de esa entrevista fueron marcadas como la Identificación 39, ofrecida por el Ministerio Público y no admitida por el TPI.[502]

52) Llevó al señor González Martínez a donde la fiscal Correa González y se le leyeron al arrestado las advertencias nuevamente, admitidas como el Exhibit 15-3 del Ministerio Público, y ambos lo entrevistaron.[503] Concluida la entrevista, devolvió al señor González Martínez a la institución carcelaria.[504]

53) El 14 de octubre de 2019, excarceló al señor González Martínez, lo llevó al Centro Metropolitano de Investigaciones y Denuncias (CMID) y tanto él como la fiscal Correa González leyeron nuevamente las advertencias al señor González Martínez, admitidas como los Exhibits 15-4 y 15-5 del Ministerio Público, respectivamente.[505] El arrestado las firmó y marcó que declararía.[506] Luego, la fiscal Correa González le tomó una declaración jurada al señor González Martínez.[507]

54) Se realizó una rueda de confrontación de fotos, admitida como el Exhibit 61 del Ministerio Público, en la que el señor González Martínez escogió el número 2 del Ministerio Público, seleccionando así a la señora Pérez Bigio.[508] El acta fue admitida como el Exhibit 62 del Ministerio Público.

55) La señora Pérez Bigio se encontraba en sala.[509]

56) Según los identificó, el Exhibit 8-1 del Ministerio Público era un disco con la grabación del 9-1-1; el Exhibit 8-2 del Ministerio Público era el *subpoena* enviado al sistema 9-1-1; y el Exhibit 8-3 del Ministerio Público era el registro de llamadas al 9-1-1. Las llamadas le proveyeron información sobre el vehículo desde el que dispararon a la señora Padilla Romero.[510]

57) En algunas llamadas, se proveían datos de los ocupantes y en otras de la tablilla del Hyundai (IWE-252). Del Exhibit 8-3 del Ministerio Público se desprendía que, el 30 de septiembre de 2019, hubo una llamada sobre una herida de bala a las 17:56:48 en la Ave. Lomas Verdes, carretera PR-177, después del Supermercado Pueblo, frente a Hogar Crea, en

---

[497] Íd., pág. 160, líneas 2 a la pág. 161, línea 15.
[498] TPO, 12 de julio de 2023, pág. 8, línea 21, a la pág. 9, línea 1.
[499] Íd., pág. 11, línea 11, a la pág. 15, línea 10.
[500] Íd., pág. 15, líneas 16-19.
[501] Íd., pág. 16, líneas 2 a la pág. 17, línea 6.
[502] Íd., pág. 17, línea 7 a la pág. 23, línea 22.
[503] Íd., pág. 27, línea 9 a la pág. 31, línea 7.
[504] Íd., pág. 31, líneas 3-7.
[505] Íd., pág. 31, línea 8 a la pág. 36, línea 5.
[506] Íd.
[507] Íd., pág. 36, línea 6 a la pág. 38, línea 3; pág.
[508] Íd., pág. 56, línea 18-24; pág. 58, línea 6 a la pág. 62, línea 14; pág. 99, línea 13, a la pág. 105, línea 11.
[509] Íd., pág. 107, líneas 7-17.
[510] Íd., pág. 108, línea 2, a la pág. 110, línea 22.

Guaynabo hacia Cupey.[511] El vehículo fue descrito en la llamada como gris oscuro, un Hyundai Accent o Hyundai Elantra.[512]

58) De otra llamada, generada a las 6:13 p.m., obtuvo los datos de un vehículo relacionado con el asesinato, tales como la tablilla IWE-252, marca Hyundai, modelo Elantra, color gris oscuro.[513]

59) Diligenció cerca de doce (12) órdenes de allanamiento a compañías de teléfonos y aseguradoras.[514] En específico, Sprint, Claro, AT&T y TextNow.[515]

60) Entre ellas, diligenció una orden de registro y allanamiento a la compañía Claro, relacionada con el número de teléfono 787-635-9727, el cual atribuyó al señor Avilés González, según este último informó cuando fue citado.[516] También, diligenció otra orden para AT&T por el número 787-222-6540 vinculado a la señora Pérez Bigio, cuyo número obtuvo de la entrevista a la hija mayor de la occisa.[517] Se diligenció otra orden a la compañía TextNow para corroborar información provista por el señor González Martínez sobre que él se comunicaba con la señora Pérez Bigio a través de un número de esa compañía.[518] Las respuestas se presentaron como los Exhibits 28-1 al 28-3, 29-1 al 29-3, 30-1 al 30-3 y 31-1 al 31-2 del Ministerio Público.

61) Identificó al señor Avilés González en sala.[519]

62) Obtuvo una foto del señor Avilés González a través de Facebook y la mostró al señor González Martínez, admitida como el Exhibit 63 del Ministerio Público.[520]

63) El 21 de octubre de 2019, el señor Avilés González acudió a la División de Homicidios con su representante legal y brindó su información personal.[521] El señor Avilés González comunicó que se desempeñaba como mecánico de aviación en Lufthansa Technik.[522] Las notas de la entrevista tomadas por el Agte. Rodríguez Martínez fueron admitidas como el Exhibit 64 del Ministerio Público.

64) Se le leyeron las advertencias, admitidas como el Exhibit 17-1 del Ministerio Público, y se le explicó que era sospechoso del asesinato de la señora Padilla Romero.[523] Como los Exhibits 17-2 y 17-3 del Ministerio Público, se admitieron las advertencias que le leyó al señor Avilés González el 26 y 27 de noviembre de 2019, respectivamente.[524]

65) Se diligenció una orden de registro y allanamiento respecto al número de teléfono 787-635-9727 para ocupar el celular del señor Avilés González, pero no fue entregado.[525]

66) De los videos obtenidos de JAPC, obtuvo datos del Hyundai gris, vio que tenía *sunroof* y observó que estaba estacionado al lado del negocio, cerca de GM

---

[511] Íd., pág. 117, líneas 1-22; pág. 119, línea 1-18.
[512] Íd., pág. 120, líneas 1-3.
[513] Íd., líneas 4-23.
[514] Íd., pág. 126, líneas 4-18.
[515] Íd., pág. 126, línea 19, a la pág. 5.
[516] Íd., pág. 127, líneas 14-18; pág. 128, línea 25, a la pág. 129, línea 12.
[517] Íd., pág. 131, líneas 15-24.
[518] Íd., pág. 131, línea 25, a la pág. 132, línea 4.
[519] TPO, 13 de julio de 2023, pág. 12, líneas 9-15.
[520] Íd., pág. 18, línea 17, a la pág. 19, línea 23; pág. 21, línea 17-20; pág. 22, líneas 7-13; pág. 23, línea 1-9.
[521] Íd., pág. 29, línea 1, a la pág. 33, línea 9.
[522] Íd., pág. 33, líneas 13-22.
[523] Íd., pág. 33, línea 23, a la pág. 34, línea 25.
[524] Íd., pág. 38, líneas 10-23; pág. 39, líneas 3-8.
[525] Íd., pág. 42, línea 12, a la pág. 43, línea 1; pág. 44, líneas 7-17.

Auto Parts, y luego al frente, al otro extremo de la calle.[526]

67) De los videos obtuvo la ruta transitada por el Hyundai Elantra y por la Honda Pilot, la cual transcurrió por las carreteras PR-174 y PR-177.[527]

68) En los videos, observó que la Honda Pilot llegó y salió del negocio y que el Hyundai Elantra se mantuvo cerca de esta en todo momento.[528]

69) En los Exhibits 10-2, 10-3 y 10-4 del Ministerio Público identificó el negocio JAPC, el Hyundai Elantra, el negocio de artículos escolares y la Honda Pilot.[529]

70) En el Exhibit 10-4 del Ministerio Público, la hora en los videos era 17:28 y se podía apreciar el negocio JAPC de frente.[530] En el minuto 17:55:30, observó a la Honda Pilot saliendo y al Hyundai Elantra, hasta ese momento estacionado, dar reversa y salir hacia la Honda Pilot.[531]

71) En el Exhibit 58 del Ministerio Público, video captado por las cámaras de la Gasolinera Shell ubicada en la carretera PR-177, observó a las 6:05:50 p.m. a la Honda Pilot pasar por el carril de la derecha y al Hyundai Elantra detrás en el carril del medio.[532]

72) A las 6:05:58 p.m., el Hyundai Elantra estaba por el carril del medio, pero más al frente que la Honda Pilot, la cual permanecía en el carril derecho.[533]

73) En el Exhibit 11-3 del Ministerio Público, un video captado por las cámaras del Condominio The Falls, ubicado en la intersección de la carretera PR-177 con la carretera PR-833, identificó el Condominio y que la Honda Pilot se detuvo a las 5:55:53 p.m., pasando el semáforo intermitente.[534]

74) El Exhibit 28-1 del Ministerio Público era una certificación de Sprint sobre el número de teléfono 787-902-4397, perteneciente al señor González Martínez.[535]

75) El registro de llamadas del 30 de septiembre de 2019 reflejaba once (11) llamadas entre el 787-902-4397 y el número que empezaba con 256, entre las 1:11 p.m. y las 10:03 p.m.[536] A las 5:56:18 p.m., se produjo una llamada del número 787-902-4397 al 256-607-3964 de ochenta y seis (86) segundos.[537] Esa llamada era importante por su relación a la llamada descrita por el señor González Martínez en sus declaraciones sobre el evento.[538]

76) El 1 de octubre de 2019 hubo interacción entre esos dos números en ocho (8) ocasiones, desde las 7:50 a.m. hasta las 9:23 p.m.[539]

77) El 29 de septiembre de 2019 hubo once (11) interacciones entre esos números.[540]

78) El 27 de septiembre de 2019 había cuatro (4) llamadas con el número 787-222-6540, que era de la señora

---

[526] Íd., pág. 48, línea 18, a la pág. 50, línea 1.
[527] Íd., pág. 50, línea 6-16.
[528] Íd., pág. 51, línea 1-5.
[529] Íd., líneas 23-25; pág. 52, líneas 8-25.
[530] Íd., pág. 63, líneas 4-10.
[531] Íd., pág. 63, línea 11, a la pág. 65, línea 15.
[532] Íd., pág. 67, línea 7, a la pág. 72, línea 18.
[533] Íd., pág. 73, líneas 11-21.
[534] Íd., pág. 76, línea 10 a la pág. 78, línea 10.
[535] Íd., pág. 79, línea 22 a la pág. 81, línea 6.
[536] Íd., pág. 95, línea 21, a la pág. 96, línea 7.
[537] Íd., pág. 96, líneas 8-15.
[538] Íd., pág. 98, líneas 1-11
[539] Íd., pág. 100, línea 20, a la pág. 102, línea 7; pág. 112, línea 8-13.
[540] Íd., pág. 112, línea 14, a la pág. 113, línea 7.

Pérez Bigio, y había una con el 787-635-9727, perteneciente al señor Avilés González.[541]

79) En cuanto a este último número, indicó que el 29 de septiembre de 2019 hubo siete (7) llamadas, siendo la última a las 10:21 p.m.[542]

80) La certificación negativa de licencia de armas del señor Avilés González se presentó como el Exhibit 2-2 del Ministerio Público y la del señor González Martínez como el Exhibit 2-1 del Ministerio Público.[543]

81) Se investigaron varias posibles causas del asesinato, incluyendo violencia de género.[544]

82) El 7 de octubre de 2021, cuando entrevistó a la joven Morales Padilla, ella le indicó que después del asesinato observó una motora negra con alguien mirando hacia atrás.[545] En una llamada al sistema 9-1-1, realizada justo después del asesinato, la joven Morales Padilla también hizo referencia a la motora y a la persona mirando hacia atrás.[546]

83) El 11 de octubre de 2019, tras excarcelar al señor González Martínez no sabía si este estaba bajo el efecto de medicamentos, tales como *Valium*, *Zofran*, *Pepcid*, *Imodium* o *Toradol*, pero entendía que no y que únicamente recibía un suero de solución salina.[547]

84) Ese mismo día, luego de que a las 11:30 a.m. leyera las advertencias al señor González Martínez y este se acogiera a su derecho a permanecer callado, lo dejó detenido y le volvió a hacerle unas advertencias a las 2:00 p.m.[548] En ese momento el señor González Martínez decidió declarar.[549]

85) En los videos de cámaras de seguridad de JAPC no se podían ver las tablillas de los vehículos o las personas dentro de ellos, pero sí se podían apreciar los logotipos de las marcas de los vehículos.[550]

86) En el video de la cámara de seguridad de la gasolinera Shell, el Exhibit 58 del Ministerio Público, no se veían personas dentro del Hyundai Elantra, no se podían apreciar los logotipos de los vehículos, ni las tablillas, pero si sus características.[551]

87) En el video de la cámara de seguridad del Condominio The Falls, el Exhibit 11-3 del Ministerio Público, no se veían las tablillas de los vehículos, ni personas dentro de estos.[552]

88) El Exhibit 1 de la defensa, un *Resumen de llamada por número de control 54447-T*, se trataba de una confidencia recibida por la Policía en la que se describían los hechos ocurridos y se detallaba que el conductor de un Hyundai Elantra gris con tablilla IWE-252 era de tez negra y alto, era el único en el vehículo y fue quien disparó hacia la Honda Pilot.[553]

89) El Exhibit 2 de la defensa, un *Resumen de llamada por número de control 54450-T*, detallaba una confidencia en la que se ofreció información de que quien presuntamente asesinó a la señora Padilla

---

[541] Íd., pág. 133, línea 12, a la pág. 134, línea 5.
[542] Íd., pág. 133, línea 5, a la pág. 136, línea 21.
[543] Íd., pág. 138, línea 20, a la pág. 139, línea 4.
[544] TPO, 30 de agosto de 2023, pág. 10, línea 23, a la pág. 11, línea 7.
[545] Íd., pág. 12, líneas 6-15.
[546] Íd., pág. 13, líneas 15, a la pág. 14, línea 6.
[547] Íd., pág. 29, línea 14, a la pág. 30, línea 6.
[548] Íd., pág. 30, línea 25 a la pág. 31, línea 23; pág. 38, líneas 8-18.
[549] Íd., pág. 38, líneas 8-12.
[550] Íd., pág. 57, línea 15, a la pág. 58, línea 10.
[551] Íd., pág. 58, línea 11, a la pág. 59, línea17.
[552] Íd., pág. 59, línea 18, a la pág. 60, línea 3.
[553] Íd., pág. 105, líneas 14, a la pág. 105, línea 16.

Romero fue su marido para recibir dinero de un seguro, dado que le iba mal en el negocio JAPC.[554]

90) Producto de su investigación, descartó la teoría de que la pareja de la señora Padilla Romero fuese responsable por el asesinato porque encontró que no era beneficiario de su seguro de vida.[555] En cambio, la investigación fue centrándose en que el que disparó en contra de la señora Padilla Romero fue el señor González Martínez, en compañía del señor Avilés González, por encargo de la señora Pérez Bigio.[556]

91) En los videos captados por las cámaras de seguridad de JAPC, no se podía apreciar si el señor Avilés González o el señor González Martínez estaban dentro del Hyundai Elantra.[557] En el video del GM Auto Parts y en el video de la gasolinera Shell no se podía ver hacia el interior del Hyundai Elantra ni la Honda Pilot.[558]

92) El video captado por las cámaras del Condominio The Falls, el más cercano a la ocurrencia de los disparos, admitido como el Exhibit 11-3 del Ministerio Público no tenía audio y no mostraba al señor González Martínez salir del vehículo para disparar, ni luces repentinas por las detonaciones.[559]

93) Según los resultados del ICF, ninguna huella dactilar recuperada del Hyundai Elantra pertenecía al señor Avilés González.[560]

94) Cuando se ocupó el Hyundai Elantra, el vehículo estaba cerrado y no fue abierto hasta que lo trabajó el ICF.[561]

95) Otros oficiales y él realizaron diversas gestiones infructuosas para dar con el paradero y citar al señor Luis López Bigio, testigo anunciado por el Ministerio Público.[562]

**Testimonio de la examinadora Berríos Rivera**

Por otra parte, la examinadora Berríos Rivera testificó lo siguiente:

1) Desde el 2016 se había desempeñado como examinadora de armas de fuego en el ICF.[563]

2) Fue la examinadora que trabajó todas las piezas de evidencia sometidas al ICF en el caso del asesinato de la señora Padilla Romero.[564]

3) Evaluó la evidencia sometida bajo el número identificador AF-19-1194, cuyo recibo fue admitido como el Exhibit 12-1 del Ministerio Público, la cual consistía en: cuatro (4) proyectiles y catorce (14) casquillos (Exhibit 23 del Ministerio Público); y una pistola Glock, modelo 27, calibre .40 (Exhibit 35 del Ministerio Público).[565]

---

[554] Íd., pág. 107, línea 10, a la pág. 108, línea 24.
[555] Íd., pág. 150, línea 18, a la pág. 154, línea, 20.
[556] Íd.
[557] Íd., pág. 113, líneas 6-24.
[558] Íd., pág. 113, línea 25, a la pág. 114, línea 18.
[559] Íd., pág. 114, línea 19, a la pág. 115, línea 14.
[560] Íd., pág. 121, línea 7-11.
[561] Íd., pág. 157, línea 1, a la pág. 158, línea 6.
[562] TPO, 21 de noviembre de 2023, pág. 8, línea 1, a la pág. 19, línea 4. Este testimonio fue brindado para establecer la no disponibilidad del testigo y rebatir la presunción de testigo voluntariamente suprimido.
[563] TPO, 10 de octubre de 2023, pág. 8, líneas 24-25; pág. 9, líneas 1-8.
[564] Íd., pág. 22, líneas 2-9.
[565] Íd., líneas 10-24; pág. 23, líneas 4-11.

4) Evaluó la evidencia sometida bajo el número identificador AF-19-1222, cuyo recibo fue admitido como el Exhibit 12-3 del Ministerio Público, la cual consistía en dos (2) proyectiles obtenidos de la Honda Pilot (Exhibit 24 del Ministerio Público) y otros dos (2) proyectiles que provenían de la autopsia realizada a la señora Padilla Romero (Exhibit 65 del Ministerio Público).[566]

5) Los casquillos que provenían de la escena, admitidos como el Exhibit 23, fueron disparados por la pistola, admitida como el Exhibit 35 del Ministerio Público.[567]

6) De todas las piezas de evidencia que evaluó, no pudo evaluar un fragmento de bala obtenido de la autopsia de la señora Padilla Romero.[568]

7) Concluyó que el 30 de septiembre de 2019, en el asesinato, únicamente se utilizó la pistola admitida como el Exhibit 35 del Ministerio Público.[569]

**Testimonio de la Agte. Negrón Rivera**

Por otra parte, la Agte. Negrón Rivera declaró lo siguiente:

1) Al momento de declarar había sido agente de la Policía por veinte (20) años y se encontraba destacada en el Departamento de Justicia como examinadora forense digital en la UICC.[570]

2) Con relación al asesinato de la señora Padilla Romero, le fueron entregados cinco (5) celulares para extraerles información y cuatro (4) registros de llamadas para la corroboración de información sobre el caso.[571]

3) Los registros correspondían a: (1) el número 787-902-4397, utilizado por el señor González Martínez, provisto por Sprint; (2) el número de teléfono 787-635-9727, usado por el señor Avilés González, provisto por Claro; (3) el número de teléfono 787-222-6540, usado por la señora Pérez Bigio, provisto por AT&T; y (4) el número de teléfono 256-607-3964, usado también por la señora Pérez Bigio, provisto por TextNow.[572]

4) Respecto al 787-902-4397, se solicitó identificar cómo ese número había interactuado con los demás números de teléfono registrados y ubicar las antenas a las que se conectaron durante esas llamadas para corroborar las localizaciones de los celulares utilizados.[573] Lo mismo se le solicitó en cuanto al 787-635-9727.[574]

5) Con la información de llamadas que proveen las compañías de celulares, se utiliza la posición de las antenas a las que se conectó el equipo y el área de cobertura de estas para delimitar la localización del equipo dentro de dichos parámetros al momento de cada llamada.[575]

6) Utilizando los registros, preparó un informe de triangulación, admitido como el Exhibit 68 del Ministerio Público, con la ubicación de las antenas obtenidas de los registros de los números 787-902-

---

[566] Íd., pág. 34, líneas 3-23
[567] Íd., pág. 41, líneas 6-25; pág. 42, líneas 1-15.
[568] Íd., pág. 49, líneas 18-25; pág. 50, líneas 1-13.
[569] Íd., pág. 51, líneas 6-14.
[570] Íd., pág. 54, líneas 19, a la pág. 55, línea 3.
[571] Íd., pág. 82, líneas 16-25.
[572] Íd., pág. 83, línea 4, a la pág. 84, línea 15.
[573] Íd., pág. 84, líneas 16-22.
[574] Íd., pág. 85, líneas 13-18.
[575] Íd., pág. 85, línea 19, a la pág. 88, línea 13.

4397 y 787-635-9727 para el 30 de septiembre de 2019.[576]

7) Se reunió con el Agte. Rodríguez Martínez en varias ocasiones para conocer la ubicación de los hechos y la ruta de la señora Padilla Romero.[577]

8) Como resultado de su análisis, el teléfono 787-902-4397 utilizado por el señor González Martínez fue utilizado el 30 de septiembre de 2019 a las 4:46 p.m. en una llamada con el número 256-607-3964 de TextNow, vinculado a la señora Pérez Bigio, en el área que cubría la compañía de construcción donde trabajaba la señora Padilla Romero, JAPC.[578]

9) Hubo otra llamada del 787-902-4397 utilizado por el señor González Martínez al 256-607-3964, vinculado a la señora Pérez Bigio, a las 5:11 p.m. con una duración de 4 minutos con 31 segundos en la misma área de cobertura, que era donde estaba la compañía de construcción.[579]

10) A las 5:28:46 p.m., hubo una tercera llamada proveniente del número 256-607-3964, vinculado a la señora Pérez Bigio, al 787-902-4397 utilizado por el señor González Martínez.[580]

11) A las 5:56:18 p.m., hubo una cuarta llamada del 787-902-4397 utilizado por el señor González Martínez al 256-607-3964, vinculado a la señora Pérez Bigio, en un área que cubría parte de la carretera PR-177 y la salida hacia la Ave. Martínez Nadal, lo cual coincidía con la información que le brindó el agente investigador en cuanto a que el señor González Martínez notificó por teléfono a la señora Pérez Bigio que la "vuelta" estaba hecha.[581] En el testimonio vertido por el señor González Martínez, él declaró haber realizado dicha llamada.[582]

12) A las 6:08:52 p.m. y a las 6:09:30 p.m., hubo una quinta y sexta llamada en las que el 256-607-3964, vinculado a la señora Pérez Bigio, contactó al 787-902-4397 utilizado por el señor González Martínez, las cuales se ubicaron en el área del peaje de la Ave. Martínez Nadal y el barrio Caimito y duraron 25 y 25 segundos, respectivamente.[583]

13) A las 6:12:38 p.m. hubo otra llamada del 787-902-4397 utilizado por el señor González Martínez al 256-607-3964, vinculado a la señora Pérez Bigio, que fue ubicada en el área de Cupey y tuvo una duración de 4 minutos y 13 segundos.[584]

14) El 787-902-4397 utilizado por el señor González Martínez recibió otra llamada de un número que iniciaba con 939 en el área que cubría la casa de este.[585]

15) El día de los hechos, ubicó una interacción del 787-635-9727, vinculado al señor Avilés González, a las 3:16:40 p.m. en el área de Río Hondo y luego en el área de la Zona Industrial Palmas, y localizó otra a las 7:05:05 p.m. en las antenas de Altos de Camarones, Montehiedra y Caimito Arriba.[586] La primera llamada

---

[576] Íd., pág. 110, línea 10, a la pág. 112, línea 22.
[577] Íd., pág. 104, línea 23, a la pág. 105, línea 19.
[578] Íd., pág. 120, línea 14, a la pág. 122, línea 21.
[579] Íd., pág. 123, línea 1, a la pág. 124, línea 11.
[580] Íd., pág. 124, líneas 12-23.
[581] Íd., pág. 124, línea 24, a la pág. 126, línea 23; pág. 143, líneas 12-20.
[582] Íd., pág. 137, línea 21, a la pág. 139, línea 1.
[583] Íd., pág. 144, línea 9, a la pág. 146, línea 12.
[584] Íd., pág. 146, líneas 13-25.
[585] Íd., pág. 148, líneas 7-22.
[586] Íd., pág. 151, línea 22, a la pág. 158, línea 8.

la podía ubicar en el área de Plaza Río Hondo en el Expreso PR-22 y la segunda en el área de la casa del señor González Martínez.[587]

16) El Exhibit 69 del Ministerio Público contenía una tabla preparada por la propia Agte. Negrón Rivera en la que comparó las llamadas que surgían del número 787-222-6540 y del 256-607-3965, ambos vinculados a la señora Pérez Bigio, para identificar si había números comunes a los que ambos teléfonos llamaron.[588]

17) De los registros del 256-607-3965, vinculado a la señora Pérez Bigio, surgió que se realizaron veintiocho (28) llamadas al 787-902-4397, utilizado por el señor González Martínez.[589] Este era el número que con más frecuencia llamaba.[590]

18) Siete (7) de los números llamados por el 256-607-3965, vinculado a la señora Pérez Bigio, coincidían con los llamados desde el 787-222-6540, también relacionado a la señora Pérez Bigio.[591]

19) Para las extracciones, recibió cinco (5) celulares con cinco (5) consentimientos al registro, corroboró cada equipo y el 14 de octubre de 2019 entregó un recibo de recepción a la Agte. Acevedo Jiménez, admitido como el Exhibit 59 del Ministerio Público, y luego los devolvió al Agte. Rodríguez Martínez el 13 de noviembre de 2019.[592] Los recibos fueron admitidos como los Exhibits 70-1 al 70-5 del Ministerio Público.

20) Los celulares eran: (1) un Galaxy Modelo J7, negro, con pantalla rota, que no encendía, con los últimos cuatro números de IMEI 6194, admitido como el Exhibit 71 del Ministerio Público; (2) un Galaxy Modelo GTN71000, blanco, con pantalla rota, que no encendía, con los últimos cuatro números de IMEI 1589, admitido como el Exhibit el 72-1 del Ministerio Público; (3) un LG modelo G5, el único con SIM Card, la cual tenía los últimos cuatro números de IMEI 4144 y era emitida por Claro, los últimos cuatro números IMEI del equipo eran 4356, admitido como el Exhibit 72-2 del Ministerio Público; (4) un LG, negro, con pantalla rota, lápiz Stylus y que no tenía disponible el número de IMEI a simple vista, admitido como el Exhibit 72-3 del Ministerio Público; y (5) uno Vortex, modelo 8, negro, con pantalla rota, sin SIM Card, cuyos últimos cuatro números de IMEI eran 1589, admitido como el Exhibit 72-4 del Ministerio Público.[593]

21) Extrajo información de los Exhibits 71 y 72-3 del Ministerio Público. Se produjo un CD para la información extraída de cada uno, los cuales entregó a la Agte. Acevedo Jiménez el 17 de octubre de 2019.[594] Los discos como objeto fueron admitidos como el Exhibit 73 del Ministerio Público, no así su contenido.

---

[587] Íd.

[588] TPO, 11 de octubre de 2023, pág. 13, línea 12, a la pág. 14, línea 7; pág. 14, línea 20, a la pág. 17, línea 1; pág. 21, línea 1-23.

[589] Íd., pág. 26, líneas 22-24.

[590] Íd., pág. 27, líneas 7-10.

[591] Íd., pág. 25, líneas 18-22.

[592] Íd., pág. 51, línea 12, a la pág. 54, línea 2.

[593] Íd., pág. 65, línea 20, a la pág. 67, línea 3; pág. 72, línea 7, a la pág. 73, línea 23.

[594] TPO, 13 de octubre de 2023, pág. 10, líneas 17-24; pág. 15, líneas 6-19.

22) Su trabajo era revisar si en los celulares había evidencia del asesinato de la señora Padilla Romero y el resultado fue positivo.[595]

23) Del Exhibit 72-1 del Ministerio Público extrajo tres (3) grabaciones de audio, provenientes de los archivos de la aplicación Whatsapp.[596] Una fue creada a las 12:36:09 p.m. del 9 de julio de 2019[597], otra a las 1:19:02 p.m. del 11 de julio de 2019[598] y la última a las 1:19:23 p.m. del 11 de julio de 2019[599]. Las grabaciones fueron admitidas como el Exhibit 75 del Ministerio Público.

24) No hizo una triangulación del número 787-222-6540.[600]

25) No tenía un documento para acreditar que el 787-902-4397 pertenecía al señor González Martínez.[601]

26) Las coordenadas provistas en el informe de triangulación y los registros corresponden a la ubicación de las antenas.[602] No se indica el lugar de la persona que genera la llamada, pero sí el área sugerida en la que se ubica.[603]

27) El área de cubierta de las antenas podía comprender una (1) milla y media (½) a tres (3) millas.[604]

28) No mencionó que el 787-635-9727 estuviese inscrito a nombre de la madre del señor Avilés González, a quien no entrevistó.[605]

29) No podía precisar dónde se encontraba el celular con número 787-635-9727 en las triangulaciones que hizo del 787-902-4397.[606]

30) No podía decir quiénes utilizaban los celulares en el momento de las llamadas, únicamente dónde se encontraba el equipo.[607]

31) Para registrar la cuenta del 787-635-9727, asociado al señor Avilés González, contaba con una orden de allanamiento.[608]

32) Para registrar los teléfonos pertenecientes al señor González Martínez tenía el consentimiento de él.[609]

El 30 de octubre de 2023, el TPI emitió, notificó y archivó en autos una *Resolución* en la que declaró No Ha Lugar la objeción de los apelantes sobre la admisibilidad del Exhibit 75 del Ministerio Público. A esos efectos, resolvió que el Ministerio Público estableció, mediante prueba, la cadena de custodia, la autenticidad, la confiabilidad del procedimiento de extracción y la identidad de la voz

---

[595] Íd., pág. 25, línea 24, a la pág. 26, línea 5.
[596] TPO, 23 de octubre de 2023, pág. 13, línea 11, a la pág. 14, línea 5.
[597] Íd., pág. 22, línea 21, a la pág. 23, línea 20.
[598] Íd., pág. 25, líneas 8-25.
[599] Íd., pág. 26, líneas 15-21.
[600] Íd., pág. 62, líneas 17-22
[601] Íd., pág. 70, líneas 4-8.
[602] Íd., pág. 76, líneas 1-3.
[603] Íd., líneas 4-11.
[604] Íd., pág. 79, líneas 5-13
[605] Íd., pág. 92, líneas 7-13; pág. 94, línea 20, a la pág. 96, línea 9.
[606] Íd., pág. 102, línea 10, a la pág. 104, línea 20.
[607] Íd., pág. 106, líneas 8-23.
[608] Íd., pág. 107, líneas 24, a la pág. 108, línea 5.
[609] Íd., pág. 108, líneas 6-16.

contenida en los audios. También, resaltó que por el testimonio del señor González Martínez se demostró que las declaraciones de la señora Pérez Bigio en los audios eran pertinentes.

Por un lado, concluyó que con el testimonio de los Agtes. Martínez Natal, Lamberty Aldea, Acevedo Jiménez, Negrón Rivera y del Tnte. Alvarado Reyes se probó la cadena de custodia de los celulares ocupados hasta que fueron entregados a la UICC. Por el otro, adjudicó que la identificación de la voz en los tres (3) audios por la joven Morales Padilla fue confiable y no daba margen a la probabilidad sustancial de una identificación errónea, ni sugestiva. Igualmente, interpretó que las declaraciones contenidas en los audios no eran testimoniales y la extracción de los mensajes no violentaban la prohibición constitucional de intercepciones telefónicas, ni el derecho a la intimidad de la señora Pérez Bigio.

Esa determinación fue impugnada por los apelantes el 2 de noviembre de 2023 mediante un recurso de *Certiorari Criminal* presentado ante esta Curia, el cual recibió el identificador alfanumérico KLCE202301210. En esa ocasión, plantearon que el TPI erró al admitir las grabaciones obtenidas de un celular de un testigo no disponible que no declaró sobre ellos en la Vista Preliminar y al admitirlos en contra del señor Avilés González, coartó su derecho a confrontarlos.

El 3 de noviembre de 2023, emitimos una *Resolución* en la que denegamos la expedición del auto de *Certiorari*. En aquel entonces, razonamos que no concurrían los criterios que justificarían intervenir con la determinación del foro primario. También, precisamos que el dictamen en cuanto a las grabaciones de audio era razonable, toda vez que las manifestaciones no eran de carácter testimonial por lo que no estaban protegidas por la cláusula de confrontación. Aún así, dejamos claro que nada impedía que los apelantes renovaran su oposición a la admisibilidad del Exhibit 75

del Ministerio Público una vez el foro primario resolviera el caso en sus méritos, de entenderlo necesario.

**Testimonio del Dr. Dávila Toro**

El Dr. Dávila Toro testificó lo siguiente:

1) Al momento de declarar, se desempeñaba como patólogo forense del ICF.
2) Fue el encargado de realizar la autopsia de la señora Padilla Romero, la cual recibió el número 2843-2019.[610]
3) Plasmó los resultados de su examen del cadáver en un informe médico forense, admitido como el Exhibit 14-3 del Ministerio Público.[611]
4) Se tomaron fotografías del cadáver, admitidas como el Exhibit 14-5 del Ministerio Público.[612]
5) La causa de muerte de la señora Padilla Romero fue heridas de bala.[613]
6) El cadáver tenía cinco (5) heridas de bala, las cuales identificó de la A a la E en el informe médico forense.[614] Al respecto, detalló que:
7) La herida A era una herida de forma estrellada, ubicada en la parte anterior de la cabeza, al lado derecho de la frente, tres (3) pulgadas debajo del tope de la cabeza, una pulgada a la derecha de la línea media anterior de la cabeza, con anillo de abrasión, trayectoria de adelante hacia atrás, un poco a la izquierda, que fracturó el cráneo, y de la que se recuperó un fragmento de proyectil de bala.[615]
8) La herida B estaba en la región temporal izquierda, a cuatro (4) pulgadas y media (½) por debajo del tope de la cabeza y a cuatro (4) pulgadas a la izquierda de la línea media anterior de la cara, tenía tatuaje de pólvora, lo que implicaba una distancia desde la punta del arma hasta el cuerpo de tres (3) pies o menos, era redondeada y tenía una trayectoria de izquierda a derecha y un poco hacia abajo, con salida por la mejilla derecha.[616] Al momento de ese disparo, el cristal debía estar roto, toda vez que, de lo contrario, no se hubiese producido un tatuaje de pólvora.[617]
9) La herida C estaba en el lateral izquierdo del cuello, con anillo de abrasión, y trayectoria de izquierda a derecha.[618]
10) La herida D estaba ubicada en el hombro izquierdo, con anillo de abrasión, trayectoria de izquierda a derecha, respecto a la que se recuperó un proyectil que cruzó la línea medial desde el hombro izquierdo y llegó al hombro derecho.[619]
11) La herida E estaba en la superficie posterior del antebrazo izquierdo, con trayectoria de izquierda a derecha y un poco hacia arriba, y salida debajo del

---

[610] TPO, 17 de octubre de 2023, pág. 5, líneas 9-19.
[611] Íd., pág. 7, línea 18, a la pág. 9, línea 4.
[612] Íd., pág. 9, línea 7 a la pág. 11, línea 1.
[613] Íd., pág. 11, línea 7-11
[614] Íd., pág. 13, líneas 7-9.
[615] Íd., pág. 16, línea 15, a la pág. 20, línea 22.
[616] Íd., pág. 21, línea 13, a la pág. 25, línea 2; pág. 28, líneas 15-19.
[617] Íd., pág. 28, líneas 7-13.
[618] Íd., pág. 28, línea 20, a la pág. 29, línea 24.
[619] Íd., pág. 30, línea 3, a la pág. 31, línea 5.

codo izquierdo.[620] La herida E era compatible con que la señora Padilla Romero estuviese conduciendo.[621]

## Testimonio de la joven Morales Padilla

Por último, le tocó testificar a la joven Morales Padilla, hija de la señora Padilla Romero, quien declaró lo siguiente:

1) En ese momento tenía veintiún (21) años.[622]
2) Para el 30 de septiembre de 2019, vivía en Montehiedra con su madre, la señora Padilla Romero, el señor Pérez Colón y su hermana menor de edad de iniciales LPP.[623]
3) Ella era hija natural de la señora Padilla Romero y el señor José Morales Acosta, mientras que la menor LPP era hija de la señora Padilla Romero y el señor Pérez Colón, quienes fueron pareja desde el 2009 hasta el momento de los hechos.[624]
4) Además de tener una relación de madre e hija, la señora Padilla Romero y ella eran amigas, siempre estaban juntas, eran muy cercanas y se contaban todo.[625]
5) Para el 2009, vivieron en esa misma residencia con la señora Pérez Bigio por unos meses.[626]
6) La relación entre la señora Padilla Romero y la señora Pérez Bigio era "muy mala".[627]
7) Cuando la conoció, la señora Pérez Bigio no tenía trabajo y, posteriormente, estuvo en la oficina de JAPC.[628]
8) JAPC era una oficina de construcción que le pertenecía al señor Pérez Colón y tenía varias oficinas, una en Santa Juanita, conocida por ellos como la oficina vieja, otra en la carretera PR-174, cerca de un negocio de artículos escolares, que conocía como la oficina nueva, tenía otra por La Barca en la carretera PR-5, así como otro local.[629]
9) La señora Pérez Bigio iba a la oficina a pedir dinero.[630]
10) La señora Padilla Romero comenzó a trabajar en JAPC antes del 2010 como secretaria, luego manejaba la compañía, iba a los proyectos, mandaba a comprar materiales, hacía cheques y archivaba, entre otras tareas.[631]
11) Antes de la muerte de la señora Padilla Romero, la señora Pérez Bigio estuvo trabajando en JAPC.[632]
12) La señora Pérez Bigio tenía dos (2) hijos, quienes llegó a ver y conocer.[633]
13) Para el 2019, la señora Pérez Bigio se reportaba a trabajar en la oficina de La Barca, mientras que la señora Padilla Romero iba a la oficina ubicada en la

---

[620] Íd., pág. 32, línea 6-22;
[621] Íd., pág. 35, líneas 10-15.
[622] TPO, 26 de octubre de 2023, pág. 6, líneas 8-9.
[623] Íd., líneas 14-17; pág. 7, líneas 10-14.
[624] Íd., pág. 6, línea 18, a la pág. 7, línea 9.
[625] Íd., pág. 7, líneas 10-14.
[626] Íd., pág. 9, línea 10-21.
[627] Íd., pág. 14, línea 22, a la pág. 15, línea 2.
[628] Íd., pág. 15, línea 8, a la pág. 16, línea 5.
[629] Íd., pág. 16, línea 6, a la pág. 17, línea 6
[630] Íd., pág. 18, líneas 1-8.
[631] Íd., pág. 20, líneas 8-19.
[632] Íd., pág. 23, líneas 6-13.
[633] Íd., pág. 24, línea 19, a la pág. 25, línea 5.

carretera PR-174, al lado del negocio de artículos escolares.[634]

14) Para el 30 de septiembre de 2019, tenía diecisiete (17) años, cursaba el cuarto año, y su hermana menor tenía ocho (8) años y estaba en segundo grado, ambas en la misma escuela.[635]

15) La señora Padilla Romero tenía una Honda Pilot negra con aros negros y detalles color plateados al frente, de cuatro (4) puertas.[636] El vehículo había sido adquirido en diciembre de 2018 por el señor Pérez Colón.[637]

16) El 30 de septiembre de 2019, se sentía enferma, llamó a la señora Padilla Romero para que la buscara temprano, pues normalmente salían a las 5:00 p.m., y su mamá accedió a buscarlas a las 3:00 p.m.[638]

17) A las 3:00 p.m., la señora Padilla Romero llegó a la escuela, las menores compraron unos libros y luego las tres se fueron.[639]

18) De ahí, fueron a la oficina de JAPC, denominada La Barca, donde estaba el señor Pérez Colón con otros empleados.[640] Allí estuvieron por varios minutos y la señora Padilla Romero fue a otra oficina a llevarle dinero a un empleado.[641]

19) Luego, las tres fueron al restaurante El Mesón, ubicado en Rexville, para comprar comida para ellas y el señor Pérez Colón y, posteriormente, volvieron a La Barca a dejar la comida de este último, su hermana y ella comieron en la Honda Pilot y luego se bajó para ir al baño.[642]

20) Después, se dirigieron a la oficina de JAPC en Santa Juanita para buscar un libro que ella había pedido, pero no estaba el libro, sino el papel del correo para recogerlo en una sucursal.[643] Fueron al correo, pero ya estaba cerrado y, por eso, se dirigieron directo a la oficina nueva de JAPC ubicada al lado del negocio de artículos escolares, cerca de la carretera PR-174.[644]

21) Tras llegar a la oficina nueva, ella y la menor LPP se quedaron en la Honda Pilot, mientras que la señora Padilla Romero se bajó, recogió dos (2) mascotas, una perrita llamada Fipsi y un pajarito llamado Juancho, el cual cargaba en el pecho.[645]

22) Cuando iban en la Honda Pilot, la señora Padilla Romero conducía el vehículo, la joven Morales Padilla iba a su lado y la menor LPP iba atrás.[646]

23) Permanecieron en la oficina nueva cerca de diez (10) minutos hasta que la señora Padilla Romero salió, puso a la perrita Fipsi en el asiento de atrás y, a eso de las 5:30 p.m. se dirigieron a la casa en Montehiedra.[647]

24) La ruta que iban a tomar pasaba por la carretera PR-174, donde estaba la oficina, por una luz en la que se ubicaba un restaurante McDonald's y virarían a la izquierda hacia la Avenida Los Filtros (carretera PR-

---

[634] Íd., pág. 30, líneas 9-17.
[635] Íd., pág. 31, línea 8, a la pág. 32, línea 1.
[636] Íd., pág. 32, líneas 9-16.
[637] Íd., pág. 34, líneas 12-20.
[638] Íd., pág. 32, línea 23, a la pág. 34, línea 5.
[639] Íd., pág. 34, líneas 6-11.
[640] Íd., pág. 35, líneas 5-15.
[641] Íd., línea 15-24.
[642] Íd., pág. 36, líneas 5-13.
[643] Íd., pág. 36, línea 16-25.
[644] Íd., pág. 37, líneas 1-5.
[645] Íd., líneas 6-19.
[646] Íd., líneas 20-24.
[647] Íd., pág. 37, línea 25, a la pág. 39, línea 2.

177), pasando Costco y la escuela de ambas menores.[648]

25) En algún punto del trayecto se durmió y lo último que recordaba ver era un supermercado Amigo.[649]

26) Después, despertó al escuchar lo que pensó que eran petardos y, al abrir los ojos, sintió que le pasaban dos (2) cosas por el frente, vio que su ventana tenía un roto, miró hacia al frente, observó una persona en motora mirando hacia el vehículo y vio a su mamá, quien tenía la cabeza agachada y las manos hacia arriba.[650]

27) Escuchó a su hermana gritar y, por eso, le pidió a esta que se tranquilizara.[651]

28) Entonces, se percató de que la Honda Pilot seguía en movimiento y, por eso, aguantó el guía y detuvo la guagua.[652]

29) Tomó su teléfono, llamó al señor Pérez Colón y, mientras tanto, cogió el celular de su hermana y llamó al 9-1-1.[653]

30) Se bajó de la Honda Pilot, miró hacia atrás y comenzó a detener el tráfico vehicular.[654]

31) Detuvo el tráfico gritando que le habían disparado a su madre, recordó que estaba en una llamada con el sistema 9-1-1, le dijo al operador que le habían disparado a su madre y le entregó su celular a una persona que se había parado a ayudar para que hablara con el señor Pérez Colón.[655]

32) El operador del 9-1-1 le preguntó si la señora Padilla Romero estaba respirando y, por eso, ella abrió la puerta, vio que su madre estaba intentando respirar y lo comunicó al operador, quien le indicó que sacara de la Honda Pilot a la menor LPP y la perrita.[656]

33) A la escena llegó la Policía, paramédicos y la gente que se detuvo.[657]

34) Entretanto, escuchó a alguien hablar de un pajarito en el suelo, ella respondió que era suyo y cuando lo recogió, se percató de que estaba lleno de sangre.[658]

35) Mientras los paramédicos estaban verificando a su hermana y a ella, llegó el señor Pérez Colón, quien se echó a llorar.[659]

36) A la escena habían llegado dos (2) ambulancias, una recogió a la señora Padilla Romero y la otra a la menor LPP y a ella, ambas se dirigieron al Centro Médico.[660]

37) Una vez en Centro Médico, fue atendida porque se sentía muy mal, llegaron sus amistades y el señor Pérez Colón y las acompañó una oficial de la Policía.[661]

38) Posteriormente, un doctor le explicó que su madre había fallecido y, tras la noticia, padeció de un fuerte dolor de cabeza y presión elevada, por lo que le administraron medicamentos.[662]

---

[648] Íd., pág. 39, líneas 3-16.
[649] Íd., pág. 39, líneas 17-21., a la pág. 40, línea 3
[650] Íd., pág. 39, línea 21, a la pág. 40, línea 8.
[651] Íd., pág. 40, líneas 16-22.
[652] Íd., pág. 40, línea 22, a la pág. 41, línea 1.
[653] Íd., pág. 41, líneas 1-9.
[654] Íd., líneas 8-9.
[655] Íd., pág. 42, línea 9, a la pág. 43, línea 1.
[656] Íd., pág. 43, líneas 8-16.
[657] Íd., pág. 44, líneas 3-7.
[658] Íd., líneas 9-13.
[659] Íd., líneas 18-23.
[660] Íd., pág. 45, línea 2-14.
[661] Íd., pág. 45, línea 15, a la pág. 47, línea 21.
[662] Íd., pág. 47, línea 24, a la pág. 48, línea 11.

39) A eso de las 2:00 a.m., el señor Pérez Colón, la menor LPP y ella salieron del Centro Médico y se dirigieron hacia la casa en Montehiedra.[663]

40) Una vez en la casa, mientras se preparaban para dormir, escuchó a la señora Perez Bigio gritar llamando al papá de esta, el señor Pérez Colón, desde afuera de la casa, a quien reconoció por su voz, bajó y le abrió la puerta.[664]

41) La señora Pérez Bigio permaneció en el área de la puerta y las escaleras de la casa, el señor Pérez Colón le explicó que la señora Padilla Romero había fallecido y la reacción de la señora Pérez Bigio fue "normal, se quedó tranquila" y no lloró.[665] La señora Pérez Bigio permaneció en la casa por unos veinte (20) minutos.[666]

42) Volvió a ver a la señora Pérez Bigio en la mañana del día siguiente cuando esta llegó a la casa en Montehiedra mientras se preparaban para ir al ICF a identificar el cuerpo de la señora Padilla Romero.[667]

43) La relación entre su madre y la señora Pérez Bigio fue mala desde el primer momento en que se vieron.[668]

44) Para el 2019, la señora Pérez Bigio estaba trabajando en la compañía, la relación de esta con la señora Padilla Romero era "bien mala", a tal punto que su madre no la quería en la oficina nueva.[669] Por eso, la señora Pérez Bigio comenzó a trabajar en la oficina conocida como La Barca y la señora Padilla Romero trabajó desde la oficina nueva.[670]

45) Había visitado la residencia de la señora Pérez Bigio en varias ocasiones y la pudo identificar en las fotos admitidas como los Exhibits 26-6 y 26-9 del Ministerio Público.[671]

46) Para el 2019, el número de la señora Pérez Bigio era el 787-222-6540.[672]

47) A través de los años, habló con la señora Pérez Bigio tanto en persona, como por teléfono.[673] Podía reconocer la voz de la señora Pérez Bigio, quien hablaba "como calle" y no "de una manera culta".[674]

48) En los audios que surgen del Exhibit 75 del Ministerio Público, enviados por la señora Pérez Bigio al señor González Martínez, y extraídos del celular de este, se podía escuchar la voz de la señora Pérez Bigio en los tres (3) audios.[675]

49) La señora Pérez Bigio se encontraba en sala.[676]

50) El 30 de septiembre de 2019, no observó nada raro o algún vehículo siguiéndolas mientras iba de oficina en oficina.[677] En ningún momento observó un Hyundai Elantra color gris en el trayecto por la Avenida Los Filtros.[678]

---

[663] Íd., pág. 49, líneas 8-15.
[664] Íd., pág. 49, línea 16, a la pág. 50, línea 2.
[665] Íd., pág. 50, líneas 3-19.
[666] Íd., líneas 20-21.
[667] Íd., pág. 53, líneas 7-13.
[668] Íd., pág. 58, líneas 1-4.
[669] Íd., pág. 85, línea 22, a la pág. 86, línea 8.
[670] Íd., pág. 87, líneas 1-7.
[671] Íd., pág. 90, línea 13, a la pág. 94, línea 1.
[672] Íd., pág. 103, líneas 1-14.
[673] Íd., pág. 106, línea 5-17
[674] Íd., pág. 107, línea 22, a la pág. 109, línea 2.
[675] Íd., pág. 123, línea 2, a la pág. 124, línea 15.
[676] Íd., pág. 125, línea 3, a la pág. 126, línea 5.
[677] Íd., pág. 186, línea 16, a la pág. 187, línea 6.
[678] Íd., pág. 187, líneas 7-9.

51) En el Exhibit 9-30 del Ministerio Público se podía ver la oficina de JAPC, la última que visitaron el 30 de septiembre de 2019.[679]

52) En el Exhibit 9-18 del Ministerio Público se podían ver los negocios frente a JAPC.[680]

53) En el Exhibit 4-12 del Ministerio Público se podía apreciar la Honda Pilot.[681]

54) En el Exhibit 9-25 del Ministerio Público se ilustraba la vista desde el otro extremo de la calle y los negocios mirando hacia JAPC, frente a los cuales no observó que un Hyundai Elantra gris estuviese estacionado allí.[682]

55) Posterior a los disparos, no observó un Hyundai color gris, solo a la persona en la motora, mirando hacia atrás.[683] No podía decir a cuánta distancia se encontraba el individuo, no le vio las manos y no podía decir si llevaba una pistola o si llevaba un casco.[684]

56) Las labores de la señora Pérez Bigio en JAPC consistían en supervisar proyectos.[685]

57) En algún momento le comunicó a algún agente de la Policía que el señor Pérez Colón era "muy celoso", decía palabras obscenas cuando discutía, que agredía a la señora Padilla Romero y que esta se defendía.[686]

58) También llegó a comunicarle a algún agente de la Policía que la señora Padilla Romero le había dicho que fuera haciendo las maletas.[687] También le llegó a decir que el señor Pérez Colón había indicado "que iba a correr sangre".[688]

Durante su testimonio, la joven Morales Padilla describió unos eventos ocurridos en el 2009 y 2010 entre la señora Pérez Bigio y la señora Padilla Romero, los cuales fueron excluidos por el TPI tras la objeción de la defensa bajo el fundamento de que eran incidentes muy remotos.[689]

Tras escuchar los testimonios antes pormenorizados, celebrado el juicio por tribunal de derecho, el TPI emitió fallos de culpabilidad en contra de los apelantes. Por un lado, resolvió que la señora Pérez Bigio era culpable de asesinato en primer grado, en violación del Artículo 93 del Código Penal, *supra*, y de disparar o apuntar armas, en violación del Artículo 5.15 de la Ley de Armas de

---

[679] Íd., pág. 188, líneas 7-24.
[680] Íd., pág. 189, línea 11-19.
[681] Íd., pág. 191, líneas 19-24.
[682] Íd., pág. 192, línea 19, a la pág. 193, línea 10.
[683] Íd., pág. 210, líneas 2-19.
[684] Íd., pág. 221, línea 16, a la pág. 22, línea 9.
[685] Íd., pág. 213, líneas 21-24.
[686] Íd., pág. 228, línea 25, a la pág. 228, línea 15.
[687] Íd., pág. 231, líneas 3-14.
[688] Íd., pág. 232, líneas 5-13.
[689] Íd., pág. 84, línea 7, a la pág. 85, línea 15; pág. 229, línea 14, a la pág. 230, línea 1.

2000, *supra*. Por el otro, declaró culpable al señor Avilés González de asesinato en primer grado, disparar o apuntar armas y dos (2) cargos de portación y uso de armas de fuego sin licencia, en violación del Artículo 5.04 de la Ley de Armas de 2000, *supra*.

Posteriormente, impuso la siguiente serie de condenas a los apelantes. A la señora Pérez Bigio:

1) noventa y nueve (99) años de cárcel, por el asesinato en primer grado.
2) diez (10) años de cárcel, equivalentes a la pena de cinco (5) años fijada por disparar o apuntar armas, duplicada en virtud del Artículo 7.03 de la Ley de Armas de 2000, *supra*.

Como las penas de ambos delitos debían ser cumplidas de forma consecutiva entre sí, al amparo del Artículo 7.03 de la Ley de Armas de 2000, *supra*, la pena total impuesta a la señora Pérez Bigio fue de ciento nueve (109) años de cárcel.

Al señor Avilés González:

1) noventa y nueve (99) años por el asesinato en primer grado;
2) veinte (20) años de cárcel por la portación y uso de armas de fuego sin licencia, equivalentes a la pena de (10) años fijada ante la infracción de ese delito, duplicada en virtud del Artículo 7.03 de la Ley de Armas de 2000, *supra*.
3) veinte (20) años de cárcel por el otro cargo de portación y uso de armas de fuego sin licencia, que equivalen a la pena de (10) años fijada ante la infracción de ese delito, duplicada en virtud del Artículo 7.03 de la Ley de Armas de 2000, *supra*.
4) diez (10) años, los cuales equivalen a la condena de cinco (5) años dispuesta por disparar o apuntar armas, duplicada en virtud del Artículo 7.03 de la Ley de Armas de 2000, *supra*.

Como las penas de los cuatro (4) delitos debían ser cumplidas de forma consecutiva entre sí por virtud del Artículo 7.03 de la Ley de Armas de 2000, *supra*, la pena total impuesta al señor Avilés González fue de ciento cuarenta y nueve (149) años.

Inconforme, el 8 de marzo de 2024, la señora Pérez Bigio radicó la *Apelación criminal* de epígrafe y le imputó al TPI la comisión de los siguientes errores:

1) ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL EMITIR UN FALLO DE CULPABILIDAD EN EL CASO DE EPÍGRAFE A PESAR DE QUE NO SE PROBÓ LA

CULPABILIDAD DEL ACUSADO MÁS ALLÁ DE DUDA RAZONABLE.

2) ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL ADMITIR EL TESTIMONIO DE VISTA PRELIMINAR DEL TESTIGO LUIS GONZÁLEZ MARTÍNEZ AL DETERMINAR QUE ERA UN TESTIGO NO DISPONIBLE SIN QUE SE HAYA PROBADO SU NO DISPONIBILIDAD CONFORME LA LEY Y JURISPRUDENCIA APLICABLE CON LA CONSECUEN[C]IA DE COARTAR EL DERECHO A LA CONFRONTACIÓN DE LA APELANTE.

3) ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL EMITIR SENTENCIAS CONSECUTIVAS ENTRE S[Í] EN LOS ARTÍCULOS 93 (A) DEL CÓDIGO PENAL Y EL ARTÍCULO 5.15 DE LA LEY DE ARMAS DE PUERTO RICO A PESAR DE QUE ERA DE APLICACIÓN EL CONCURSO DE DELITOS SIENDO APLICABLE IMPONER LAS PENAS CONCURRENTES ENTRE S[Í].

También en desacuerdo, el 10 de abril de 2024, el señor Avilés González presentó un *Recurso [de] apelación criminal* en el que señaló la comisión por el TPI de los siguientes errores:

1) Erró el Honorable Tribunal con su fallo de culpabilidad ante una prueba contradictoria, insuficiente en derecho y carente de crédito, que no derrotó la presunción de inocencia. Nunca se establecieron los cargos más allá de duda razonable máxime, cuando el único testigo que relaciona al convicto con los hechos, repudi[ó] su testimonio en corte abierta y se negó a declarar. Nunca este testigo identificó al convicto en corte abierta. Lo más trágico de este proceso fue, que la prueba científica presentaba en el caso, repudiada por el Ministerio Público, pero traída por la defensa, una prueba completa de ADN, excluyó al apelante de responsabilidad penal en estos hechos y el TPI hizo caso omiso de la misma.

2) Erró el Honorable Tribunal al otorgar credibilidad al único testigo de cargo que identificaba al apelante, Sr. Luis González Martínez, co-autor, al que debió de evaluar con desconfianza y cautela, quien brindó un testimonio evasivo, lleno de contradicciones sobre hechos esenciales, falto de exactitud en su testimonio de vista preliminar. Quien se negó a declarar en el juicio, que repudi[ó] su convenio de inmunidad y su testimonio previo. Se negó a declarar en el juicio, violando el derecho a la confrontación del apelante, pues nunca estuvo disponible para ser contrainterrogado sobre sus dos versiones.

3) Erró el Honorable Tribunal de Instancia al declarar testigo no disponible al testigo cooperador-repudiante, Luis González Martínez y permitir que bajo la Regla 806 (A) (1) de Evidencia, se admita el testimonio que prestó en la vista preliminar, cuando nunca levantó en el juicio, su derecho a no incriminarse, nunca lo levant[ó] su representación legal, nunca se le apercibió que de no declarar podía ser incurso en desacato y que nunca fue confrontado con la grabación de su testimonio en vista preliminar. Todo ello en clara violación al derecho constitucional a la confrontación del imputado.

4) Erró el Honorable Tribunal al admitir en evidencia mensajes de texto, voces e información indiscriminada de los celulares del testigo cooperador-repudiante, sin que este identificara los celulares y nunca habló sobre el contenido de los mismos en el juicio. Nunca los celulares fueron autenticados por su alegado dueño, sin que se

cumpliera con el requisito de cadena de custodia. Toda esa prueba violó crasamente el derecho a la confrontación del apelante. Nunca en sala durante el juicio este testigo autenticó esta evidencia para establecer su identificación, ni se establecieron criterios de confiabilidad de la misma.

5) Erró el Honorable Tribunal de Primera Instancia como cuestión de derecho al concluir que el delito estatuido en el Artículo 5.15 de la Ley de Armas no está comprendido en el cargo de asesinato.

6) Erró el Honorable Tribunal al condenar al apelante por un cargo de Art[í]culo 5.05 sobre un arma que se encontraba en el interior del auto Hundai [sic] Elantra gris obscuro, que nadie vio, que nadie ocupó, que nunca se disparó, que no hubo prueba de corroboración alguna de su presencia y uso, en la comisión de estos hechos. Arma que ni siquiera se le imput[ó] al testigo cooperador-repudiante, en su convenio de inmunidad.

7) Erró el Honorable Tribunal al permitir prueba de expresiones realizadas por la co-acusada Keishla Pérez Bigio, realizadas tres meses antes de los hechos, en las cuales no estuvo involucrado el apelante, violando su derecho constitucional a la confrontación[.] Nunca se tomaron medidas cautelares para proteger los derechos del apelante. El apelante fue condenado por lo expresado por la Sra. Keishla Pérez Bigio en dichas grabaciones, pues la prueba científica de ADN, le excluyó de responsabilidad.

8) Erró el Honorable Tribunal de Primera Instancia como cuestión de derecho al imponer las sentencias contra el apelante de forma consecutiva, con penas agravadas, convirtiendo la sentencia en un castigo cruel e inusitado.

9) Erró el Honorable Tribunal de Primera Instancia al duplicar las penas por infringir la Ley de Armas, pues la imposición de una pena duplicada al palio del Artículo 7.03 de la Ley de Armas es actualmente inconstitucional atendiendo los resultados de Pueblo v. Vicmael [sic] Colón, 2023 TSPR 71, Pueblo v. Nieves Cabán 2019 TSPR 33 y la doctrina federal de Cunningham v. California, 549 U.S. 270 (2007).

Estipulada la TPO, el 19 de septiembre de 2024, la señora Pérez Bigio radicó un *Alegato de la apelante* en el que nos solicitó que revoquemos las sentencias apeladas. En su escrito, argumentó, en esencia, que no se probó su culpabilidad más allá de duda razonable, que se admitió erróneamente el testimonio vertido en Vista Preliminar por el señor González Martínez y que las penas le fueron impuestas en contravención de la ley.

Sobre el primer y segundo error, planteó que el TPI no debió declarar testigo no disponible al señor González Martínez sin antes celebrar una vista evidenciaria y sin que este se acogiera expresamente a su derecho a no incriminarse mediante su propio testimonio.

Por un lado, argumentó que el foro primario venía obligado a realizar una vista en la que auscultara las razones del testigo para no declarar, las causas de su indisponibilidad y la identidad de quien incumplió el convenio de cooperación suscrito por él con el Ministerio Público. Según su criterio, no se podía concluir que el señor González Martínez invocó su derecho a no auto incriminarse, razón por la que fue declarado testigo no disponible. A ello, añadió que no podía interpretarse que el testigo ejercitó tal derecho por el mero hecho de haber recibido la orientación de distintos representantes legales y haberla comprendido.

Por el otro, arguyó que la correspondiente admisión errónea del testimonio anterior del señor González Martínez le causó un grave perjuicio a la señora Pérez Bigio porque no pudo llevar a cabo un contrainterrogatorio efectivo, ni cuestionar la obtención de evidencia, ni preguntar qué habló el testigo con los agentes de la Policía que extrajeron evidencia de sus celulares.

En ese sentido, también subrayó la diferencia entre la naturaleza de la Vista Preliminar y la del juicio en su fondo como fundamento para sostener que el contrainterrogatorio que su representación legal realizó en la Vista Preliminar no fue suficiente para cobijar su derecho a carearse con la prueba. Al respecto, distinguió que, a diferencia del juicio, al momento de confrontar al señor González Martínez en la Vista Preliminar no tenía toda la prueba que fue descubierta posteriormente y no se enfrentaba a la misma exigencia probatoria. En consecuencia, nos propuso que rechacemos el testimonio del señor González Martínez bajo el supuesto de que su admisión violentó el derecho a la confrontación de los apelantes.

Sobre el tercer error, expuso que, conforme a la doctrina del concurso ideal de delitos, el TPI únicamente podía sentenciarla por la pena más grave de los dos (2) delitos por los que fue hallada

culpable. Es decir, que, si bien correspondía condenarla por asesinato en primer grado y por disparar o apuntar un arma, solamente procedía sentenciarla a cumplir noventa y nueve (99) años de cárcel. A su entender, la acción de apuntar, disparar y asesinar quedó comprendida en una sola unidad de hechos, confesada por el señor González Martínez cuando reveló que acechó a la señora Padilla Romero y que le disparó específicamente. De esa forma, agregó, existió un mismo designio y una misma unidad de actos hacia un único objetivo: darle muerte. Por eso, nos invitó a resolver que existió un concurso ideal de delitos e imponerle a la señora Pérez Bigio la condena más grave únicamente.

Por su parte, el 30 de septiembre de 2024, el señor Avilés González presentó un *Alegato de la parte apelante* en el que solicitó que revoquemos las convicciones dictadas en su contra por el TPI. A esos efectos, propuso que ordenemos un nuevo juicio o que lo absolvamos. En contra de las sentencias, planteó toda suerte de argumentos, los cuales pormenorizamos en adelante.

Primero, arguyó que el TPI no debió declarar testigo no disponible al señor González Martínez y, admitido su testimonio, no debió otorgarle credibilidad. A su entender, el testigo de cargo no ejerció expresamente su derecho a no incriminarse mediante su propio testimonio y tampoco fue apercibido por desacato ante su negativa a declarar. Por ello, esbozó que no se le podía considerar testigo no disponible bajo los requisitos de la Regla 806(A) de Evidencia, *supra.* Incluso, señaló que, en al menos tres (3) ocasiones, el foro primario indagó si la decisión del señor González Martínez de no declarar se debía a que no quería afectar su caso y él reiteró que no. Asimismo, reclamó que la interpretación del foro primario del repetido "no voy a declarar" del testigo como un reclamo expreso del privilegio constituyó una nueva norma errónea de interpretación jurídica que no fue contemplada por el legislador.

Además, denunció que el testigo no fue confrontado con la grabación de su testimonio previo y tampoco identificó al señor Avilés González en sala durante el juicio. Por último, adujo que, como el testigo repudió su testimonio anterior, vertido en la Vista Preliminar, y se negó a declarar en el juicio, no pudo ser interrogado sobre su versión en cada ocasión y, por ello, se violó el derecho a la confrontación del señor Avilés González.

Segundo, plasmó que el testimonio en Vista Preliminar del señor González Martínez no merecía credibilidad y, una vez descartado por su inadmisibilidad, no se desfiló prueba independiente ni testigo presencial que atara al señor Avilés González a los hechos. Al respecto, argumentó que la defensa presentó prueba científica de ADN, admitida como el Exhibit 3 de esa parte, que excluyó al señor Avilés González de responsabilidad penal al arrojar con certeza matemática que él no fue el proveedor del material genético ocupado en el Hyundai Elantra tras su allanamiento. A su juicio, ello es evidencia científica, circunstancial y categórica de que el señor Avilés González no estuvo en el vehículo.

También, puntualizó que el TPI lo condenó erróneamente por la posesión de un arma que no se utilizó, no se ocupó, no se le imputó haberla portado al señor González Martínez, quien fue el único que la vio, y no se corroboró su presencia ni su uso en la comisión del delito.

Además, esbozó que el Ministerio Público no probó una conspiración o un acuerdo entre el señor Avilés González y la señora Pérez Bigio para dar muerte a la señora Romero Padilla. Por el mismo camino, afirmó que ninguno de los videos admitidos corroboró la presencia de este en el vehículo. Incluso, destacó que del testimonio de la joven Morales Padilla se desprendió que el señor Avilés González nunca estuvo en la escena, toda vez que el único vehículo que relacionó con los hechos fue una motora en la que iba

una sola persona. Igualmente, matizó que el Agte. Rodríguez Martínez admitió que en una querella se describió un Hyundai Elantra con el mismo color y tablilla del vehículo ocupado en el que solamente iba conduciendo un hombre de tez negra y alto, quien fue el único que disparó.

Tercero, expuso que el TPI admitió erróneamente evidencia de mensajes de texto, de voz e información indiscriminada de celulares que el señor González Martínez no identificó y sobre cuyo contenido no declaró. A ello, sumó que los celulares no fueron autenticados por su dueño y que no se cumplió con el requisito de cadena de custodia.

Cuarto, alegó que fue perjudicado por el manejo del caso por el foro primario al celebrar el juicio en contra del señor Avilés González junto a la señora Pérez Bigio. Es su posición que, si el foro primario hubiera separado los juicios, entonces no hubiera llegado al fallo de culpabilidad en su contra. En similar forma, adujo que la condena en su contra se basó en la publicidad excesiva que tuvo el caso.

Quinto, planteó que no correspondía permitir la presentación en su contra de las expresiones de la señora Pérez Bigio, las cuales fueron realizadas tres (3) meses antes del asesinato, contenidas en grabaciones de audio y admitidas como el Exhibit 75 del Ministerio Público. Según su criterio, únicamente el señor González Martínez podía autenticar esas conversaciones o grabaciones, pero nunca se las presentaron y, en efecto, no declaró sobre los audios. En ese sentido, acentuó que tampoco se le presentaron al testigo los consentimientos a que se utilizara la información descargada de los celulares.

Por último, reclamó que el TPI no podía condenarlo a uno de los delitos y, sobre todo, no tenía facultad para imponer las penas sentenciadas. Por un lado, argumentó que el Artículo 5.15 de la Ley

de Armas de 2000, *supra*, está subsumido en el cargo de asesinato. Por el otro, planteó que no procedía la imposición de penas de forma consecutiva y en modalidad agravada porque constituían castigo cruel e inusitado. A su vez, arguyó que la duplicación de las penas impuestas en virtud de la Ley de Armas de 2000, *supra*, era inconstitucional.

En apoyo de las sentencias apeladas, el 19 de diciembre de 2024, el Pueblo de Puerto Rico radicó un *Alegato de El Pueblo de Puerto Rico* en el que solicitó que confirmemos las sentencias apeladas. En esencia, contrapuso tres (3) planteamientos principales frente a los argumentos de los apelantes: (1) que el TPI actuó correctamente al declarar testigo no disponible al señor González Martínez y admitir el testimonio que este vertió en Vista Preliminar; (2) que en el juicio se desfiló prueba suficiente, debidamente admitida, para demostrar que la señora Pérez Bigio y el señor Avilés González cometieron los delitos por los cuales fueron acusados; y (3) que las penas fueron correctamente impuestas.

Primero, esbozó que, dada la negativa del señor González Martínez a declarar, el foro primario procedió adecuadamente cuando: autorizó al Ministerio Público a tratarlo como testigo hostil; no le ordenó contestar las preguntas por la posibilidad de que se incriminara con sus propias respuestas; y auscultó exhaustivamente las motivaciones del testigo para no querer declarar. Según razonó, al hacer esto último, se tornó innecesaria la realización de una vista evidenciaria y se cumplió cabalmente con lo requerido por la Regla 806 de Evidencia, *supra*. Además, añadió que el señor González Martínez dejó claro que no temía por su vida o por la seguridad de su familia, manifestó que no tenía dudas sobre sus derechos luego que el foro primario se los explicó y que, ante preguntas sobre sus razones para no declarar, repitió "no puedo contestar", "no recuerdo", "no voy a seguir declarando", "no voy a

seguir declarando más ná" y "yo no estoy motivado en declarar, no quiero seguir declarando, no es por seguridad ni nada, pero no quiero seguir declarando". A la luz de ello, reafirmó que fue válido declarar testigo no disponible al señor González Martínez al reconocerle su derecho a no incriminarse mediante su propio testimonio. Visto así, sostuvo que procedía admitir los testimonios previos de ese testigo que hubiesen estado sujetos a contrainterrogatorio, tal y como hizo el foro primario con el testimonio vertido por este en la Vista Preliminar.

Segundo, haciendo referencia a ese testimonio y la restante evidencia admitida por el TPI, el Pueblo de Puerto Rico insistió en que la prueba fue suficiente para demostrar la comisión de los delitos imputados. Según adujo, quedó probado que a la señora Padilla Romero se le disparó en múltiples ocasiones de forma intencional hasta asesinarla, a consecuencia de un plan establecido entre la señora Pérez Bigio como autora intelectual, con problemas con la occisa, el señor González Martínez como la persona que disparó y el señor Avilés González como el conductor del vehículo desde el que se disparó, quienes actuaron a cambio del dinero que les pagaría la señora Pérez Bigio.

Por un lado, sobre los delitos imputados a la señora Pérez Bigio, la parte apelada enfatizó que:

(1) El testimonio de la joven Morales Padilla dejó claro que la señora Pérez Bigio tenía una mala relación con la fenecida señora Padilla Romero, a tal punto que no podían trabajar en la misma oficina.

(2) Las expresiones grabadas de la señora Pérez Bigio también demostraron la mala relación entre ambas, así como su motivo para asesinar a la señora Padilla Romero, su interés en deshacerse de ella, su solicitud de ayuda al señor González Martínez para salir de ella y su mención específica de múltiples localizaciones por las que este tendría que transitar para dar con el paradero de la occisa.

(3) El 30 de septiembre de 2019, el señor González Martínez y la señora Pérez Bigio se comunicaron constantemente minutos antes y después del asesinato, así como el día siguiente.

(4) Del testimonio del señor González Martínez se desprendía que la señora Pérez Bigio lo dirigió hasta las oficinas de JAPC.

Por otro lado, sobre los delitos imputados al señor Avilés González, la parte apelada destacó que:

(1) El señor Avilés González dejó sus labores en Aguadilla sin justificación el día de los hechos.
(2) Alrededor de las 3:00 p.m. estaba en la carretera PR-22 por el área de Río Hondo.
(3) Había estado en comunicación con el señor González Martínez el día antes del asesinato.
(4) Llegó a las oficinas de JAPC junto al señor González Martínez, mientras él conducía y la señora Pérez Bigio los dirigía, de acuerdo con el testimonio del señor González Martínez.
(5) El señor Avilés González estaba conduciendo el Hyundai Elantra desde el que el señor González Martínez disparó a la señora Padilla Romero, según se desprendía del testimonio del señor González Martínez.
(6) El 30 de septiembre de 2019 el señor Avilés González también portaba un arma por su cuenta, según surgía del testimonio del señor González Martínez.
(7) El señor Avilés González no tenía licencia para portar o usar armas de fuego, según confirmó el Exhibit 2-2 del Ministerio Público.
(8) Las llamadas al 9-1-1 coincidían en que eran dos (2) hombres encapuchados, que dispararon desde un Hyundai.

Tercero, plasmó que no procedía aplicar el concurso de delitos a las convicciones de los apelantes por violentar la Ley de Armas de 2000, *supra*, una ley especial, toda vez que esta requería que sus penas se cumplieran consecutivamente entre sí y respecto a cualesquiera otras, lo cual supera las disposiciones del Código Penal de 2020, *supra*, una ley general. A su vez, justificó las penas impuestas a los apelantes en virtud de la Ley de Armas de 2000, *supra*, puesto que ese estatuto dispone que estas deberán ser duplicadas si al usarse un arma se causó daño físico o mental.

Pormenorizados los hechos procesales más relevantes a la atención de este recurso, discutimos el derecho aplicable.

**III.**

**A.**

La Constitución del Estado Libre Asociado de Puerto Rico consagra la presunción de inocencia de toda persona acusada. Art.

II, Sec. 11, **Const. ELA**, LPRA, Tomo I. Así, se trata de un principio que permea todas las etapas del procedimiento penal. De ahí que se estatuya también en la Regla 110 de Procedimiento Criminal, 34 LPRA Ap. II, R. 110, en la que se establece que "[e]n todo proceso criminal, se presumirá inocente el acusado mientras no se probare lo contrario, y en caso de existir duda razonable acerca de su culpabilidad, se le absolverá". Por todo esto, en los procesos judiciales penales, se coloca sobre el Ministerio Público el peso de la prueba y la obligación de satisfacer el estándar probatorio máximo de nuestro ordenamiento. *Pueblo v. Negrón Ramírez,* 213 DPR 895, 907 (2024); *Pueblo v. Toro Martínez,* 200 DPR 834, 856 (2018); *Pueblo v. Irizarry,* 156 DPR 780, 787 (2002). Esto quiere decir que, para establecer la culpabilidad de una persona acusada más allá de duda razonable, el Ministerio Público tiene que presentar suficiente evidencia sobre todos los elementos del delito y su conexión con la persona acusada. Íd.; *Pueblo v. García Colón I,* 182 DPR 129, 174 (2011); *Pueblo v. Ramos Álvarez,* 122 DPR 287, 315-316 (1988). De lo contrario, de carecer prueba sobre ello, el Ministerio Público incumpliría con su carga probatoria, lo cual supondría la absolución de la persona acusada respecto a dicho delito. Íd., pág. 908.

Ahora bien, ello no significa que el Ministerio Público vaya obligado a probar la comisión del delito con certeza matemática. Íd., pág. 907; *Pueblo v. Toro Martínez,* supra. Por el contrario, lo requerido es que se presente prueba satisfactoria y suficiente en derecho para producir "certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido". Íd., pág. 908 (citas omitidas); *Pueblo v. García Colón I,* supra, págs. 174-175. De ahí que tampoco se requiere que toda duda posible sea descartada, sino que se venza la duda razonable, que es aquella duda no especulativa o imaginaria, que se produce tras una

consideración justa, imparcial y serena de la totalidad de la evidencia del caso y que está fundamentada en el raciocinio de todos los elementos del juicio. Íd.; *Pueblo v. García Colón I,* supra, pág. 175. Así, nuestro más alto foro ha resuelto que hay duda razonable cuando el juzgador de los hechos siente en su conciencia insatisfacción o intranquilidad con la prueba de cargo presentada. *Pueblo v. García Colón I,* supra; *Pueblo v. Irizarry,* supra, pág. 788.

Según se desprende lógicamente de lo anterior, esta tarea de decidir si se probó la culpabilidad de la persona acusada más allá de duda razonable le corresponde primordialmente al juzgador de los hechos. *Pueblo v. Negrón Ramírez,* supra. Esto es, al jurado o, en su defecto, al juez o la jueza. Al hacerlo, la persona juzgadora de los hechos está llamada a evaluar y aquilatar la evidencia desfilada para determinar qué hechos quedaron probados. Íd. En ese oficio, los juzgadores de instancia están en la mejor posición para evaluar, aquilatar y adjudicar la prueba que se presenta ante ellos. Íd., pág. 910; *Pueblo v. García Colón I,* supra, pág. 165. Ello cobra especial importancia cuando se trata de la evaluación y adjudicación de la credibilidad de un testigo. *Pueblo v. García Colón I,* supra. Al final del día, son estos funcionarios quienes pueden formar convicciones sobre la verdad de los hechos al escuchar y observar la forma de declarar de los testigos, su comportamiento, sus gestos, sus pausas, sus contradicciones y sus manierismos. *Pueblo v. Negrón Ramírez,* supra; *Pueblo v. García Colón I,* supra, citando a *Argüello v. Argüello,* 155 DPR 62, 78 (2001).

Por todo ello, si desfilada la totalidad de la prueba el juzgador de los hechos entiende que se ha superado con satisfacción el estándar antes mencionado, se han establecido todos los elementos del delito y se ha demostrado la conexión de la persona acusada con

ellos, entonces está obligado a encontrar a la persona acusada culpable del delito. Íd., pág. 909.

Ahora bien, llegado el fallo condenatorio, la Regla 193 de Procedimiento Criminal, *supra*, R. 193, le garantiza el derecho a la persona así convicta de apelarlo ante el Tribunal de Apelaciones. Dicho foro apelativo, a su vez, tiene la facultad de revisar la determinación de culpabilidad porque la apreciación del foro primario y su fallo son una cuestión mixta de hecho y de derecho sujeta a revisión por tribunales de mayor jerarquía. Íd.

En ejercicio de su prerrogativa adjudicativa, los tribunales apelativos están obligados a reconocerle gran deferencia a la apreciación de la prueba, la adjudicación de credibilidad y las determinaciones de hechos que realiza el foro primario, especialmente aquellas que están basadas en prueba oral. Íd.; ***Pueblo v. Rivera Montalvo,*** 205 DPR 352, 373 (2020); ***Pueblo v. García Colon I,*** supra, pág. 165. Por consiguiente, como norma general, los tribunales apelativos no intervendrán en esos asuntos. ***Pueblo v. Rivera Montalvo,*** supra. Esta limitación emana, precisamente, de la posición preferente que ocupa el foro inferior con respecto a la prueba. ***Pueblo v. Negrón Ramírez,*** supra. Los foros apelativos no podemos obviar esa realidad. ***Pueblo v. Casillas, Torres,*** 190 DPR 398, 416 (2014).

No obstante, como con toda norma general, nuestro ordenamiento reconoce ciertas excepciones que facultan a los tribunales apelativos a descartar la doctrina de deferencia. ***Pueblo v. Negrón Ramírez,*** supra, pág. 909. Principalmente, se ha establecido que los tribunales apelativos podrán sustituir el criterio utilizado por el foro primario cuando se demuestre que este actuó con pasión, prejuicio o parcialidad, incurrió en craso abuso de discreción, en error manifiesto o en error de derecho. Íd., pág. 912; ***Pueblo v. Rivera Montalvo,*** supra; ***Pueblo v. García Colon I,***

supra. Si la persona que apela un fallo o veredicto en su contra aduce que el juzgador de los hechos ha errado en su apreciación de la prueba testifical, entonces se requiere como condición para la intervención apelativa que el foro sentenciador haya incurrido en las acciones antes mencionadas o cometido los tipos de error antes aludidos. Íd.

En este contexto, nuestro Tribunal Supremo ha definido *pasión, prejuicio y parcialidad* como "aquellas inclinaciones personales de tal intensidad que llevan a un juzgador a actuar movido por estas y a adoptar posiciones, preferencias o rechazos con respecto a las partes o sus causas, sin admitir cuestionamientos sobre estas y sin importar la prueba que se haya presentado en el juicio". Íd.; ***Pueblo v. Rivera Montalvo,*** supra, pág. 374.

Igualmente, ha fijado que un tribunal incurre en *abuso de discreción* cuando el juez o la jueza ignora sin razón un hecho material que no podía desatender, basa su decisión principalmente en un hecho inmaterial al que le da demasiado peso o realiza un análisis liviano y el dictamen es irrazonable. Íd., pág. 913, citando a ***Pueblo v. Rivera Montalvo,*** supra; ***Pueblo v. Ortega Santiago,*** 125 DPR 203, 211-212 (1990).

Al igual, ha precisado que el juzgador de los hechos comete un *error manifiesto* si la apreciación de la prueba se distancia de la realidad fáctica o si resulta inherentemente imposible o increíble. ***Pueblo v. Rivera Montalvo,*** supra, citando a ***Pueblo v. Irizarry,*** supra, pág. 816. En ese mismo tenor, ha puntualizado que también se incurre en *error manifiesto* cuando, aunque haya prueba para sostener las determinaciones de hechos, el foro apelativo resuelve que se cometió un error y que "las conclusiones están en conflicto con el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida". ***Pueblo v. Negrón Ramírez,*** supra, págs. 912-913 (citas omitidas).

Asimismo, se entiende por *error de derecho* el que se hace al actuar sin ceñirse a lo dispuesto por una norma jurídica vigente. *E.L.A. v. Crespo Torres,* 180 DPR 776 (2011).

En esencia, el foro apelativo tiene el deber de dejar sin efecto el fallo o veredicto condenatorio cuando un análisis de la prueba que tuvo ante sí el foro primario arroja dudas serias, razonables y fundadas sobre la culpabilidad de la persona acusada. *Pueblo v. Santiago et al.,* 176 DPR 133, 148 (2009); *Pueblo v. Carrasquillo Carrasquillo,* 102 DPR 545, 551 (1974).

De otra parte, como regla general de nuestro ordenamiento apelativo, es indispensable que todo escrito presentado señale, discuta y fundamente los errores que se le imputan al foro inferior. *Pueblo v. Colón González,* 209 DPR 967, 975-976 (2022); *Ortiz v. Holsum,* 190 DPR 511, 526 (2014). De lo contrario, sin un señalamiento de error, una discusión fundamentada y referencias a los hechos y el derecho que apoya la posición del apelante, el foro apelativo no estará en posición de atender los reclamos planteados. Íd., pág. 976. Nuestro más alto foro ha pautado que "aceptar poco menos de eso convierte la apelación presentada en '[un] breve y lacónico anuncio de la 'intención de apelar'". *Morán v. Martí,* 165 DPR 356, 366 (2005), citando a *Srio. del Trabajo v. Gómez Hnos., Inc.,* 113 DPR 204, 207 (1982).

Sin embargo, también es una norma reiterada que los tribunales apelativos tienen la facultad inherente para tomar en consideración y atender errores patentes que surjan de los casos, incluso cuando el recurso promovido no los haya esbozado. *Pueblo v. Colón González,* supra, pág. 976 (citas omitidas); *Vilanova et al. v. Vilanova et al.,* 184 DPR 824, 848 (2012); *S.L.G. Flores-Jiménez v. Colberg,* 173 D.P.R. 843, 851 (2008); *Hons. Castro, Cabán v. Depto. de Justicia,* 153 DPR 302, 312, (2001); *Hernández v. Espinosa,* 145 DPR 248, 264 (1998). Según nuestro

más alto foro, lo esencial es que la naturaleza y las cuestiones relevantes de la apelación se desprendan claramente del escrito de apelación de tal manera que el tribunal y la parte apelada no sean perjudicadas por la falta de un señalamiento de error. Íd. Empero, también ha dictado que esta es una <u>facultad excepcional</u>, cuyo ejercicio debe ser limitado, porque, de lo contrario, los tribunales apelativos se convertirían en foros consultivos y adjudicarían controversias que no fueron cuestionadas ni defendidas vigorosamente. ***Vilanova et al. v. Vilanova et al.,*** supra.

### B.

En lo pertinente a este caso, el Artículo 92 del Código Penal, *supra* sec. 5141, prescribe que el asesinato es "dar muerte a un ser humano a propósito, con conocimiento o temerariamente". Asimismo, el Artículo 93 del Código Penal, *supra*, enumera las instancias en las que un asesinato constituye asesinato en primer grado. Entre ellas, en el inciso (a), incluye "[t]odo asesinato perpetrado por medio de veneno, <u>acecho</u>, tortura, estrangulamiento, sofocación o asfixie posicional, o <u>a propósito o con conocimiento</u>". De resultar una persona convicta por asesinato en primer grado, el Artículo 94 del Código Penal, *supra* sec. 5143, mandata que se le imponga una pena de reclusión por un término fijo de noventa y nueve (99) años.

Por otro lado, la derogada Ley de Armas de 2000, *supra* ant. secs. 455 *et seq.*, regulaba la concesión de licencias para tener, poseer y portar armas, pero, sobre todo, establecía delitos relacionados a la posesión o el uso de armas, las penas por su comisión y la forma de cumplirlas.[690]

---

[690] Este estatuto era el vigente al momento de los hechos de este caso y fue derogado por la Ley de Armas de Puerto Rico de 2020 (Ley de Armas de 2020), Ley Núm. 168 de 2020, según enmendada, 25 LPRA secs. 461 *et seq.*

Con ese propósito, el Artículo 5.04 de la Ley de Armas de 2000, *supra,* prescribía el delito de portación y uso de armas de fuego sin licencia al disponer lo siguiente:

> Toda persona que transporte cualquier arma de fuego o parte de ésta, sin tener una licencia de armas, o porte cualquier arma de fuego sin tener su correspondiente permiso para portar armas, incurrirá en delito grave y convicta que fuere, será sancionada con pena de reclusión por un término fijo de diez (10) años, sin derecho a sentencia suspendida, a salir en libertad bajo palabra, o a disfrutar de los beneficios de algún programa de desvío, bonificaciones o alternativa a la reclusión reconocida en esta jurisdicción, debiendo cumplir en años naturales la totalidad de la pena impuesta. De mediar circunstancias agravantes, la pena fija establecida podrá ser aumentada hasta un máximo de veinte (20) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de cinco (5) años.
> [...]

Asimismo, el Artículo 5.15 de la Ley de Armas de 2000, *supra,* preceptuaba el delito de disparar o apuntar armas, definiéndolo en parte como sigue:

> (A) Incurrirá en delito grave toda persona que, salvo en casos de defensa propia o de terceros o de actuaciones en el desempeño de funciones oficiales o de actividades legítimas de deportes, incluida la caza, o del ejercicio de la práctica de tiro en un club de tiro autorizado:
> (1) voluntariamente dispare cualquier arma en un sitio público o en cualquier otro sitio, aunque no le cause daño a persona alguna, o
> (2) intencionalmente, aunque sin malicia, apunte hacia alguna persona con un arma, aunque no le cause daño a persona alguna. La pena de reclusión por la comisión de los delitos descritos en los incisos (1) y (2) anteriores, será por un término fijo de cinco (5) años.
> De mediar circunstancias agravantes, la pena establecida podrá ser aumentada hasta un máximo de diez (10) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de un (1) año.
> Disponiéndose que, aquella persona que cometa el delito descrito en el inciso (1) anterior, utilizando un arma de fuego y convicto que fuere, no tendrá derecho a sentencia suspendida, a salir en libertad bajo palabra, o a disfrutar de los beneficios de algún programa de desvío, bonificaciones o alternativa a la reclusión reconocida en esta jurisdicción, debiendo cumplir en años naturales la totalidad de la pena impuesta.
> Del mismo modo, cuando una persona cometa el delito descrito en el inciso (2) anterior, utilizando un arma de fuego, mediando malicia y convicto que fuere, no tendrá derecho a sentencia suspendida, a salir en libertad bajo palabra o a disfrutar de los beneficios de algún programa de desvío, bonificaciones o alternativa a la reclusión reconocida en esta jurisdicción, debiendo cumplir en años naturales la totalidad de la pena impuesta.
> [...]

Sobre las penas dispuestas en estos y los demás delitos codificados por este estatuto, el Artículo 7.03 de la Ley de Armas de 2000, *supra*, instituía el agravamiento de las penas impuestas a su amparo. En específico, dispuso:

> [...]
> Todas las penas de reclusión que se impongan bajo esta Ley serán cumplidas consecutivamente entre sí y consecutivamente con las impuestas bajo cualquier otra ley. Además, si la persona hubiere sido convicta anteriormente por cualquier violación a esta Ley o por cualquiera de los delitos especificados en el Artículo 2.11 de esta Ley o usare un arma en la comisión de cualquier delito y como resultado de tal violación alguna persona sufriera daño físico o mental, la pena establecida para el delito se duplicará.
> [...]

Así, requería que: (1) se cumplieran consecutivamente las penas impuestas mediante dicho estatuto frente a otras penas por otras leyes; y (2) que la pena por un delito se duplicara cuando una persona usara un arma en la comisión de cualquier delito y como resultado de ello una persona sufriera daño físico o mental.

Por otra parte, cabe destacar que el Artículo 7.25 de la Ley de Armas de 2020, *supra* sec. 467l, estableció una cláusula de reserva respecto a las penas impuestas por violaciones a la Ley de Armas de 2000, *supra*, y el modo de ejecutarlas. De ordinario, las cláusulas de reserva son limitaciones al principio de favorabilidad. ***Pueblo v. DiCristina Rexach,*** 204 DPR 779, 788 (2020). Mediante estas, se asegura que las leyes derogadas o enmendadas sean aplicadas a los hechos acaecidos durante su vigencia, independientemente de que el estatuto posterior le sea más favorable o desfavorable. Íd., pág. 787-788. Este es un ejercicio de una prerrogativa que recae enteramente en el legislador y la legisladora. Íd., pág. 787.

Además, en todo caso, la Ley de Armas de 2020, *supra*, conservó las mismas penas dispuestas por los delitos de portación o uso de armas de fuego y de disparar o apuntar un arma. Véanse los Artículos 6.05 y 6.14 de la Ley de Armas de 2020, *supra* secs. 466d y 466m. También, mantuvo la duplicación de penas y el

cumplimiento de penas consecutivas. Véase Artículo 6.01 de la Ley de Armas de 2020, *supra* ant. sec. 466.

## C.

Tanto el Art. II, Sec. 11 de la Constitución del Estado Libre Asociado de Puerto Rico, como la Sexta Enmienda de la Constitución de los Estados Unidos protegen el derecho de una persona acusada a confrontar o carearse con quien testifica en su contra. Art. II, Sec. 11, **Const. ELA**, LPRA, Tomo I; Emda. VI, **Const. EE. UU.**, LPRA, Tomo I; ***Pueblo v. Lugo López,*** 214 DPR ___ (2024), 2024 TSPR 83; ***Pueblo v. Pérez Santos,*** 195 DPR 262, 269 (2016). Esto representa una de las garantías fundamentales de nuestro procedimiento criminal. Íd.; ***Pueblo v. Pérez Santos,*** supra.

De este denominado derecho a la confrontación, se ha interpretado que emanan tres (3) vertientes procesales encarnadas en el derecho de la persona acusada: (1) a confrontar cara a cara a los testigos adversos; (2) a contrainterrogar esos testigos; y (3) a que se excluya aquella prueba de referencia que el Ministerio Público pretenda presentar en contra suya. ***Pueblo v. Pérez Santos,*** supra, pág. 269-270. Esta última vertiente va de la mano con la norma general de exclusión de prueba de referencia, aunque no es necesario que exista correspondencia total entre ambas. Íd., pág. 270, citando a E.L. Chiesa Aponte, <u>Derecho procesal penal de Puerto Rico y Estados Unidos</u>, Bogotá, Ed. Forum, 1992, Vol. 1, pág. 569.

Previo a desmenuzar la norma general de exclusión de prueba de referencia, resulta preciso recabar en las implicaciones propias del derecho a la confrontación respecto a la prueba de referencia. Y es que, previo a recurrir a lo establecido al respecto en las Reglas de Evidencia, *supra*, corresponde determinar si la declaración en cuestión es de carácter testimonial. ***Pueblo v. Pérez Santos,*** supra; ***Pueblo v. Santos Santos,*** 185 DPR 709, 722 (2012); ***Crawford v. Washington,*** 541 US 36 (2004). Si tiene carácter testimonial, la

declaración no será admisible, a menos que la persona declarante testifique en el juicio o, si no está disponible para testificar, que la declaración haya estado sujeta al contrainterrogatorio por parte de la persona acusada. *Pueblo v. Pérez Santos,* supra; *Pueblo v. Santos Santos,* supra, pág. 721. Si no lo tiene, la declaración podrá ser admisible si se superan los requisitos de las Reglas de Evidencia, *supra.* Íd. Es decir, una declaración testimonial realizada fuera de corte y presentada en contra de la persona acusada será admisible, únicamente si: (1) el declarante no está disponible para comparecer a juicio; y (2) la persona acusada tuvo la oportunidad de contrainterrogar al declarante en el momento en que se hizo la declaración. *Pueblo v. Santos Santos,* supra; *Crawford v. Washington,* supra, págs. 53-54.

Ahora bien, el Tribunal Supremo de los Estados Unidos ha evitado expresamente proveer una definición absoluta de qué constituye una declaración testimonial, pero se ha manifestado en tres (3) sentidos que sirven de guía para identificarla.

Primero, pautó que la cláusula de confrontación aplica a testigos en contra de la persona acusada, los cuales definió como "those who 'bear testimony'". *Crawford v. Washington,* supra, pág. 51, citando a 2 N. Webster, *An American Dictionary of the English Language* (1828). Segundo, definió testimonio como "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact". Íd. Al hacerlo, propuso que un querellante que ofrece una declaración formal a oficiales gubernamentales "ofrece testimonio" de manera distinta a una persona que le comenta algo casualmente a un conocido. Íd. Tercero, entre las instancias principales en las que existen declaraciones testimoniales mencionó: las declaraciones recibidas por oficiales de la Policía durante un interrogatorio bajo custodia, las declaraciones anteriores en juicio que la persona acusada no tuvo la oportunidad

de contrainterrogar y las declaraciones ofrecidas antes del juicio que el declarante razonablemente pudiera esperar que fueran usadas por el Ministerio Público en contra de la persona acusada. ***Pueblo v. Santos Santos,*** supra, pág. 722-723; ***Crawford v. Washington,*** supra, págs. 51-52.

Superado ese imperativo constitucional, para que una declaración sea admitida corresponde que supere las exigencias de las Reglas de Evidencia, *supra*. A esos efectos, la Regla 801 de Evidencia, *supra*, R. 801, define una *declaración* como "una aseveración oral o escrita" o una "conducta no verbalizada de la persona, si su intención es que se tome como una aseveración", un *declarante* como "la persona que hace una declaración" y *prueba de referencia* como "una declaración que no sea la que la persona declarante hace en el juicio o vista, que se ofrece en evidencia para probar la verdad de lo aseverado". Acto seguido, se excluyen de la definición de prueba de referencia ciertas *declaraciones anteriores*, en virtud de la Regla 802 de Evidencia, *supra*, R. 802, y ciertas *admisiones*, según las definió la Regla 803 de Evidencia, *supra*, R. 803.

Entre las admisiones, el inciso (e) de la Regla 803 de Evidencia, *supra*, pauta que no se considerará prueba de referencia una admisión si se ofrece contra una parte y es "una declaración de [una] persona que actuó como conspiradora de la parte [,] hecha en el transcurso de la conspiración y para lograr su objetivo". Sobre esto, la referida Regla también estatuyó lo siguiente:

> El contenido de la declaración se tomará en consideración, pero no será suficiente por sí solo para establecer la autoridad de la persona declarante bajo el inciso (c), ni la relación de agencia o empleo y su ámbito bajo el inciso (d), ni la existencia de la conspiración y la participación en ésta de la persona declarante y de la parte contra quien se ofrece la declaración bajo el inciso (e). Íd.

Para que esta disposición aplique, no es necesario que se impute el delito de conspiración. E. L. Chiesa Aponte, <u>Reglas de Evidencia de</u>

Puerto Rico 2009: Análisis por el Prof. Ernesto L. Chiesa, San Juan, Publicaciones JTS, 2009, pág. 246. En cambio, deben satisfacerse tres (3) requisitos: (1) que exista una conspiración de la que sean miembros el declarante y la persona contra quien se ofrece la declaración; (2) que la declaración se haya hecho durante la vigencia de la conspiración; y (3) que la declaración se haya hecho para adelantar los fines de la conspiración. Íd.

Ahora, más importante aún, la Regla 804 de Evidencia, *supra*, R. 804, establece la norma general de exclusión de prueba de referencia, mediante la cual se excluirá toda prueba de referencia, a menos que se disponga algo distinto por ley o sea admisible bajo el Capítulo 8 de las Reglas de Evidencia, *supra*. Es decir, en esencia, la prueba de referencia en cuestión debe superar alguna de las excepciones establecidas en las Reglas de Evidencia, *supra*.

En lo pertinente, la Regla 806 de Evidencia, *supra*, cumple dos (2) propósitos: (1) definir las situaciones en las que una persona declarante será considerada *testigo no disponible*; y (2) regular la admisión como excepción de ciertas declaraciones realizadas por un *testigo no disponible*. En concreto, la Regla 806 de Evidencia, *supra*, preceptúa:

> (A) Definición: No disponible como testigo incluye situaciones en que la persona declarante:
>> (1) está exenta de testificar por una determinación del Tribunal por razón de un privilegio reconocido en estas Reglas en relación con el asunto u objeto de su declaración;
>> (2) insiste en no testificar en relación con el asunto u objeto de su declaración a pesar de una orden del Tribunal para que lo haga;
>> (3) testifica que no puede recordar sobre el asunto u objeto de su declaración;
>> (4) al momento del juicio o vista, ha fallecido o está imposibilitada de comparecer a testificar por razón de enfermedad o impedimento mental o físico; o
>> (5) está ausente de la vista y quien propone la declaración ha desplegado diligencia para conseguir su comparecencia mediante citación del Tribunal
>
> No se entenderá que una persona declarante está no disponible como testigo si ello ha sido motivado por la gestión o conducta de quien propone la declaración con el propósito de evitar que la persona declarante comparezca o testifique.

(B) Cuando la persona declarante no está disponible como testigo, es admisible como excepción a la regla general de exclusión de prueba de referencia lo siguiente:

(1) *Testimonio anterior*

Testimonio dado como testigo en otra vista del mismo u otro procedimiento, en una deposición tomada conforme a Derecho durante el mismo u otro procedimiento. Ello si la parte contra quien se ofrece ahora el testimonio – o un predecesor en interés si se trata de una acción o procedimiento civil – tuvo la oportunidad y motivo similar para desarrollar el testimonio en interrogatorio directo, contrainterrogatorio o en redirecto.

[…] (Subrayado nuestro).

Sobre la Regla 806(A)(1) de Evidencia, *supra*, R. 806(A)(1), el Prof. Chiesa Aponte comentó:

La Regla 806 (A) (1) reconoce como fundamento de no disponibilidad que al declarante lo cobije el privilegio de no testificar. Esto incluye el privilegio contra la autoincriminación, de rango constitucional, y el privilegio de una persona casada de no testificar en una acción civil o penal en la que su cónyuge es parte, reconocido en la Regla 509. Se ha omitido la parte de la Regla Federal 804 (a) (1) que alude a *"by ruling of the court"*, pero el resultado es el mismo. El reclamo de privilegio debe ser genuino, y si la corte lo rechaza, no se aplica esta causal de no disponibilidad. Si el testigo insiste en no declarar a pesar de que el tribunal le ordena testificar so pena de desacato, estaría no disponible bajo el apartado (2) de la regla. El tribunal podría rechazar un reclamo del privilegio contra la autoincriminación si el testigo tiene inmunidad que lo proteja contra un procedimiento criminal, o si la acción penal está prescrita, ha recibido indulto, etc. E. L. Chiesa Aponte, Reglas de Evidencia de Puerto Rico 2009: Análisis por el Prof. Ernesto L. Chiesa, *supra*, pág. 277.

Por último, la Regla 809 de Evidencia, *supra*, R. 809, instituye una cláusula residual al disponer:

Una declaración no expresamente comprendida en las Reglas 805 a 806, pero que contenga garantías circunstanciales de confiabilidad comparables, no estará sujeta a la regla general de exclusión de prueba de referencia si el Tribunal determina que:

(A) la declaración tiene mayor valor probatorio, para el propósito para el cual se ofrece, que cualquier otra prueba que la persona proponente hubiera podido conseguir de haber desplegado diligencia razonable y

(B) la persona proponente notificó con razonable anterioridad a la parte contra quien la ofrece su intención de presentar tal declaración, para informarle sobre las circunstancias particulares de ésta, incluyendo el nombre y la dirección de la persona declarante.

**D.**

De otra parte, la Regla 104 de Evidencia, *supra*, ordena el procedimiento a seguir en cuanto al ofrecimiento, la admisión o la exclusión de la evidencia. La misma indica lo siguiente:

(A) Requisito de objeción. La parte perjudicada por la admisión errónea de evidencia debe presentar una objeción oportuna, específica y correcta o una moción para que se elimine del récord evidencia erróneamente admitida cuando el fundamento para objetar surge con posterioridad. Si el fundamento de la objeción surge claramente del contexto del ofrecimiento de la evidencia, no será necesario aludir a tal fundamento.

(B) Oferta de prueba. En el caso de exclusión errónea de prueba, la parte perjudicada deberá invocar el fundamento específico para la admisibilidad de la evidencia ofrecida y hacer una oferta de prueba de forma que surja claramente cuál es la evidencia que ha sido excluida y la naturaleza, propósito y pertinencia para la cual se ofrece. No será necesario invocar tal fundamento específico ni hacer la oferta de prueba cuando resultan evidentes del contexto del ofrecimiento. Íd.

Al objetar y hacer un ofrecimiento de prueba, se preserva la posibilidad de apelar la determinación del foro primario. ***Pueblo v. Santiago Irizarry****,* 198 DPR 35, 44 (2017).

Por otro lado, la Regla 105 de Evidencia, *supra,* R. 105, dispone lo siguiente:

(A) Regla general. No se dejará sin efecto una determinación de admisión o exclusión errónea de evidencia ni se revocará por ello sentencia o decisión alguna a menos que:
(1) la parte perjudicada con la admisión o exclusión de evidencia hubiere satisfecho los requisitos de objeción, fundamento u oferta de prueba establecidos en la Regla 104 y
(2) el Tribunal que considera el señalamiento estime que la evidencia admitida o excluida fue un factor decisivo o sustancial en la sentencia emitida o decisión cuya revocación se solicita.
(B) Error constitucional
Si el error en la admisión o exclusión constituye una violación a un derecho constitucional de la persona acusada, el tribunal apelativo sólo confirmará la decisión si está convencido más allá de duda razonable que, de no haberse cometido el error, el resultado hubiera sido el mismo.

El tipo de error al que se refiere el inciso (A)(2) de la Regla 105 de Evidencia, *supra,* es parte de la doctrina de *error no perjudicial* (*harmless error),* la cual establece que los tribunales apelativos no revocarán si se interpreta que el error fue benigno o no perjudicial. ***Pueblo v. Santiago Irizarry,*** supra, pág. 45. En esos casos, se confirma el dictamen a pesar del error porque la correcta admisión o exclusión de la evidencia no hubiese producido un resultado

distinto. Íd. Para que motive la revocación, el error debe haber sido un factor decisivo o sustancial en el fallo. Íd.

Por otra parte, si se trata de la violación de un derecho constitucional, procede aplicar el estándar de *error constitucional no perjudicial* (*harmless constitutional error*), delimitado en el inciso (B) de la Regla 105 de Evidencia, *supra*. Bajo este crisol, únicamente procede confirmar un dictamen si el foro apelativo se convence más allá de duda razonable de que, de no haberse cometido el error, el resultado sería el mismo. Íd. Un error constitucional comprende, por ejemplo, cuando se admite prueba en violación del derecho de confrontación o de no incriminarse por su propio testimonio, del debido proceso de ley, o de la protección contra registros irrazonables. Íd. También, se ha definido el error estructural: un error constitucional de tal magnitud que lesiona fatalmente el sistema adversativo o el juicio imparcial. Íd.

Asimismo, de acuerdo con lo dispuesto por la Regla 106 de Evidencia, *supra*, R. 106, si se tratara de un *error extraordinario*, el foro apelativo podría considerar dicho señalamiento, aunque no se hubiese cumplido con la Regla 104 de Evidencia, *supra*. Como requisito, la Regla 106 de Evidencia, *supra*, enumera los siguientes:

> (A) el error fue craso ya que no cabe duda de que fue cometido,
> (B) el error fue perjudicial porque tuvo un efecto decisivo o sustancial en la sentencia o decisión cuya revocación se solicita y,
> (C) el no corregirlo resulte en un fracaso de la justicia.

En otro tema, en cuanto a la prueba presentada en el juicio, la Regla 110 de las Reglas de Evidencia, *supra*, R. 110, prescribe:

> La juzgadora o el juzgador de hechos deberá evaluar la evidencia presentada con el propósito de determinar cuáles hechos han quedado establecidos o demostrados, con sujeción a los principios siguientes:
> …
> (c) Para establecer un hecho, no se exige aquel grado de prueba que, excluyendo la posibilidad de error, produzca absoluta certeza.
> (d) La evidencia directa de una persona testigo que merezca entero crédito es prueba suficiente de cualquier hecho, salvo que otra cosa se disponga por ley.

...
(h) <u>Cualquier hecho en controversia es susceptible de ser demostrado mediante evidencia directa o mediante evidencia indirecta o circunstancial.</u> Evidencia directa es aquella que prueba el hecho en controversia sin que medie inferencia o presunción alguna y que, de ser cierta, <u>demuestra el hecho de modo concluyente</u>. Evidencia indirecta o circunstancial es aquella que tiende a demostrar el hecho en controversia probando otro distinto, del cual por sí o en unión a otros hechos ya establecidos, puede razonablemente inferirse el hecho en controversia. Íd. (Subrayado nuestro).

En virtud de lo anterior, las Reglas de Evidencia, *supra*, permiten que se pruebe un hecho con evidencia directa, indirecta o circunstancial. Además, reconocen que un testigo al que se le otorgó entero crédito por el juzgador es prueba suficiente para demostrar cualquier hecho. Así, el testimonio de un único testigo al que el tribunal le conceda credibilidad podrá ser suficiente para derrotar la presunción de inocencia.

De la misma forma, la evidencia circunstancial es aquella que tiende a demostrar el hecho en controversia probando otro distinto, del cual, por sí, o en unión a otros hechos ya establecidos, puede razonablemente inferirse el hecho en controversia. E. L. Chiesa Aponte, *Reglas de Evidencia Comentadas*, 1era ed., San Juan, Ediciones Situm, Inc., 2016, pág. 53. De manera que la prueba circunstancial es tan suficiente como la prueba directa para probar cualquier hecho. Íd.

Entretanto, la Regla 403 de Evidencia, *supra*, permite la exclusión de evidencia pertinente cuando el valor probatorio de esta es <u>superado sustancialmente</u> por el riesgo de causar perjuicio indebido, entre otros factores. No obstante, no es de cualquier perjuicio que trata esta Regla. E. L. Chiesa Aponte, <u>Reglas de Evidencia de Puerto Rico 2009: Análisis por el Prof. Ernesto L. Chiesa</u>, *supra*, pág. 116. Esto, pues, de ordinario, toda evidencia que se presenta en contra de una parte se trae con el propósito de perjudicarle. Íd. Se refiere al efecto que podría tener una evidencia "que probablemente reciba mayor peso por el jurado que el que

objetivamente tiene, lo que engendra el riesgo de resolver en base a consideraciones indebidas, particularmente, pero no solamente, de tipo emocional". Íd. Así, se trata de prueba que puede provocar un resultado erróneo al ser traída para principalmente levantar pasión y causar prejuicio. ***Pueblo v. Santiago Irizarry,*** supra, pág. 44.

Por otra parte, entre las condiciones previas para la admisión de evidencia, la Regla 901 de Evidencia, *supra,* R. 901, impone el requisito de autenticación o identificación y enumera ejemplos para cumplir con él. En específico, preceptúa:

> (A) El requisito de autenticación o identificación como una condición previa a la admisibilidad se satisface con la presentación de evidencia suficiente para sostener una determinación de que la materia en cuestión es lo que la persona proponente sostiene.
> (B) De conformidad con los requisitos del inciso (A) de esta Regla y sin que se interprete como una limitación, son ejemplos de autenticación o identificación los siguientes:
> (1) *Testimonio por testigo con conocimiento*
> Testimonio de que una cosa es lo que se alega.
> [...]
> (3) *Identificación de voz*
> La voz de una persona podrá identificarse, ya sea escuchada directamente o a través de grabación u otro medio mecánico, electrónico o digital, o por opinión formada a base de haberse escuchado dicha voz en alguna ocasión bajo circunstancias que la vinculan con la voz de la referida persona.
> [...]
> (11) *Cadena de custodia*
> La evidencia demostrativa real puede ser autenticada mediante su cadena de custodia.
> (12) *Proceso o sistema*
> Evidencia que describa el proceso o sistema utilizado para obtener un resultado y que demuestre que el proceso o sistema produce resultados certeros.
> (13) *Récord electrónico*
> Un récord electrónico podrá autenticarse mediante evidencia de la integridad del sistema en el cual o por el cual los datos fueron grabados o almacenados. La integridad del sistema se demuestra a través de evidencia que sustente la determinación que en todo momento pertinente el sistema de computadoras o dispositivo similar estaba operando correctamente o en caso contrario, el hecho de que su no operación correcta no afectó la integridad del récord electrónico.
> [...]

De ordinario, se exige que se pruebe la cadena de custodia respecto a:

> [...] objetos que contienen evidencia fungible, la cual no puede ser marcada; cuando, a pesar de no ser fungible, la prueba no tiene "características únicas que la distingan de objetos similares y resulta, igualmente, imposible de marcar

o, pudiendo ser marcada, ello no se hizo", y cuando la condición del objeto es significativa y puede ser fácilmente alterado. ***Pueblo v. Henríquez, Urbáez,*** 205 DPR 311, 325-326 (2020) (Sentencia); ***Pueblo v. Carrasquillo Morales,*** 123 DPR 690, 701 (1989); ***Pueblo v. Echevarría Rodríguez I,*** 128 DPR 299, 349 (1991).

Sin embargo, cuando se demuestra que la prueba no ha sido alterada, cualquier duda de que ha sido modificada se dirigirá al peso, no a la admisibilidad. Íd., citando a ***Pueblo v. Santiago Feliciano,*** 139 DPR 361, 425 (1995).

Entretanto, la Regla 902 de Evidencia, *supra*, R. 902, enumera los siguientes casos en los que no se requerirá evidencia extrínseca de autenticación:

[...]
(K) *Récords certificados de actividades que se realizan con regularidad*
El original o un duplicado de un récord de actividades que se realizan con regularidad dentro de la jurisdicción del Estado Libre Asociado de Puerto Rico y los Estados Unidos de América, el cual sería admisible conforme a la Regla 805(F), si se acompaña de una declaración jurada de la persona a cargo de su custodia o de alguna otra persona cualificada, que certifique que dicho récord:
(1) se preparó en o cerca del momento en que ocurrieron los sucesos o las actividades mencionadas por una persona que tiene conocimiento de dichos asuntos, o mediante información transmitida por ésta;
(2) se llevó a cabo en el curso de la actividad realizada con regularidad, y
(3) se preparó como una práctica regular de dicha actividad.
La parte que se proponga someter un récord como evidencia, conforme a lo dispuesto en este inciso, tendrá que notificar por escrito su intención a todas las partes contrarias. Además, tendrá que tener el récord y la declaración jurada disponibles para inspección con suficiente antelación a su presentación como evidencia a fin de brindar a la parte contraria una oportunidad justa para refutarlos.
(L) Récord electrónico
Se presumirá la integridad del récord si:
(1) se establece mediante declaración jurada que fue grabado o almacenado por una parte adversa a la que lo propone, o
(2) se establece mediante declaración jurada que fue grabado o almacenado en el curso usual y ordinario de negocios por una persona que no es parte en los procedimientos y quien no lo ha grabado o almacenado bajo el control de la que lo propone.

Por último, la Regla 156 de Procedimiento Criminal, *supra,* R. 156, prescribe que el testimonio de un coautor de los hechos "será examinado con desconfianza y se le dará el peso que estime el juez

o el jurado luego de examinarlo con cautela a la luz de toda la evidencia presentada en el caso". *Pueblo v. Rivero, Lugo y Almodóvar*, 121 DPR 454, 467-468 (1988). No obstante, el referido testimonio de un coautor no requiere corroboración. *Pueblo v. Echevarría Rodríguez I*, supra, pág. 317. Más bien, la desconfianza y cautela sirven de guía al juzgador de hechos sobre el valor probatorio que adjudicará y, por eso, el testimonio será suficiente si, una vez aquilatado en esa forma, es creído más allá de duda razonable. Íd., pág. 318.

**E.**

En nuestro ordenamiento, se reconoce que el concurso de delitos está presente en instancias en las que una misma persona comete, con uno o más actos, varias ofensas que son valoradas y juzgadas conjuntamente en el mismo procedimiento judicial. *Pueblo v. DiCristina Rexach,* supra, pág. 790; L. E. Chiesa Aponte, _Derecho penal sustantivo,_ 2nda ed., San Juan, Pubs. JTS, 2013, pág. 59. Mediante la figura del concurso de delitos se evalúa cómo determinar cuál es la pena que mejor refleja la gravedad del hecho y la culpabilidad de la persona. Íd. Su naturaleza responde al propósito de reducir la magnitud de las penas al evitar que una persona sea castigada por un mismo hecho delictivo y al aminorar la pena impuesta por la comisión de dos o más delitos diferentes. *Pueblo v. Álvarez Vargas,* 173 DPR 587, 592 (2008).

La figura del concurso puede suscitarse en tres tipos de escenarios: (1) el concurso ideal, (2) el concurso medial y (3) el concurso real. Íd.

El primero, el ideal, ocurre cuando con un solo acto o unidad de conducta se violan varias disposiciones penales que tutelan bienes jurídicos distintos. Íd.; *Pueblo v. Álvarez Vargas,* supra, págs. 592-593. Cuando es aplicable, procede acusar a la persona por más de un delito para castigar todos sus actos, pero únicamente

se le sanciona con la pena más grave porque las múltiples violaciones fueron producto de una misma conducta. Íd.; ***Pueblo v. Álvarez Vargas,*** supra, pág. 593.

El segundo, el medial, surge cuando una persona comete más de un delito, pero todas las circunstancias apuntan a que uno de los delitos fue el medio necesario para cometer el otro. Íd.; ***Pueblo v. Álvarez Vargas,*** supra. En estos casos, se aplica la misma norma del concurso ideal. Íd.; ***Pueblo v. Álvarez Vargas,*** supra, pág. 593-594.

El tercero, el real, ocurre cuando varias unidades de conducta violan la misma ley o leyes penales distintas, de forma que con varios actos se cometen varios delitos. Íd.; ***Pueblo v. Álvarez Vargas,*** supra, pág. 594. En estas instancias, el tratamiento varía y, en nuestra jurisdicción, el Artículo 71 del Código Penal, *supra* sec. 5104, dispone cómo se aplicarán las penas en cada uno de los tipos de concurso bajo dicha ley y, en el caso del concurso real, distingue su aplicación según la magnitud de la pena.

En específico, el Artículo 71 del Código Penal, *supra*, estatuye lo siguiente:

> (a) Concurso ideal y medial de delitos: Cuando sean aplicables a un hecho dos o más disposiciones penales, cada una de las cuales valore aspectos diferentes del hecho, o cuando uno de éstos es medio necesario para realizar el otro, se condenará por todos los delitos concurrentes, pero sólo se impondrá la pena del delito más grave.
> (b) Concurso real de delitos: Cuando alguien haya realizado varios delitos que sean juzgados simultáneamente, cada uno de los cuales conlleva su propia pena, se le sentenciará a una pena agregada, que se determinará como sigue:
> > (1) Cuando uno de los delitos conlleve pena de reclusión de noventa y nueve (99) años, ésta absorberá las demás.
> > (2) Cuando más de uno de los delitos conlleve reclusión por noventa y nueve (99) años, se impondrá además una pena agregada del veinte (20) por ciento por cada víctima.
> > (3) En los demás casos, se impondrá una pena para cada delito y se sumarán, no pudiendo exceder la pena agregada del veinte (20) por ciento de la pena para el delito más grave.

Ahora, para la aplicación del concurso real, se ha reconocido que se deben cumplir los siguientes requisitos: (1) que exista

identidad del sujeto activo; (2) que ese sujeto haya cometido varios delitos independientes entre sí; (3) que se le haya sometido a un juicio simultáneo, conforme a las Reglas de Procedimiento Criminal, *supra*; y (4) que una disposición especial no prohíba la pena agregada. **Pueblo v. DiCristina Rexach,** supra, pág. 792, citando a **Pueblo v. Álvarez Vargas,** supra, pág. 599.[691]

Como se analizó en la Sección B de la Parte III de esta *Sentencia,* el Artículo 7.03 de la Ley de Armas de 2000, *supra,* requería que todas las penas de reclusión a imponerse bajo dicho estatuto tenían que cumplirse consecutivamente entre sí y consecutivamente con las impuestas bajo cualquier otra ley. Esto coloca las disposiciones en cuanto a las penas de dicho estatuto - el cual se replica en el Artículo 6.01 de la vigente Ley de Armas de 2020, *supra* - en conflicto con las normas que establece el Artículo 71 del Código Penal, *supra.* ¿Qué tratamiento debe dársele a personas que han sido convictas por violar el Código Penal, *supra,* y la Ley de Armas de 2000, *supra,* o la vigente Ley de Armas de 2020, *supra,* cuando con una misma unidad de conducta ha infringido ambos estatutos? Nuestro más alto foro atendió una situación relacionada en **Pueblo v. DiCristina Rexach,** supra.

En esa ocasión, nuestro Tribunal Supremo tuvo la oportunidad de determinar si procedía aplicar el principio de favorabilidad del Artículo 4 del Código Penal, *supra* sec. 5004, al señor DiCristina Rexach, quien fue encontrado culpable por múltiples delitos cometidos mientras robaba una tienda. Íd. Al amparo del Código Penal, *supra,* fue hallado culpable de asesinato en primer grado, restricción de libertad agravada, robo agravado, conspiración y destrucción de pruebas. En virtud de la Ley de Armas

---

[691] Adviértase que, en **Pueblo v. DiCristina Rexach,** supra, nuestro más alto foro aplicó los requisitos delimitados en **Pueblo v. Álvarez Vargas,** supra. En aquella ocasión se interpretó el Artículo 79 del Código Penal de 2004, Ley Núm. 149 de 2004, según enmendada, 33 LPRA sec. 4707.

de 2000, *supra,* fue declarado culpable por portación y uso de armas de fuego sin licencia, uso de arma blanca y apuntar y disparar un arma de fuego. Íd., págs. 782-783.

En lo pertinente al presente recurso, a nuestro más alto foro también le correspondió resolver si procedía aplicar las disposiciones del Artículo 71 del Código Penal, *supra,* sobre el concurso de delitos. Íd., pág. 782. Esto, pues el señor DiCristina Rexach alegaba que procedía modificar las penas que le fueron impuestas de forma que la pena de noventa y nueve (99) años por asesinato en primer grado absorbiera las demás penas, incluyendo aquellas impuestas por violentar la Ley de Armas de 2000, *supra.* Íd., pág. 785. Sin embargo, nuestro Tribunal Supremo determinó que <u>las disposiciones del Artículo 71 del Código Penal, *supra,* únicamente aplicaban a las penas impuestas por los delitos cometidos en violación al referido Código Penal, *supra,* y no a las penas impuestas por infringir la Ley de Armas de 2000, *supra.*</u> Íd., pág. 794. Es decir, las normas establecidas respecto al concurso de delitos delineadas en el Código Penal, *supra,* no se aplican a convicciones bajo la Ley de Armas de 2000, *supra.*

Acto seguido, nuestro más alto foro modificó las penas aplicadas al señor DiCristina Rexach. Íd., págs. 794-795. Por un lado, aplicó el concurso a las penas impuestas al amparo del Código Penal, *supra,* siguiendo el principio de favorabilidad de dicho estatuto, y resolvió que la pena de noventa y nueve (99) años por asesinato en primer grado absorbería las demás penas condenadas bajo ese estatuto. Íd. Por el otro, le sumó cada una de las penas impuestas por las convicciones al amparo de la Ley de Armas de 2000, *supra.* Íd.

Por último, cabe recordar que el Artículo 1 del Código Penal, *supra* sec. 5001, preceptúa que sus principios y normas generales aplicarán a la conducta regulada por otras leyes penales, <u>excepto</u>

cuando esas leyes dispongan lo contrario. Esto incluye lógicamente a la Ley de Armas de 2000, *supra,* en todo lo que no sea incompatible. Ese, precisamente, es el caso de la imposición de penas, puesto que ambos estatutos tienen disposiciones contrarias. Por un lado, el Código Penal, *supra,* ley de carácter general, requiere la aplicación del concurso de delitos. Por el otro, el Artículo 7.03 de la Ley de Armas de 2000, *supra,* ley de carácter especial, mandata *directamente* que las penas de reclusión impuestas a su amparo tendrán que ser cumplidas de manera consecutiva respecto a las penas establecidas en cualquier otro estatuto.

Así, el legislador excluyó la aplicación del concurso de delitos a convicciones bajo la Ley de Armas de 2000, *supra.*

**F.**

Tanto el Artículo II, Sección 12, de la Constitución del Estado Libre Asociado de Puerto Rico como la Octava Enmienda a la Constitución de los Estados Unidos consagran la prohibición a la imposición de castigos crueles e inusitados. Art. II, Sección 12, **Const. ELA**, LPRA, Tomo 1; Emda. VIII, **Const. EE. UU.**, LPRA, Tomo 1. Estas cláusulas exigen que se respete una proporción razonable entre la severidad de la pena y la gravedad de la conducta delictiva que condena la ley. ***Pueblo v. Echevarría Rodríguez I,*** supra, pág. 372; ***Pueblo v. Pérez Zayas,*** 116 DPR 197, 201 (1995); ***Solem v. Helm,*** 463 US 277, 286-287 (1983). Además, es requerido que se impongan penas que no sean arbitrarias y que sean las menos restrictivas de la libertad para lograr el fin por el cual se imponen. ***Pueblo v. Pérez Zayas,*** supra.

Al realizar este balance, los tribunales deben evaluar los siguientes factores: (1) el daño causado a la víctima y a la sociedad; (2) la culpabilidad o actitud mental de la persona convicta al perpetrar los hechos; y (3) si la persona convicta tendrá oportunidad de disfrutar del beneficio de libertad bajo palabra. ***Pueblo v.***

*Echevarría Rodríguez I,* supra; *Solem v. Helm,* supra, pág. 292. En la esfera federal también se han reconocido los siguientes factores adicionales: (1) la naturaleza de la ofensa; (2) la pena impuesta por la comisión del mismo delito en otras jurisdicciones; y (3) la pena impuesta a otras personas convictas en la misma jurisdicción. *Solem v. Helm,* supra; *Rummel v. Estelle,* 445 US 263, 295 (1980).

**G.**

Tanto el Art. II, Sección 11 de la Constitución del Estado Libre Asociado de Puerto Rico como la Sexta Enmienda de la Constitución de los Estados Unidos reconocen el derecho de las personas acusadas a un juicio público, justo e imparcial. Art. II, Sec. 11, **Const. ELA**, LPRA, Tomo I; Emda. VI, **Const. EE. UU.**, LPRA, Tomo I; *Pueblo v. Rivera Nazario,* 141 DPR 865, 874 (1996). Cuando un juicio es por derecho, la cláusula de debido proceso de ley del Art. II, Sección 7 de la Constitución del Estado Libre Asociado y de la Decimocuarta Enmienda de la Constitución de Estados Unidos garantizan la imparcialidad del juez o la jueza. Art. II, Sec. 7, **Const. ELA**, LPRA, Tomo I; Emda. XIV, **Const. EE. UU.**, LPRA, Tomo I; E. L. Chiesa Aponte, Procedimiento criminal y la Constitución: Etapa Adjudicativa, 1era ed., San Juan, Ediciones Situm, Inc., 2018, págs. 385. A esto además se añade que las personas acusadas tienen derecho a que se pruebe lo que se le imputa con prueba admisible y sin influencias ajenas. *Pueblo v. Rivera Nazario,* supra.

A la luz de esa promesa, la posibilidad de publicidad adversa y excesiva cobra importancia porque podría trastocar los derechos de la persona acusada. Íd. No obstante, ello no significa que la publicación que rodea un proceso penal violenta automáticamente el derecho a un juicio justo e imparcial. Íd. Al final del día, en una sociedad abierta con libertad de prensa y una ciudadanía informada se dará publicidad a asuntos de interés como lo son los casos

penales. Íd.; ***Pueblo v. Hernández Mercado,*** 126 DPR 427, 435 (1990). Lo contrario implicaría que no se podrían encausar personas acusadas en casos notorios y revestidos de interés público. Íd., pág. 876, citando a ***Pueblo v. Lebrón González,*** 113 DPR 81, 86 (1982).

En ese balance, nuestro Tribunal Supremo ha reiterado que la adjudicación hecha por un juzgador de hechos está permeada de una presunción de regularidad y corrección. ***Pueblo v. Rivera Nazario,*** supra, citando a ***Pueblo v. Echevarría Rodríguez I,*** supra, pág. 327. Debe notarse, además, que el mayor peligro de la publicidad adversa está en el juicio por jurado, toda vez que se presume que el juez juzgará únicamente a base de la prueba admitida. E. L. Chiesa Aponte, <u>Procedimiento criminal y la Constitución: Etapa Adjudicativa</u>, *supra*, pág. 387. Por la referida presunción, se coloca en la persona acusada el peso de la prueba de demostrar afirmativamente que la publicación de noticias fue de tal naturaleza, impacto y exposición que se le privó de un juicio justo y un jurado imparcial. ***Pueblo v. Rivera Nazario,*** supra, págs. 874-875, citando a ***Pueblo v. Lebrón González,*** supra. Al promovente que pretende rebatir la presunción, le corresponde probar "la existencia de publicidad parcializada, inflamatoria o tan intensa que de la misma pueda, a su vez, inferirse con razonable certeza una atmósfera de pasión contra el acusado". ***Pueblo v. Echevarría Rodríguez I,*** supra, pág. 329.

Al momento de examinar planteamientos de publicidad adversa, nuestro más alto foro ha pautado que se deberá evaluar el *perjuicio real* que pudo causar la información publicada a la luz de un análisis caso a caso según sus hechos particulares y la totalidad de sus circunstancias. ***Pueblo v. Rivera Nazario,*** supra, pág. 877. Entre los principales factores a considerar en esa tarea enumeró:

(1) la naturaleza cuantitativa y cualitativa de la publicidad;
(2) las medidas tomadas por el tribunal para contrarrestar el potencial del perjuicio;

(3) los reclamos del acusado;

(4) la determinación de si el Jurado tuvo en efecto conocimiento de información del caso a través de los medios objeto de prueba en el juicio y si se trata de materia admisible como prueba;

(5) la disposición de los jurados para emitir su veredicto sólo con base en la prueba, descartando la información extrínseca originada por la publicidad del caso; y

(6) la conducta del Ministerio Fiscal. Íd., págs. 877-878.

**IV.**

En el caso de marras tenemos la oportunidad de revisar los fallos condenatorios dictados por el TPI en contra de dos apelantes que, a la misma vez, señalan que el foro primario no debió declarar testigo no disponible al principal testigo de cargo y, por lo tanto, tampoco debió admitir el testimonio que este vertió en la Vista Preliminar del mismo procedimiento. Igualmente, ambos plantean que no se les probó su culpabilidad más allá de duda razonable y cuestionan las penas que le fueron impuestas tras la convicción, en especial por no aplicarse la figura del concurso de delitos. Por su cuenta, uno de ellos levanta una serie de argumentos adicionales, aplicables a su caso en particular, los cuales atenderemos tras resolver las controversias que ambos arguyeron en común. Estos argumentos aluden a la admisión errónea de evidencia en contra del acusado, el error en la apreciación de cierta prueba de ADN, la suficiencia de la prueba para probar la portación de un arma, la violación de la prohibición en contra de castigos crueles e inusitados, la inconstitucionalidad de la duplicación de penas dispuesta en la Ley de Armas de 2000, *supra*, el efecto de la publicidad adversa que recibió el acusado y el perjuicio causado por el enjuiciamiento conjunto de los apelantes.

El TPI declaró culpable a la señora Pérez Bigio por asesinato en primer grado y por disparar o apuntar armas. También halló culpable al señor Avilés González por asesinato en primer grado, por disparar o apuntar un arma y por dos (2) delitos de portación y uso de armas de fuego sin licencia. A causa de ello, condenó a la señora

Pérez Bigio a un total de ciento nueve (109) años de cárcel, al imponerle una pena duplicada por el delito de disparar o apuntar un arma y ordenar que esta se cumpla consecutivamente frente a la pena por asesinato. Asimismo, sentenció al señor Avilés González a un total de ciento cuarenta y nueve (149) años de cárcel, al imponerle penas duplicadas tanto por disparar o apuntar un arma como por cada uno de los delitos de portación y uso de armas sin licencia, todas las cuales ordenó cumplir consecutivamente a la pena por asesinato. A la luz del expediente, de la prueba testifical y de la evidencia documental, resolvió que se probó la conducta imputada. Esto es, que, en el asesinato de la señora Padilla Romero, la señora Pérez Bigio fue la autora intelectual del delito, mientras que el señor Avilés González fue quien condujo el vehículo desde el que el señor González Martínez, autor material del delito, disparó y ultimó a la víctima. En el juicio en su fondo, el señor González Martínez se negó a testificar y, por ello, el foro primario lo declaró testigo no disponible y admitió el testimonio que este vertió en la Vista Preliminar del mismo caso, donde estuvo sujeto a un amplio contrainterrogatorio.

En desacuerdo con los fallos condenatorios en su contra, los apelantes aducen que no se probó su culpabilidad más allá de duda razonable y, con ello, cuestionan la suficiencia y la apreciación de la prueba presentada en su contra. Sin embargo, la señora Pérez Bigio, más allá de reseñar la TPO, dirige su argumentación de los errores a la admisión del testimonio del señor González Martínez en la Vista Preliminar y deja al descubierto la discusión específica sobre la suficiencia de la evidencia para probar los delitos y la apreciación de esta por el foro primario.

Mientras tanto, para el señor Avilés González, el TPI no debió otorgarle credibilidad al testimonio del señor González Martínez. También, según su criterio, no fue vinculado a los hechos mediante

la declaración de otro testigo presencial o la presentación de prueba independiente al testimonio del principal testigo de cargo. Incluso, señala que fue condenado erróneamente por la portación de un arma que no fue utilizada, no fue ocupada, no fue corroborada su presencia o su uso y que solamente fue vista por el señor González Martínez, a quien no se le imputó la posesión del arma. De la misma manera, agrega que no se probó la existencia de una conspiración o un acuerdo entre el señor Avilés González y la señora Pérez Bigio para llevar a cabo el asesinato. También, a su juicio, los videos admitidos no corroboraron su presencia en el vehículo.

Todavía más, plantea tres (3) asuntos de prueba que lo excluyeron de responsabilidad o relación con los hechos. Primero, expone que el testimonio de la joven Morales Padilla descartó su presencia en la escena porque el único vehículo que esta relacionó con los hechos fue una motora en la que iba una sola persona. Segundo, subraya que el Agte. Rodríguez Martínez admitió que, en una querella, se mencionó que el asesinato fue cometido por un solo hombre, alto de tez negra, que iba conduciendo un vehículo cuya descripción coincidía con el que fue ocupado. Tercero, apunta al Exhibit 3 de la defensa, un *Certificado de análisis forense DNA* preparado por el Negociado de Ciencias Forenses de Puerto Rico, como prueba científica de ADN que lo excluyó de responsabilidad penal al establecer con certeza matemática que no fue el proveedor del material genético levantado del vehículo utilizado para el asesinato.

También en común inconformidad, la señora Pérez Bigio y el señor Avilés González arguyen que el TPI erró al admitir el testimonio vertido en Vista Preliminar por el señor González Martínez, principal testigo de cargo. Para la señora Pérez Bigio, el foro primario no debió declararlo testigo no disponible sin antes realizar una vista evidenciaria para auscultar las razones de este

para no declarar y sin que este se acogiera expresamente a su derecho a no incriminarse mediante su propio testimonio. A esto, añade que la admisión del referido testimonio le causó un grave perjuicio, pues no pudo llevar a cabo un contrainterrogatorio efectivo, ni cuestionar la obtención de evidencia, ni preguntar qué interacción tuvo el testigo con los agentes de la Policía. De igual forma, señala que, mediante la admisión del referido testimonio, se violentó su derecho a la confrontación porque, a diferencia del juicio en su fondo, en la Vista Preliminar la defensa no tenía toda la prueba que fue descubierta posteriormente y no se enfrentaba a la misma exigencia de causa. Por eso, nos solicita que resolvamos que el contrainterrogatorio realizado al señor González Martínez en aquella ocasión no le cobijó adecuadamente su derecho a carearse con la prueba.

Para el señor Avilés González, el principal testigo de cargo no podía considerarse testigo no disponible según la Regla 806(A) de Evidencia, *supra*, porque no ejerció expresamente su derecho a no incriminarse por su propio testimonio y no fue apercibido por el foro primario sobre desacato ante su negativa a declarar. Incluso, hace hincapié en que el señor González Martínez rechazó en reiteradas ocasiones que su razón para no declarar fuera que no quería afectar su caso. Y es que, según su criterio, interpretar los repetidos "yo no voy a declarar" y sus variantes expresados por el testigo de cargo como un reclamo del privilegio a no incriminarse es una exégesis jurídica nueva y errónea que no fue contemplada por el legislador. De igual manera, aduce que se violentó su derecho a la confrontación porque no pudo contrainterrogar a dicho testigo sobre sus dos presuntas versiones después que repudiara su testimonio previo.

Conjuntamente también, los apelantes cuestionan la imposición de las penas bajo la figura del concurso de delitos. Para

la señora Pérez Bigio, la acción de apuntar, disparar y asesinar quedó comprendida en una sola unidad de hechos con el mismo designio de causarle la muerte a la señora Padilla Romero. Por ello, argumenta que existió un concurso ideal de delitos y que, en consecuencia, procedía hallarla culpable por asesinato en primer grado y disparar o apuntar armas, pero únicamente imponerle la condena más grave. Para el señor Avilés González, el delito de disparar o apuntar armas está subsumido en el cargo de asesinato y, por ello, no existía facultad para imponer la pena dispuesta por su comisión.

Por su propia cuenta, además, el señor Avilés González presenta algunos señalamientos que le favorecerían únicamente a él. En primer lugar, cuestiona la admisión en su contra de grabaciones de voz enviadas por la señora Pérez Bigio al señor González Martínez bajo el fundamento de que este último no los identificó, no declaró en juicio sobre su contenido y no se expresó sobre el consentimiento al registro del celular del que se extrajeron las grabaciones. Además, según arguye respecto a dicho celular, no se cumplió el requisito de cadena de custodia y no se autenticó con el testimonio de su dueño.

En segundo lugar, argumenta que la imposición de penas consecutivas y duplicadas constituyó castigo cruel e inusitado. A su vez, propone que la duplicación de penas contenida en la Ley de Armas de 2000, *supra*, es inconstitucional. A favor de esa apreciación, hace referencia a **Pueblo v. Colón González,** supra, **Pueblo v. Nieves Cabán,** 201 DPR 853 (2019) y **Cunningham v. California,** 549 US 270 (2007).

En tercer lugar, reclama que fue perjudicado por la publicidad excesiva que tuvo el caso y porque se celebró el juicio en su contra en compañía de la señora Pérez Bigio. A su entender, el procedimiento estuvo viciado desde el comienzo por el ánimo de

vengar la muerte de la víctima. Por ello, acusa que el fallo de culpabilidad se basó en la publicidad excesiva y no en la prueba.

En contraposición a los apelantes, el Pueblo de Puerto Rico argumenta, en primer lugar, que el TPI no incidió al declarar testigo no disponible al señor González Martínez y admitir el testimonio vertido por él en Vista Preliminar. Es su posición que el foro primario tomó los pasos correctos ante la negativa del testigo a declarar, pues autorizó al Ministerio Público a cuestionarlo como testigo hostil, no le ordenó al testigo contestar preguntas que pudieran incriminarlo e investigó exhaustivamente con sus propias preguntas las motivaciones del testigo para no declarar. Por ello, además, plantea que no era necesario que el foro primario celebrara una vista evidenciaria. Sobre todo, aduce que el TPI atinó al resolver que el señor González Martínez no declararía en virtud de un privilegio, su derecho a no incriminarse mediante su propio testimonio, especialmente después de que este manifestara que no tenía dudas sobre los derechos que le explicó el foro primario. De esa forma, justificó que se admitiera el testimonio previo del testigo en Vista Preliminar, momento en el que estuvo sujeto al contrainterrogatorio de los apelantes.

En segundo lugar, el Ministerio Público arguye que la prueba desfilada y debidamente admitida en el juicio en su fondo probó que la señora Pérez Bigio y el señor Avilés González cometieron los delitos imputados. Su posición es que tanto el referido testimonio como la demás evidencia demostraron que el señor González Martínez le disparó a la señora Padilla Romero de forma intencional hasta asesinarla como parte del encargo pagado y de un plan establecido por la señora Pérez Bigio, motivada por los problemas que tenía con la occisa, junto al señor Avilés González como conductor del vehículo desde el que se disparó.

Respecto a la señora Pérez Bigio, enfatiza que el testimonio de la joven Morales Padilla y las propias expresiones grabadas de la acusada demostraron la mala relación que tenía con la señora Padilla Romero. Asimismo, destaca que las grabaciones probaron el motivo de la acusada para asesinar a la víctima, su interés en deshacerse de ella, su solicitud de ayuda al señor González Martínez para "salir" de la víctima, su ofrecimiento de una recompensa por perpetrar el delito y su mención específica de localizaciones para ubicarla el día en que se cometiera el delito. A su vez, señala que el testimonio del señor González Martínez evidenció que la señora Pérez Bigio lo dirigió hasta las oficinas de JAPC, mientras que los registros telefónicos corroboraron que ambos se comunicaron constantemente minutos antes y después de los hechos.

Respecto al señor Avilés González, particulariza que la prueba demostró que, el día de los hechos, este dejó sus labores sin justificación, se dirigió al área de los hechos pasando por la zona de Río Hondo, Bayamón cerca de las 3:00 p.m., estuvo en comunicación con el señor González Martínez, condujo el vehículo mientras se cometía el asesinato y portó un arma por su cuenta sin licencia para ello. Además, aduce que las llamadas al sistema 9-1-1 coincidieron en que dos (2) hombres encapuchados perpetraron el crimen desde un Hyundai.

En tercer lugar, plantea que las penas impuestas a los apelantes fueron correctas en derecho porque el concurso de delitos no debe ser aplicado a las convicciones de los apelantes bajo la Ley de Armas de 2000, *supra*, toda vez que exige que las penas impuestas a su amparo se cumplan de forma consecutiva frente a aquellas que correspondan por virtud de cualquier otra ley penal.

Tras un análisis objetivo, sereno y cuidadoso del voluminoso expediente del caso, de la prueba documental desfilada debidamente admitida y de la extensa TPO estipulada por las partes, en correcta

práctica adjudicativa apelativa, resolvemos sin ambages que no se cometieron los errores señalados por los apelantes. Los fallos de culpabilidad en contra de los apelantes se sostienen en la totalidad de la prueba evaluada, vista y escuchada por el foro primario, la cual incluyó el testimonio vertido en Vista Preliminar del señor González Martínez, debidamente admitido tras una correcta declaración de testigo no disponible, y las grabaciones de la voz de la señora Pérez Bigio, admitidas correctamente luego de ser cabalmente autenticadas e identificadas. No existe razón o indicio alguno de pasión, perjuicio o parcialidad, craso abuso de discreción, error manifiesto o error de derecho que justifique nuestra intervención. Tampoco existe causa para resolver que se admitió erróneamente prueba alguna de forma perjudicial en contra de los apelantes. Por el contrario, la admisión de la prueba de cargo se sostiene ampliamente en la TPO estipulada por las partes. Además, las penas impuestas a los apelantes fueron correctas en derecho, no requieren modificación por razón del concurso de delitos y no constituyen castigos crueles e inusitados. Finalmente, tampoco procede revocar la convicción del señor Avilés González por la publicidad adversa que pudo recibir el caso, ni porque se le haya juzgado junto a la señora Pérez Bigio.

En primer orden, los fallos de culpabilidad se sostienen ampliamente en la totalidad de la prueba desfilada. Le debemos gran deferencia a la apreciación de dicha prueba por el foro primario, así como a su adjudicación de credibilidad y sus determinaciones de hechos, especialmente las que se basan en prueba oral. *Pueblo v. Negrón Ramírez,* supra, pág. 910; *Pueblo v. Rivera Montalvo,* supra, pág. 373. No existe razón para intervenir con esa tarea y su resultado en este caso. Los apelantes tampoco aducen en qué o cuándo el TPI actuó con pasión, perjuicio o parcialidad o cómo se cometió un craso abuso de discreción, un error manifiesto o un error

de derecho en la apreciación de la prueba. Así, no se cumple con lo requerido para invalidar un fallo basado en que el juzgador de los hechos ha errado en la apreciación de la prueba testifical. Por el contrario, un minucioso análisis de la abundante TPO nos lleva a concluir que se establecieron todos los elementos de los delitos imputados, así como su conexión a los apelantes.

De igual manera, un examen profundo de la prueba desfilada no arroja dudas serias, ni razonables, ni fundadas sobre la culpabilidad de los apelantes. Al contrario, reafirma la gran deferencia que otorgamos al foro primario en su apreciación y la corrección y regularidad que presumimos de su fallo condenatorio.

Determinado lo anterior, cabe recalcar que el testimonio de un único testigo era suficiente para probar el delito de portación y uso de un arma de fuego sin licencia que se le imputó en particular al señor Avilés González. Así lo estimó evidenciado el foro primario y no intervendremos con esa apreciación ante la ausencia de fundamentos para hacerlo.

También, cabe precisar específicamente que, contrario al planteamiento del señor Avilés González, el Exhibit 3 de la defensa no le excluyó de responsabilidad o vínculo con este caso. Si bien no existe causa para intervenir con la apreciación que el foro primario le dio al *Certificado de análisis forense DNA*, un estudio de este arroja con claridad que los resultados no descartan definitivamente la presencia del señor Avilés González en el vehículo utilizado en el asesinato. Por el contrario, únicamente implican que no se levantó evidencia genética suya en el vehículo ocupado cuatro (4) días después del día de los hechos.

En segundo orden, del análisis de la voluminosa TPO y del expediente también se desprende que el foro primario actuó correctamente al declarar testigo no disponible al señor González Martínez y al admitir su testimonio ofrecido en la Vista Preliminar

cuando estuvo sujeto al amplio y exhaustivo contrainterrogatorio de la defensa. Ello no implicó una violación al derecho a la confrontación de los apelantes y respondió cabalmente a las exigencias de nuestras Reglas de Evidencia, *supra*.

Si bien el testimonio que el señor González Martínez ofreció en la Vista Preliminar tiene carácter testimonial, satisface los requisitos constitucionales del derecho a la confrontación porque el testigo no estaba disponible y <u>los apelantes tuvieron abundante oportunidad de contrainterrogar al declarante en el momento en que se hizo la declaración</u>. Como ilustra la extensa transcripción de dicho testimonio, reseñada pormenorizadamente en la Parte II de esta *Sentencia*, tanto la señora Pérez Bigio como el señor Avilés González tuvieron oportunidad en demasía para contrainterrogar al señor González Martínez y así lo hicieron.[692] En esa ocasión, obtuvieron respuestas del testigo sobre:

(1) su estado físico y mental el día de los hechos;
(2) su pasado médico y su historial de consumo de sustancias controladas;
(3) su pasado delictivo y su posible vínculo a otros delitos;
(4) la multiplicidad de advertencias de ley que le realizaron agentes y fiscales;
(5) su interacción con los agentes de la Policía;
(6) si conocía a los apelantes, en especial el nombre de la señora Pérez Bigio;
(7) <u>su declaración jurada</u> y su contenido;
(8) qué detalles no ofreció para identificar al señor Avilés González, así como la posible inconsistencia entre la realidad y la altura que indicó que tenía;
(9) si vio a las menores que iban en el vehículo al que disparó;
(10) la identificación que hizo de la señora Pérez Bigio;
(11) las veces que vio los vídeos presentados por el Ministerio Público;
(12) sus interacciones con el señor Avilés González antes y durante el delito;
(13) su participación principal y activa en el asesinato;
(14) la obtención ilegal por él del vehículo y la pistola utilizados en el asesinato y la posterior ocupación por la Policía de ambas piezas de evidencia;
(15) el <u>acuerdo de cooperación</u> que suscribió con el Ministerio Público, así como <u>sus motivaciones para cooperar</u>;

---

[692] Véase TPO de Vista Preliminar, 9 y 10 de marzo de 2020.

(16) los detalles sobre el uso de máscara por el señor Avilés González;

(17) la posesión por el señor Avilés González de una pistola.

Ello constata que los apelantes desplegaron un extenso y habilidoso contrainterrogatorio al testigo en el que exploraron, además, la obtención de evidencia por la Policía y lo que el testigo habló con los agentes del Estado.

Pese a lo anterior, el señor Avilés González plantea que como en el juicio el señor González Martínez repudió su testimonio anterior y al negarse a declarar no se le pudo cuestionar su nueva versión. Hemos examinado exhaustivamente la totalidad de la TPO y no se ha encontrado en qué momento el señor González Martínez repudió o contradijo el testimonio que vertió en la Vista Preliminar. Por el contrario, el testigo se limitó a negarse reiteradamente a contestar preguntas.

Por todo ello, no procede interpretar que la admisión del testimonio en cuestión violentó el derecho a la confrontación de los apelantes. Así resuelto, la admisión únicamente dependería de que se superen los requisitos de las Reglas de Evidencia, *supra*, en cuanto a la prueba de referencia. Así mismo ocurre en este caso.

Ante la reiterada negativa del señor González Martínez a contestar las preguntas del Ministerio Público, de la defensa e incluso de la jueza, el TPI lo declaró testigo no disponible en virtud de la Regla 806(A) de Evidencia, *supra*. Esto, luego de que, en reiteradas ocasiones, se le explicara su derecho a no incriminarse y que este ratificara que lo entendía.[693] Además, este es un derecho al que se acogió durante la Vista Preliminar y que le fue reiterado en multiplicidad de ocasiones al leérsele las advertencias de ley, las cuales firmó. También, el testigo respondió que no podía contestar

---

[693] Véase, también, TPO, 17 de abril de 2023, pág. 17, línea 12, a la pág. 18, línea 21; pág. 25, líneas 1-12.

a preguntas cuyas respuestas serían incriminatorias.[694] Incluso, el TPI auscultó repetidamente las razones que el señor González Martínez tenía para no contestar y, así, fue más allá de lo que requiere la referida regla para declarar a un testigo no disponible.[695] Por ello, analizada la TPO y en consideración del proceder del foro primario, la determinación de testigo no disponible fue correcta en derecho, toda vez que se sostiene una conclusión de que el señor González Martínez estaba cobijado por un privilegio reconocido en las Reglas sobre lo que declararía, especialmente a la luz del procedimiento que pesaba en su contra por los mismos hechos.

Nada más que eso exigen las Reglas. En virtud de lo que prescribe la Regla 806(A)(1) de Evidencia, *supra*, estamos ante un testigo no disponible cuando la persona declarante "está exenta de testificar por una determinación del Tribunal por razón de un privilegio reconocido en estas Reglas en relación con el asunto u objeto de su declaración". De lo anterior, no se desprende un requisito de que el privilegio haya sido expresamente invocado, solo se requiere una determinación por el Tribunal de que la persona está exenta de testificar por razón de un privilegio. En este caso sobra la justificación para determinar que el señor González Martínez estaba exento de testificar bajo el privilegio que le garantiza el derecho a no incriminarse mediante su propio testimonio.

Más allá, en todo caso, también podría aplicarse la Regla 806(A)(3) de Evidencia, *supra*, en vista de las múltiples declaraciones del señor González Martínez respecto a que no recordaba los asuntos sobre los que se le preguntaba.[696] Esta disposición codifica como situación en la que un declarante no está disponible como testigo cuando "testifica que no puede recordar

---

[694] Íd., pág. 21, línea 11, a la pág. 22, línea 17; pág. 23, líneas 14-20.
[695] Íd., pág. 47, líneas 19-25, a la pág. 49, línea 3; pág. 66, línea 17, a la pág. 67, línea 7.
[696] Íd., pág. 25, línea 20, a la pág. 27, línea 25; pág. 38, línea 21, a la pág. 39, línea 24.

sobre el asunto u objeto de su declaración". Íd. Y es que, como mismo acentúan los apelantes en sus alegatos, en el juicio el testigo reiteró en exceso que no recordaba a las preguntas del Ministerio Público y de los apelantes.

Ante la acertada declaración de testigo no disponible, procedía la admisión de todo testimonio anterior del señor González Martínez que satisficiera lo requerido por la Regla 806(B)(1) de Evidencia, *supra.* El testimonio que ofreció el testigo en Vista Preliminar cumplió cabalmente con ello. Se trata de un testimonio dado como testigo en otra vista del mismo procedimiento y la parte contra la que se ofrece tuvo oportunidad y motivo similar para desarrollar el testimonio mediante contrainterrogatorio. Por todo ello, resolvemos que el testimonio ofrecido en Vista Preliminar por el señor González Martínez fue admitido conforme a derecho, dada la indisponibilidad de este como testigo y la amplia oportunidad que los apelantes tuvieron para contrainterrogarlo en aquella ocasión.

En tercer orden, no se cometió un error en la admisión de la demás prueba en la que se sustentan los fallos condenatorios. No surge razón para dictar que alguna pieza de prueba fue erróneamente admitida de forma que perjudicara a los apelantes. Por el contrario, de la totalidad de la prueba documental y testifical, se desprende que la prueba fue admitida conforme a derecho.

Todavía más, ante esta Curia, ni la señora Pérez Bigio, ni el señor Avilés González detallan qué evidencia fue erróneamente admitida con excepción del alegato de este último en cuanto a las grabaciones contenidas en el Exhibit 75 del Ministerio Público. Sin embargo, según surge de la TPO, el Ministerio Público demostró fehacientemente la admisibilidad de esa evidencia. Justificó la pertinencia de las grabaciones mediante el testimonio del señor González Martínez. Estableció la cadena de custodia sobre el celular del que se extrajo con el testimonio de los Agtes. Martínez Natal,

Lamberty Aldea, Acevedo Jiménez, Negrón Rivera y del Tnte. Alvarado Reyes. Probó la confiabilidad del proceso de extracción a través del testimonio de la Agte. Negrón Rivera. Autenticó la voz contenida en las grabaciones por medio del testimonio de la joven Morales Padilla. Validó la extracción con los consentimientos a registro de la persona a quien se le ocupó el celular. Visto así, el Exhibit 75 del Ministerio Público – las grabaciones enviadas por la señora Pérez Bigio al señor González Martínez – fue admitido conforme a derecho, al igual que la restante prueba de cargo.

Sobre este Exhibit del Ministerio Público, el señor Avilés González también propone que las grabaciones no debían ser admitidas en su contra y que su admisión le causó perjuicio. Resulta preciso recordar que no es requisito que se impute conspiración para presentar, en contra de una parte, una *admisión* realizada por una persona que actuó como conspiradora en el transcurso de una conspiración con ella para lograr su objetivo. R. 803 de Evidencia, *supra*; E. L. Chiesa Aponte, <u>Reglas de Evidencia de Puerto Rico 2009: Análisis por el Prof. Ernesto L. Chiesa</u>, *supra*. En este caso, las expresiones en cuestión fueron hechas por la señora Pérez Bigio y enviadas al señor González Martínez durante la vigencia de la conspiración en la que participó el señor Avilés González y, además, comunicaban instrucciones, ofrecimientos y localizaciones para lograr el objetivo de la conspiración. Tampoco encontramos indicio de perjuicio indebido, según los factores delineados en la Regla 403 de Evidencia, *supra*, y, aún menos, divisamos justificación para concluir que se supera el valor probatorio de esta prueba. Por último, en todo caso, de haber sido admitida erróneamente, no se trata de evidencia que sin su admisión se hubiese producido un resultado distinto y, por tal razón, resolvemos que su admisión no vicia el fallo condenatorio en contra del señor Avilés González.

En cuarto orden, la imposición de las penas estatuidas por la convicción de cada uno de los delitos fue correcta en derecho. Las penas impuestas por el foro primario son las codificadas en el Código Penal, *supra*, y en la Ley de Armas, *supra*. Igualmente, no procede la aplicación del concurso de delitos a las convicciones por delitos dispuestos en la Ley de Armas de 2000, *supra*, frente al asesinato en primer grado, toda vez que dicho estatuto exige que las penas impuestas a su amparo sean cumplidas consecutivamente respecto a aquellas dispuestas en cualquier otra ley penal. De esta forma, la Ley de Armas de 2000, *supra*, quedó excluida de la aplicación del concurso de delitos que dispone el Código Penal, *supra*.

Por otro lado, tampoco estamos ante una pena total que constituya un castigo cruel e inusitado. El daño causado por el delito a la víctima y a la sociedad – la muerte violenta de una mujer – y la culpabilidad del acto – dar muerte a alguien disparando desde un vehículo en un lugar abierto a cambio de dinero o por riñas personales – justifican la imposición de las penas según las estatuye el Código Penal, *supra* y la Ley de Armas de 2000, *supra*. No existe óbice en la jurisprudencia que impida la imposición de las penas condenadas en este caso. Por el contrario, son ratificadas por la validación otorgada por nuestro más alto foro a penas aún más graves. Véase *Pueblo v. Torres Pérez*, 209 DPR 367 (2022) (Resolución); *Pueblo v. Álvarez Chevalier,* 199 DPR 735 (2018) (Resolución). No estamos ante una desproporcionalidad entre la severidad de las penas impuestas y la gravedad de la conducta delictiva.

Mucho menos se nos presenta razón alguna para declarar inconstitucional la duplicación de las penas que ordena la Ley de Armas de 2000, *supra*. Contrario a lo señalado, pero no discutido por el señor Avilés González, los resultados de *Pueblo v. Colón*

*González,* supra, *Pueblo v. Nieves Cabán,* supra y *Cunningham v. California,* supra, no justifican tal proceder.

En quinto orden, no se configuran – ni el señor Avilés González los discute efectivamente – los factores necesarios para la revocación de una convicción a causa de la publicidad adversa que pudo recibir el caso. De la voluminosa TPO estipulada por las partes no se desprende indicio alguno de que influencias ajenas o publicidad excesiva y adversa hayan afectado la tarea de la juzgadora de los hechos. Además, el señor Avilés González estaba llamado a demostrar afirmativamente que se le privó de un juicio justo y un juzgador imparcial ante la publicación de noticias parcializadas e inflamatorias, pero no lo hizo. Varias alegaciones generalizadas de publicidad adversa no son suficientes para revocar su convicción. En este caso, procede sostener la presunción de regularidad y corrección del fallo condenatorio emitido.

Por último, la misma suerte corre el planteamiento del señor Avilés González respecto al perjuicio que le pudo causar que haya sido enjuiciado junto a la señora Pérez Bigio. Nuevamente, huelga reiterar que no existe en el expediente del caso razón alguna para resolver que el TPI actuó con pasión, perjuicio o parcialidad, ni para concluir que la presencia de la señora Pérez Bigio impidió la apreciación de la prueba por la juzgadora de los hechos y su adjudicación basada únicamente en la prueba admitida.

Por todo lo anterior, corresponde confirmar los dictámenes apelados en su totalidad. No se cometieron los errores señalados por los apelantes. Al contrario, las sentencias apeladas fueron emitidas conforme a derecho. No hallamos causa ni asomo que motive resolver que se cometieron errores patentes que los apelantes no señalaron o que señalados no fueron sustentados y discutidos de forma fundamentada. El fallo condenatorio se sostiene ampliamente en la prueba desfilada ante el TPI.

## V.

Por los fundamentos antes expuestos, *confirmamos* las sentencias apeladas.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones
